**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| DERICK ORTIZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SIG SAUER, INC.,<br><br>Defendant. | CASE NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Derek Ortiz, individually and on behalf of all others similarly situated as set forth herein, alleges as follows:

## NATURE OF THE ACTION

1.      This is a class action brought by gun owners against Defendant SIG SAUER, Inc. ("SIG" or "SIG SAUER") for manufacturing, distributing, and selling SIG P320-brand semi-automatic pistols that, due to a design defect, can inadvertently discharge a round of ammunition if dropped on the ground (a "drop fire").  SIG repeatedly misrepresented and warranted that the P320 pistols were "drop safe" and "won't fire unless you want [them] to."  SIG's original design of the P320 pistol rendered the weapon unreasonably dangerous for its intended uses.

2.      The P320 is the first pistol manufactured by SIG to deploy a striker firing mechanism versus a hammer firing mechanism, which SIG had experience manufacturing for at least 72 years.

3.      The P320 is a popular and commercially successful pistol.  It is used by law enforcement agencies all over the country, and is owned by hundreds of thousands of civilians.

In 2016, the U.S. Army selected the SIG P320 to replace the M9 service pistol as the standard-issue sidearm of U.S. military servicemembers.

4.      SIG has known about the drop fire design defect since at least 2014 when it started manufacturing the SIG P320 and conducted its own internal testing.  Then, in April 20, 2016, the U.S. Army discovered the defect during its field testing.  In the Army's assessment, the issue was due to a design defect, specifically a heavy and defective trigger and sear.[1]  The Army insisted that SIG fix the deficiency by installing a lighter trigger and modified sear.  SIG promptly implemented this fix for the military versions of the P320.  However, SIG continued to manufacture defective P320 pistols for the civilian market until late 2017.  Currently, there are believed to be approximately 500,000 defective P320 pistols in circulation in the civilian market.

5.      Pistols should not discharge upon mere impact with the ground.  Drop fires are extremely rare and are abnormal in the firearms industry.  A 2015 study from the U.S. Center for Disease Control and Prevention analyzed data from 27 states and found that in 193 cases where people were killed "due to unintentional firearm-related injuries," a "dropped gun" was to blame in only 12 of those deaths.[2]

6.      By filing this action, Plaintiff does not intend to infringe upon any rights conferred by the Second Amendment.  Plaintiff is a responsible and law-abiding citizen who believes that firearms should function properly and safely.  Among other things, Plaintiff wants

---

[1] The sear is the part of the trigger mechanism that holds the hammer, striker, or bolt back until the correct amount of pressure has been applied to the trigger; at which point the hammer, striker, or bolt is released to discharge the weapon.  In other words, the sear constitutes the system of levers that connects the trigger to the firing mechanism (*i.e.*, the "striker" in a SIG P320, which is similar to a firing pin in a rifle).
[2] Drop fires are often depicted in media and popular culture, such as Hollywood movies.  However, these depictions are fictional.  Drop fires are not normal.

to ensure that gun owners like himself are not duped into paying hundreds of dollars for guns that are unsafe.

7.     For all the reasons set forth herein, including but not limited to SIG's failure to disclose a material design defect with its P320, Plaintiff seeks relief in this action individually, and as a class action on behalf of similarly situated purchasers of SIG P320 pistols, for:  (i) violation of the Magnuson-Moss Warranty Act; (ii) breach of express warranty; (iii) breach of the implied warranty of merchantability; (iv) unjust enrichment; (v) fraudulent concealment; (vi) fraud; and (vii) violation of the New Hampshire Consumer Protection Act ("NHCPA"), NH ST § 358-A:1, *et seq*.

## THE PARTIES

8.     Plaintiff Derek Ortiz is a citizen of Arizona, residing in Snowflake, Arizona.  He purchased a civilian version of the SIG P320 pistol for approximately $500 from a ProForce Law Enforcement store in Prescott, Arizona on or about September 30, 2016.  Plaintiff Ortiz's P320 pistol is defective in that it was manufactured pursuant to a defective design that causes the gun to fire unintentionally when dropped.  Prior to his purchase, Plaintiff Ortiz read on both the SIG SAUER website and in a SIG SAUER brochure that the P320 was "drop safe" and that it "won't fire unless you want it to."  Plaintiff Ortiz relied on these representations in that he would not have purchased his SIG P320, or would not have been willing to pay as much for it, had he known that the P320 was in fact not drop safe and that it can fire even when you do not want it to.  Plaintiff Ortiz also understood that in making the sale, the retailer was acting with the knowledge and approval of SIG and/or as the agent of SIG.  Plaintiff Ortiz also understood that each purchase involved a direct transaction between himself and SIG, because his P320 came with packaging and other materials prepared by SIG, including representations and warranties

that his P320 was "drop safe" and "won't fire unless you want it to."  Plaintiff Ortiz has been

deprived of the use and enjoyment of his SIG P320, which he has stopped using out of fear that it

is not safe.  Defendant's Voluntary Upgrade Program would not make Plaintiff Ortiz whole

because it would not compensate him for his lost use of the pistol during the upgrade period, and

it would not compensate him for the significantly diminished resale value of his SIG P320

resulting from the drop fire design defect.

9.      Defendant SIG SAUER, Inc. is a Delaware corporation with its principal place of

business at 72 Pease Boulevard, Newington, New Hampshire 03801.  SIG a leading global

designer and manufacturer of firearms for military, law enforcement, and commercial markets.

SIG offers pistols, rifles, short barrel rifles, firearms accessories, apparel, CD/DVD training, and

knives.  The company also provides customized training in security subjects for corporate

customers and law enforcement agencies on a contract basis.  SIG markets and sells its products

through dealers.  SIG SAUER, Inc. was formerly known as SIGARMS, Inc. and changed its

name to SIG SAUER, Inc. in October 2007.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)

because there are more than 100 class members and the aggregate amount in controversy exceeds

$5,000,000.00, exclusive of interest, fees, and costs, and at least one class member is a citizen of

a state different from Defendant.

11.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because

Defendant resides in this District, and a substantial part of the events or omissions giving rise to

Plaintiff's claims occurred within this District.

## FACTS COMMON TO ALL CLAIMS

**A.** **SIG Repeatedly Represents That The P320 Is "Drop Safe" And "Won't Fire Unless You Want It To"**

12.     In its "Safety Without Compromise" marketing campaign for the P320, which appears on its website among other places, SIG represents:  "We've designed safety elements into every necessary feature on this pistol.  From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to:"

## SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

13.     Under the heading "Striker Safety," SIG further states that the design of the P320 "[p]revents the striker from releasing unless the trigger is pulled:"

**Striker Safety:** Prevents the striker from re-leasing unless the trigger is pulled.

14.     SIG also represents in the same marketing materials that the P320 is "drop safe:"



15.     However, the SIG P320 is not "drop safe" because it has a defective design that causes the gun to fire unintentionally when dropped.

**B.      On April 20, 2016, The U.S. Department Of Defense Discovered The Drop Fire Design Defect, Which SIG Promptly Fixed For Military Versions Of The Pistol**

16.     In 2015, the U.S. Army sought to replace the standard-issue M9 service pistol that had been in use since 1980.  The M9, which is a Beretta 92FS chambered in 9 mm, is an older design with a steel frame and hammer-style firing mechanism.  Among other changes, the U.S. Army desired a more modern pistol with a polymer frame and a striker-style firing mechanism.

17.     As part of this effort, the U.S. Army researched several prominent brands of pistols, including the SIG P320 and the Glock 19.  The SIG P320 ultimately won the contract, worth roughly $500 million.  The full-size SIG P320 is now designated the M17 service pistol for military use, and the compact P320 is designated the M18 service pistol.

18.     During its internal testing on April 20, 2016, the U.S. Army discovered that the SIG P320 pistol would fire unintentionally on its own when dropped, which the Army deemed to be a "deficiency."  The examination used a test version of ammunition, similar to a blank.  A report from the U.S. Department of Defense explains:

> During drop testing in which an empty primed cartridge was
> inserted, the striker struck the primer causing a discharge.  The
> Army directed SIG SAUER to develop ECP [an Engineering
> Change Proposal] to correct this deficiency.

19.     The U.S. Department of Defense traced this "deficiency" to an issue with the

trigger and sear.  Recognizing the dangerous nature of the design defect, the Department of

Defense required SIG to correct the issue before continuing with the M17 / M18 contract (which

it did successfully):

> SIG SAUER modified the trigger mechanism to eliminate this
> deficiency.  Subsequent testing validated that this ECP corrected
> the deficiency and the pistol no longer fired when dropped.  The
> MHS [Modular Handgun System, code for the M17 / M18 project]
> with this ECP was submitted as the production-representative
> pistol ….

20.     In a statement to CNN as part of an investigative report, the U.S. Army stated that

since the fix, "there is no drop test deficiency" with the SIG P320.  This fix, however, only

applied to the military versions of the SIG P320.

21.     Civilians and firearm dealers replicated the drop fire incidents in their own testing

of the SIG P320.  On August 7, 2017, Omaha Outdoors, an online gun store that publishes

popular product reviews, published a report on YouTube exploring the issue.  Andrew Tuohy, an

Iraq War veteran and firearms expert with Omaha Outdoors, tested four P320s on video for the

accidental "drop fire" problem.  Three of them, when dropped at a certain angle, discharged

more than half the time.[3]  The fourth P320 had a lighter, upgraded trigger and never discharged

when dropped.  Testers at Omaha Outdoors concluded the pistol's factory-installed trigger was

so heavy that when the pistol was dropped on its back with the barrel facing up, the inertia of the

fall caused the trigger to pull:

---

[3] But even when the pistols with the older, defective trigger did not accidentally fire, there was
still evidence they nearly did.  In every case, Tuohy said, he found marks on the back of the
ammunition that showed the gun had tapped the primer, which ignites the gunpowder.



22.     That video prompted the Houston Police Department to conduct testing of its

own.  Sgt. Robert Sandoval, the department's firearms instructor, told CNN he dropped a P320

pistol 30 times in three different ways.  It went off four times, he said.  The chief was alerted.

Officers were warned immediately.

23.     In other words, all units of the SIG P320 are defectively designed and are thus

unduly susceptible to drop firing.

**C.     SIG Continued To Manufacture Defective Pistols For The Civilian Market Until Late 2017, Of Which Roughly 500,000 Defective Pistols Are Still In Circulation**

24.     Despite being aware of the design defect since it first started to manufacture the

SIG P320 in 2014, and the complaints of the U.S. Department of Defense in 2016, SIG did not

implement the drop fire fix for its civilian pistols until late 2017, at which point it began

manufacturing the P320 with a lighter trigger and modified sear.  As a result, more than 500,000

SIG P320 pistols were sold to the public with the design defect.

25.     To date, SIG P320 pistols manufactured with the design defect are still in

widespread circulation.  In May 2018, CNN called 40 firearm dealers in 20 states as part of an

investigative report, and found that 11 of the 40 shops still sold the defective version of the SIG

P320 pistol.

26.     The same CNN investigative report found that 162 of the 400 SIG P320 pistols sold on Armslist.com, a leading online marketplace for guns, were of the older, defective version of the SIG P320 pistol.  CNN further found that only 4 of these sellers warned potential buyers about the problem.  Another 3 sellers displayed unrepaired guns, yet claimed they had been upgraded.

**D.      Numerous Individuals Have Been Injured By The SIG P320's Drop Fire Design Defect**

27.     There have been many prior reported incidents of unintended discharges involving the SIG P320 that were dropped and fired unintentionally without the trigger being pulled, or simply while being handled, or while being holstered.

28.     On January 5, 2017, Officer Vincent A. Sheperis, a member of the Stamford Police Department's Special Response Team ("SRT") in Connecticut, accidentally dropped his Department-issued P320 while loading SRT equipment into the rear of his vehicle.  Upon impact with the ground, the pistol discharged, without the trigger being pulled, shooting him in his left leg, causing substantial physical harm, emotional distress, sleeplessness, and mental trauma.  At the time of its descent to the ground and the discharge, Officer Sheperis's pistol was fully holstered.  The trigger was therefore incapable of being touched or of any manual movement by Officer Sheperis.  At no time before, during or after the incident did Officer Sheperis place his finger on the P320's trigger or touch the holstered firearm in any manner.  The P320 in question was delivered to SIG's headquarters for testing days after the January 5, 2017 shooting.  SIG therefore had knowledge of the accidental discharge mere days after the incident in January 2017.

29.     On October 1, 2017, Sgt. Derrick Broughton narrowly missed injuring himself in Riverdale, Georgia.  Specifically, Sgt. Broughton's SIG P320 accidentally discharged when he

slipped on a cement block and fell to the ground in pursuit of a suspect.  His weapon was holstered and fired when he struck the ground.

30.     On February 7, 2018, Officer Marcie D. Vadnais, a seven-year veteran of the Loudoun County, Virginia Sheriff's Department, was removing her fully-holstered P320 from her duty belt.  In the process of removing the holster, the gun fired one round into her thigh, shattering her femur in several places and causing massive blood loss and other internal injuries.  At no time during this incident did Officer Vadnais touch the trigger, which at all times was inside and covered by a SIG-manufactured holster.  On impact with her femur, the discharged round broke into many pieces, leaving numerous pieces of shrapnel and bone shards within her leg.  Emergency room surgeons inserted a steel rod to make it possible for Officer Vadnais to walk.  It is attached to her pelvis and knee with screws and will remain there the rest of her life.

31.     On March 29, 2018, a SWAT officer with the Orlando Police Department was injured by his personally-owned SIG P320.  The officer was at home when a call came in about a possible hostage situation.  He ran outside and accidentally dropped his holstered pistol onto his concrete driveway.  The gun went off on its own, sending a 9 mm bullet into the officer's left leg and shattering his tibia bone near the knee.

32.     Upon information and belief, it is standard operating procedure for all U.S. law enforcement agencies, including the United States Secret Service, the Federal Bureau of Investigation, the Bureau of Alcohol, Tobacco, Firearms and Explosives, as well as local and state police departments, to carry pistols with a chambered round.  SIG was fully aware of this fact at the time it sold any and all P320 pistols to U.S.-based law enforcement agencies and departments.

33.     Likewise, it is a widespread practice among civilians who "conceal carry" their pistols to have a round in the chamber.  This practice does not violate black letter rules of firearm safety, as pistols should not be unduly susceptible to drop firing.

**E.     SIG's CEO Misrepresents That "There Have Been Zero Reported Drop-Related P320 Incidents"**

34.     On August 4, 2017, SIG's CEO, Ron Cohen, released a statement stating: "There have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market."

35.     This was statement was false, in view of SIG's knowledge that Officer Sheperis had been shot by a drop fire some eight months earlier with a version of the weapon that was not the military version, but the commercial version of the weapon.  There is no difference between the version of the weapon purchased and used by law enforcement agencies and any civilians in the U.S. commercial market.

**F.     Despite Its Knowledge Of The Drop Fire Design Defect, SIG Never Issued A Mandatory Recall**

36.     Despite being aware of the drop fire design defect, Defendant SIG has not issued a mandatory recall of the commercial model of the P320 weapon.

37.     Rather, on August 8, 2017, SIG announced a "voluntary upgrade" for the P320 pistol, explaining that "[a]s a result of input from law enforcement, government and military customers, SIG has developed a number of enhancements in function, reliability, and overall safety including drop performance."

38.     The voluntary upgrade was presented as purely optional, not urgent, and not mandatory.  But the so-called "voluntary upgrade" is not really an upgrade – it is a mandatory safety repair for the P320 in disguise.

39.     Nor has SIG notified affected owners of the defective SIG P320 pistols in a clear and conspicuous manner.  For example, SIG never endeavored to send individual notice to

affected owners of defective SIG P320 pistols.  SIG could have attempted to notify these individuals through warranty and registration records, but no such effort was made.

    40.    As part of the voluntary upgrade, SIG installs a lighter trigger (by about 35%) and an improved sear to prevent accidental discharges:



The voluntary upgrade also adds a disconnector safety to prevent out-of-battery discharges, in which a round is fired with the chamber open:



41.    SIG had a duty to disclose that the P320 suffered from a dangerous drop fire design defect.  Instead of disclosing the design defect in its marketing materials or product packaging, SIG concealed this design defect from Plaintiff and the Class, causing them to purchase their pistols when they otherwise would not have purchased them.

42.    But SIG never acknowledged that its P320 suffered from a drop fire design defect, nor did it explain that the "voluntary upgrade" was intended to repair the drop fire deficiency.

43.    Instead, SIG merely states that "[s]everal important changes have taken place to bring an original SIG SAUER P320 pistol to its new upgraded status.  These changes include an enhanced, upgraded trigger and slide."  Nothing is said about the drop fire design defect, or about the crucial importance of the safety repair.

44.    Likewise, SIG prominently represents that the "updated trigger" that is offered in the "voluntary upgrade" is "expected to improve the trigger-pull experience."  Again, nothing is stated about the drop fire design defect, or the critical importance of the safety repair:

## Updated Trigger

The new trigger for the P320 pistol will feature a thinner profile and reduced mass. This is expected to improve the trigger-pull experience.

45.      In an information page specifically made for "Domestic U.S. Consumer[s]," SIG explains that its upgrade program "will include an alternate design that reduces the physical weight of the trigger, sear, and striker while additionally adding a mechanical disconnector." Yet again, SIG fails to disclose the drop fire design defect, or the importance of the fix:



SIG SAUER is offering a voluntary program for P320 pistols. This will include an alternate design that reduces the physical weight of the trigger, sear, and striker while additionally adding a mechanical disconnector.

46.      In a 5 minute, 8 second information video posted on the SIG website, a SIG employee explains:  "Okay, so you get your upgraded P320 from the box, and the first thing you're probably going to notice is the triggers.  The upgraded guns have a much smaller and

lightweight trigger.  It's been reduced in weight by about 35%.  It's going to reduce inertia to the

rear."  However, the SIG employee does not explain that these changes are intended to fix the

drop design defect.



47.     The drop fire design defect is not mentioned anywhere else in this informational

video.  Rather, "drop safety" is only mentioned twice.  First, at 1 minute, 38 seconds, when

discussing the addition of a disconnector safety (which is intended to fix out-of-battery

discharges and not drop fires), the SIG employee emphasizes that the addition of the

disconnector safety "has nothing to do with drop safety:"

> So what I'll do is I'll take both guns apart here, and I'll show the
> difference what it looks like [sic], and I'll actually talk about what
> the disconnector does.  So on your left we have the original P320,
> and on the right the upgraded P320.  So here you'll notice the
> mechanical disconnector on the newer model.  So this has nothing
> to do with drop safety, it's simply a matter of a mechanical

disconnection of the trigger from the sear when the slide is moved
to the rear.

Second, at 2 minutes, 20 seconds, the employee repeats that the addition of a disconnector safety

has "nothing to do with drop safety:"

> So, the older style pistol, you'll notice that when the trigger is
> pulled, the sear will go down but also the sear would pop back up.
> So the trigger is actually resetting the sear in place.  With the new
> system, since the disconnect is doing all that work for you, the
> trigger merely drops the sear, and that's all it does.  So again, old
> style and new style [sic] you'll actually see that the sear simply
> moves down and releases the striker.  The disconnector does the
> reset for you.  So that's the big difference between the actual
> mechanical disconnector and the one without that.  Again, nothing
> to do with drop safety, but it also gives you a much different
> feeling trigger.

In fact, the vast majority of the video discusses the disconnector safety, instead of the upgraded

trigger and sear.

    48.    The only information about the drop fire design defect first appeared around

August 8, 2017, is buried in the Frequently Asked Questions ("FAQ") in SIG's website, and

itself fails to disclose material information:

> **What is the P320 Voluntary Upgrade Program?**
> SIG SAUER is offering a voluntary program for P320 pistols.
> This will include an alternate design that reduces the physical
> weight of the trigger, sear, and striker while additionally adding a
> mechanical disconnector.
>
> **Why is this upgrade happening?**
> Through additional testing above and beyond standard American
> National Standards Institute (ANSI)/Sporting Arms & Ammunition
> Institute (SAAMI), National Institute of Justice (NIJ), Department
> of Justice (DOJ), Massachusetts, California, and other global
> military and law enforcement protocols, we have confirmed that
> usually after multiple drops, at certain angles and conditions, a
> potential discharge of the firearm may result when dropped.
> Although it is a rare occurrence, with very specific conditions, SIG
> SAUER is offering an upgrade to all of its current P320 owners.

49.     However, the same FAQ emphasizes that the P320 pistols are (i) "safe in its current configuration," (ii) the upgrade is a purely "voluntary service," (iii) there have been "minimal reported drop-related P320 incidents" that "occurred in conditions that appear to be outside of normal testing protocols," and (iv) the upgrade is not automatic and will not be performed if one "sends [his or her] P320 in for something other than this upgrade:"

> **Is my P320 safe in its current configuration?**
> Yes.  The P320 meets and exceeds all US safety standards.
> However, mechanical safeties are designed to augment, not replace
> safe handling practices.  Careless and improper handling of any
> firearm can result in an unintentional discharge.
>
> …
>
> **What if I don't want to upgrade the trigger assembly on my**
> **P320?**
> This is a voluntary service, as the P320 meets and exceeds all
> ANSI/SAAMI, NIJ, DOJ, California, Massachusetts, and safety
> standards.  Sig Sauer welcomes all of its P320 owners to take
> advantage of this program.
>
> …
>
> **How often has the incident described occurred?**
> Minimal reported drop-related P320 incidents have occurred in the
> US commercial and law enforcement markets, with hundreds of
> thousands of guns delivered to date.  These instances occurred in
> conditions that appear to be outside of normal testing protocols.
> The current P320 design meets and exceeds all US safety
> standards.  As it relates to the ad hoc media drop tests, these were
> not part of standardized testing protocols, and they were performed
> using firearms in unknown conditions.
>
> …
>
> **If I send my P320 in for something other than this upgrade,**
> **will the upgrade be performed automatically?**
> No, the upgrade will only be performed if you elect to be part of
> the Voluntary Upgrade Program.

50.     In sum, SIG appears to have carefully prepared the material on its "voluntary upgrade" to conceal the drop fire design defect, and the critical importance of the safety repair,

which should be mandatory.  Instead, SIG represents that upgrade features "have nothing to do with drop safety," and SIG fails to adequately explain the drop fire design defect.  Most significantly, the recall is not mandatory, and SIG emphasizes that "[t]his is a voluntary service." In addition, all of SIG's safety disclosures—though inadequate—were made well after Plaintiff's SIG P320 purchase.

## CLASS ACTION ALLEGATIONS

51.     Plaintiff seeks to represent a class defined as all persons in the United States who purchased a SIG P320 semi-automatic pistol, in both the full-size and compact versions (the "Class").  Excluded from the Class are Defendant SIG SAUER, Inc., its subsidiaries, affiliates, officers, directors, assigns and successors, and any entity in which it has a controlling interest, and the Judge to whom this case is assigned and any member of his immediate family.

52.     Plaintiff also seeks to represent a subclass defined as all Class members in Arizona who purchased a SIG P320 semi-automatic pistol, in both the full-size and compact versions (the "Arizona Subclass").

53.     Plaintiff also seeks to represent a subclass defined as all Class members in New Hampshire who purchased a SIG P320 semi-automatic pistol, in both the full-size and compact versions (the "New Hampshire Subclass").

54.     Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the hundreds of thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but will be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

55.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

      (a)     whether SIG's claims regarding the P320 are deceptive and misleading;

      (b)     whether SIG engaged in false and/or deceptive advertising;

      (c)     whether SIG engaged in false and/or deceptive advertising to place profit over consumer safety;

      (d)     whether SIG has been unjustly enriched by its conduct;

      (e)     whether Class members have sustained monetary loss and the proper remedy for and measure of that loss;

      (f)     whether Plaintiff and Class members are entitled to declaratory and injunctive relief, including a mandatory recall with an unambiguous warning by SIG that the P320 is not drop safe;

      (g)     whether SIG's own internal drop testing of the P320 revealed a design defect with the weapon's trigger weight and/or internal safeties before and/or or after January 2017;

      (h)     whether SIG performed drop testing on the P320 when it was first produced, and the results of any such testing;

      (i)     the number of P320s sold to consumers; and

      (j)     whether, as a result of Defendant's misconduct as alleged herein, Plaintiff and Class members are entitled to restitution, injunctive, and/or monetary relief and, if so, the amount and nature of such relief.

56.     Plaintiff's claims are typical of the claims of Class members because Plaintiff and all Class members purchased a SIG P320 pistols affected by the drop fire issue.

57.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained counsel competent and experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

58.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

<u>**COUNT I**</u>
**(Violation Of The Magnuson-Moss Warranty Act**)

59.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

60.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and the Arizona and New Hampshire Subclasses against Defendant.

61.     The SIG P320 pistols are consumer products as defined in 15 U.S.C. § 2301(1).

62.     Plaintiff and Class members are consumers as defined in 15 U.S.C. § 2301(3).

63.     Defendant is a supplier and warrantor as defined in 15 U.S.C. § 2301(4) and (5).

64.     The amount in controversy of each individual's claim is more than the sum or value of twenty-five ($25) dollars, and the aggregate amount in controversy of all claims to be determined in this suit is equal to or greater than $50,000.00.

65.     In connection with the sale of the SIG P320 pistols, Defendant issued written warranties as defined in 15 U.S.C. § 2301(6), which warranted that the products were "drop safe" and "won't fire unless you want [them] to."

66.     In fact, the SIG P320 pistols had a drop fire design defect.

67.     By reason of Defendant's breach of warranties, Defendant violated the statutory rights due Plaintiff and Class members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301 *et seq.*, thereby damaging Plaintiff and Class members.

68.     Plaintiff and Class members were injured as a direct and proximate result of Defendants' breach because: (a) they would not have purchased the SIG P320 pistols on the same terms if they knew that the pistols have a drop fire design defect; and (b) the SIG P320 pistols do not have the characteristics, ingredients, uses, or benefits as promised by Defendant.

## COUNT II
### (Breach Of Express Warranty)

69.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

70.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and the Arizona and New Hampshire Subclasses against Defendant.

71.     Plaintiff, and each member of the Class, formed a contract with Defendant at the time Plaintiff and the other Class members purchased the SIG P320 pistol.  The terms of the contract include the promises and affirmations of fact made by Defendant on the labeling, marketing, and advertising of the SIG P320 pistols, including that the pistols were safe for their intended uses, were "drop safe" and "won't fire unless you want [them] to."  This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain, and are part of the standardized contract between Plaintiff and the members of the Class and Defendant.

72.     Plaintiff and the Class performed all conditions precedent to Defendant's liability under this contract when they purchased the SIG P320 pistols.

73.     Defendant breached express warranties about the SIG P320 pistols because these representations were false, as the P320 pistol is defectively designed, causing the gun to fire unintentionally when dropped.

74.     Plaintiff and each of the members of the Class would not have purchased their SIG P320 pistols had they known about the drop fire design defect.

75.     As a result of Defendant's breaches of express warranty, Plaintiff and each of the members of the Class have been damaged in the amount of the purchase price of the SIG P320 and any consequential damages resulting from the purchases.

76.     On September 24, 2019, prior to filing this action, Defendant was served with a pre-suit notice letter that complied in all respects with U.C.C. §§ 2-313, 2-607.  Plaintiff's counsel sent Defendant a letter advising them that they breached an express warranty and demanded that they cease and desist from such breaches and make full restitution by refunding

the monies received therefrom.  A true and correct copy of Plaintiff's counsel's letter is attached hereto as Exhibit A.

## COUNT III
### (Breach Of The Implied Warranty Of Merchantability)

77.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

78.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and the Arizona and New Hampshire Subclasses against Defendant.

79.     Defendant, as the designer, manufacturer, distributor, and/or seller, impliedly warranted that the SIG P320 pistols were merchantable with respect to goods of that kind.

80.     Defendant breached the warranty implied in the contract for the sale of the SIG P320 pistols because they could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, the goods were not fit for the ordinary purposes for which such goods are used, the goods are not adequately contained, packaged, and labeled, and the goods do not conform to the promises or affirmations of fact made on the container and label.  As a result, Plaintiff and Class members did not receive the goods as impliedly warranted by Defendant to be merchantable.

81.     Plaintiff and Class members purchased the SIG P320 pistols in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

82.     The SIG P320 pistols were not altered by Plaintiff or Class members in a manner that would cause a drop fire design defect.

83.     The SIG P320 pistols were defective when they left the exclusive control of Defendant.

84.     Defendant knew that the SIG P320 pistols would be purchased and used without additional testing by Plaintiff and Class members.

85.     The SIG P320 pistols were defectively designed and unfit for their intended purpose, and Plaintiff and Class members did not receive the goods as warranted.

86.     As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and Class members have been injured and harmed because: (a) they would not have purchased the SIG P320 pistols on the same terms if they knew that the pistols have a drop fire design defect; and (b) the SIG P320 pistols do not have the characteristics, ingredients, uses, or benefits as promised by Defendant.

## COUNT IV
### (Unjust Enrichment)

87.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

88.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and the Arizona and New Hampshire Subclasses against Defendant.

89.     Plaintiff and Class members conferred a benefit in the form of monies paid on Defendant by purchasing defective SIG P320 pistols.

90.     Defendant voluntarily accepted and retained this benefit.

91.     Because this benefit was obtained unlawfully, namely by selling and accepting compensation for defective SIG P320 pistols, it would be unjust and inequitable for the Defendant to retain it without paying the value thereof.

## COUNT V
### (Fraudulent Concealment)

92.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

93.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and the Arizona and New Hampshire Subclasses against Defendant.

94.     Defendant had a duty to disclose material facts to Plaintiff and the Class given their relationship as contracting parties and intended users of SIG P320 pistol.  Defendant also had a duty to disclose material facts to Plaintiff and the Class, namely that they were in fact manufacturing, distributing, and selling defectively designed pistols, because Defendant had superior knowledge such that the transactions without the disclosure were rendered inherently unfair.

95.     Defendant possessed knowledge of these material facts.  In fact, Defendant knew about the design defect since at least 2014 when it started manufacturing the SIG P320 and conducted its own internal testing, but it continued to manufacture and sell defectively designed pistols in the civilian market.  To date, Defendant has not issued a mandatory recall, nor does it explain the nature of the defect and the importance of the fix anywhere on its website and promotional materials.  During the time that Defendant concealed the design defect, Plaintiff and Class members were unaware that their pistols had a dangerous design defect.

96.     Defendant failed to discharge its duty to disclose these materials facts.

97.     In so failing to disclose these material facts to Plaintiff and the Class, Defendant intended to hide from Plaintiff and the Class that they were purchasing defective SIG P320 pistols.  As discussed above, Defendant obtained a substantial financial benefit as a result of its fraudulent concealment of the defective pistols.

98.     Plaintiff and the Class reasonably relied on Defendant's failure to disclose insofar as they would not have purchased the SIG P320 pistols had they known they were defective.

99.     As a direct and proximate cause of Defendant's fraudulent concealment, Plaintiff and the Class suffered damages in the amount of monies paid for the defective SIG P320 pistols.

100.    As a result of Defendant's willful and malicious conduct, punitive damages are warranted.

**COUNT VI**
**(Fraud)**

101.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

102.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class and the Arizona and New Hampshire Subclasses against Defendant.

103.    As discussed above, Defendant provided Plaintiff and Class members with false or misleading material information about the SIG P320 pistols manufactured, distributed, and sold by Defendant.  For example, SIG misrepresents that the P320 pistols are "drop safe" and "won't fire unless you want [them] to."

104.    As indicated above, however, these representations are false as the SIG P320 is defective and unduly susceptible to a drop fire.

105.    The misrepresentations and omissions of material fact made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase the SIG P320 pistols.

106.    Defendant knew that the SIG P320 pistol was defective.  In fact, Defendant knew about the design defect since at least 2014 when it started manufacturing the SIG P320 and conducted its own internal testing, but it continued to manufacture and sell defectively designed

26

pistols in the civilian market.  To date, Defendant has not issued a mandatory recall, nor does it explain the nature of the design defect and the importance of the fix anywhere on its website and promotional materials.  During the time that Defendant concealed the design defect, Plaintiff and Class members were unaware that their pistols had a dangerous design defect.

107.    The fraudulent actions of Defendant caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

108.    As a result of Defendant's willful and malicious conduct, punitive damages are warranted.

**COUNT VII**
**(Violation Of The Arizona Consumer Fraud Act (ACFA),**
**Ariz. Rev. Stat. Ann. § 44-1521, *et seq.*)**

109.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

110.    Plaintiff brings this claim individually and on behalf of the members of the proposed Arizona Subclass against Defendant.

111.    Defendant engaged in false, misleading, and deceptive practices in violation of the ACFA, which Plaintiff and other Arizona Subclass members relied on to their detriment.

112.    By failing to disclose and actively concealing the SIG P320 pistols' drop fire design defect, Defendant engaged in deceptive business practices prohibited by the ACFA, including (1) representing that the SIG P320 pistols have characteristics, uses, benefits, and qualities which they do not have, (2) representing that SIG P320 pistols are of a particular standard, quality, and grade when they are not, and (3) failing to disclose information concerning the SIG P320 pistols with the intent to induce consumers to purchase or lease the firearms.

113.    This conduct violates Sec. 44-1522(A) of the ACFA: "The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."

114.    As alleged above, Defendant made numerous statements about the safety of the SIG P320 pistols, including that they were "drop safe" and "won't fire unless you want [them] to."  Both of these statements contributed to the deceptive context of Defendant's unlawful representations as a whole.

115.    Defendant's unfair or deceptive acts and practices were intended to and did in fact deceive reasonable consumers, including Plaintiff.

116.    In purchasing the SIG P320 pistols, Plaintiff and the Arizona Subclass relied on the misrepresentations and/or omissions of Defendant.  Defendant's representations turned out not to be true because the SIG P320 pistols were manufactured pursuant to a drop fire design defect.  Had Plaintiff and members of the Arizona Subclass known this they would not have purchased the SIG P320 pistols and/or paid as much for them.

117.    Plaintiff and the Arizona Subclass sustained damages as a result of Defendant's unlawful acts and are, therefore, entitled to damages and other relief.

118.    Plaintiff seeks an order enjoining Defendant's acts or failures to act that violate the ACFA.  Plaintiff and the Arizona Subclass seek orders necessary to restore to them all money acquired from them by Defendants in violation of the ACFA.  They also seek orders necessary to restore to class members whose identities are known to or ascertainable by Defendant all money

acquired from them by Defendant in violation of the ACFA.  Plaintiff and the Arizona Subclass

also seek court costs and attorneys' fees.

119.    Plaintiff and the Arizona Subclass seek all other relief which the Court deems

proper.

**COUNT VIII**
**(Violation Of The New Hampshire Consumer Protection Act (NHCPA),**
**RSA 358-A:1, *et seq.*)**

120.    Plaintiff hereby incorporates by reference the allegations contained in all

preceding paragraphs of this complaint.

121.    Plaintiff brings this claim individually and on behalf of the members of the

proposed Class and New Hampshire Subclass against Defendant.

122.    Defendant engaged in false, misleading, and deceptive practices in violation of

the NHCPA, which Plaintiff and other New Hampshire Subclass members relied on to their

detriment.

123.    By failing to disclose and actively concealing the SIG P320 pistols' drop fire

design defect, Defendant engaged in deceptive business practices prohibited by the NHCPA,

including (1) representing that the SIG P320 pistols have characteristics, uses, benefits, and

qualities which they do not have, (2) representing that SIG P320 pistols are of a particular

standard, quality, and grade when they are not, and (3) failing to disclose information concerning

the SIG P320 pistols with the intent to induce consumers to purchase or lease the firearms.

124.    This conduct violates several specific provisions of RSA 358-A:2 of the NHCPA

including V.: "Representing that goods or services have sponsorship, approval, characteristics,

ingredients, uses, benefits, or quantities that they do not have;" VII.: "Representing that goods or

services are of a particular standard, quality, or grade, or that goods are of a particular style or

29

model, if they are of another and IX.: "Advertising goods or services with intent not to sell them as advertised[.]"

125.    As alleged above, Defendant made numerous statements about the safety of the SIG P320 pistols, including that they were "drop safe" and "won't fire unless you want [them] to."  Both of these statements contributed to the deceptive context of Defendant's unlawful representations as a whole.

126.    Defendant's unfair or deceptive acts and practices were likely to and did in fact deceive reasonable consumers, including Plaintiff.

127.    In purchasing the SIG P320 pistols, Plaintiff and the New Hampshire Subclass relied on the misrepresentations and/or omissions of Defendant.  Defendant's representations turned out not to be true because the SIG P320 pistols were manufactured pursuant to a drop fire design defect.  Had Plaintiff and members of the New Hampshire Subclass known this they would not have purchased the SIG P320 pistols and/or paid as much for them.

128.    Plaintiff and the New Hampshire Subclass sustained damages as a result of Defendant's unlawful acts and are, therefore, entitled to damages and other relief provided for under RSA 358-A:10 and 358-A:10-a of the NHCPA in the amount of actual damages or $1,000, whichever is greater.  Because Defendant's conduct was committed knowingly and/or intentionally, the Plaintiff and the New Hampshire Subclass are entitled to treble damages.

129.    Pursuant to NHCPA RSA 358-A:10 and 358-A:10-a Plaintiff seeks an order enjoining Defendant's acts or failures to act that violate the NHCPA.  Pursuant to NHCPA RSA 358-A:10 and 358-A:10-a Plaintiff and the New Hampshire Subclass seek orders necessary to restore to them all money acquired from them by Defendants in violation of the NHCPA.  They also seek orders necessary to restore to class members whose identities are known to or

ascertainable by Defendant all money acquired from them by Defendants in violation of the NHCPA.  Plaintiff and the New Hampshire Subclass also seek court costs and attorneys' fees under RSA 358-A:10 and 358-A:10-a of the NHCPA.

130.    Pursuant to NHCPA RSA 358-A:10 and 358-A:10-a, Plaintiff and the New Hampshire Subclass seek all other relief which the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.    For an order certifying the Class and the Arizona and New Hampshire Subclasses under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Classes and Plaintiff's attorneys as Class Counsel to represent the Class members;

b.    For an order declaring the Defendant's conduct violates the statutes referenced herein;

c.    For an order finding in favor of Plaintiff and the Class and the Arizona and New Hampshire Subclasses on all counts asserted herein;

d.    For statutory, compensatory, and punitive damages in amounts to be determined by the Court and/or jury;

e.    For prejudgment interest on all amounts awarded;

f.    For an order of restitution and all other forms of equitable monetary relief;

g.    For injunctive relief as pleaded or as the Court may deem proper;

h.    For an order awarding Plaintiff and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit;

i.    Damages, restitution, and/or disgorgement in an amount to be determined at trial; and

j.    For such other and further relief as the Court may deem proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  September 27, 2019          Respectfully submitted,

**DOUGLAS, LEONARD & GARVEY, P.C.**

By:     */s/ Charles G. Douglas, III*
              Charles G. Douglas, III
NH Bar #669
14 South Street, Suite 5
Concord, NH 03301
Telephone:  (603) 224-1988
E-Mail: chuck@nhlawoffice.com

**BURSOR & FISHER, P.A.**
Joseph I. Marchese (*to be admitted pro hac vice*)
NY State Bar No. 4238317
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jmarchese@bursor.com

**BURSOR & FISHER, P.A.**
Neal J. Deckant (to be admitted pro hac vice)
CA State Bar No. 322946
NY State Bar No. 5026208
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ndeckant@bursor.com