**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 6-1-2020**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
DERICK ORTIZ, INDIVIDUALLY AND  *
ON BEHALF OF ALL OTHERS         *   19-cv-1025-JL
SIMILARLY SITUATED              *   February 24, 2020
                                *   3:03 p.m.
          v.                    *
                                *
      SIG SAUER, INC.           *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

APPEARANCES:

For the Plaintiff:        Joseph Marchese, Esq.
                          Bursor & Fisher, P.A.

                          Benjamin T. King, Esq.
                          Douglas, Leonard & Garvey, PC


For the Defendant:        Robert L. Joyce, Esq.
                          Littleton, Park, Joyce,
                          Ughetta & Kelly, LLP

                          Benjamin B. Folsom, Esq.
                          McLane Middleton



Court Reporter:           Susan M. Bateman, RPR, CRR
                          Official Court Reporter
                          United States District Court
                          55 Pleasant Street
                          Concord, NH 03301
                          (603) 225-1453

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  The Court has before it for
 3   consideration this afternoon a motion hearing in civil
 4   case 19-cv-1025-JL, Ortiz versus Sig Sauer,
 5   Incorporated.
 6              THE COURT:  All right.  We're here for a
 7   motion to dismiss based on standing and sufficiency both
 8   of the allegations and of the class definitions.
 9              Why don't counsel identify themselves.  We'll
10   just go right across my right, your left.  Go ahead.
11              MR. FOLSOM:  Your Honor, Ben Folsom on behalf
12   of the defendant, Sig Sauer.
13              I'm here with my co-counsel who has been
14   admitted pro hac vice, Robert Joyce.
15              And Steve Chaucer and Tim Lachance are both
16   here from Sig Sauer as well.
17              THE COURT:  Welcome.
18              MR. JOYCE:  As Mr. Folsom indicated, Robert
19   Joyce.
20              THE COURT:  You'll be arguing, Mr. Joyce?
21              MR. JOYCE:  And Mr. Folsom will be making part
22   of the argument.
23              THE COURT:  Great.
24              MR. JOYCE:  We'll try to identify who's
25   arguing what, but thank you for the opportunity to
```

```
 1    appear here today, your Honor.

 2              THE COURT:  Oh, of course.  It's our job.

 3              MR. MARCHESE:  Good afternoon, Judge.  I'm

 4    Joseph Marchese on behalf of the plaintiff.

 5              MR. KING:  Benjamin King on behalf of the

 6    plaintiff, your Honor.

 7              THE COURT:  It's good to see you, Mr. King.

 8              All right.  Let's proceed.  You can -- and

 9    listen, there's several issues.  I'll let you decide,

10    you're free to address any issues you want.  And ones

11    they don't address orally, if you want to talk about

12    them orally you may do that, but I'll leave it up to

13    you.  I'm happy to listen.

14              MR. JOYCE:  Your Honor, I will try to cover

15    the waterfront on certain issues, you know, maybe from a

16    thousand feet relying on the papers, but I like to give

17    the Court an opportunity to question counsel to the

18    extent you have something in particular on your mind.

19              THE COURT:  Understood.  I am familiar with

20    all your papers and read the cases involved.

21              MR. JOYCE:  Thank you.

22              Okay.  By way of orientation, your Honor, the

23    plaintiff, Derick Ortiz, brings a nationwide class in

24    Arizona and New Hampshire subclass claims on behalf of

25    all consumers who purchased Sig's P320 model pistols.
```

 1              THE COURT:  You know what?  Let me stop you.

 2   One thing.  I need to say this before I forget.

 3              As I was preparing for this for, you know,

 4   it's been a slow process, several weeks now, but

 5   yesterday more intense, I realized that I purchased a

 6   Sig Sauer pistol two Christmases ago as a gift, and I

 7   thought, this is the same weapon.  I thought it was.  It

 8   turns out it was a P226.

 9              MR. JOYCE:  No, that's a completely different

10   model.

11              THE COURT:  Right.  It was a gift for my son.

12              Anyway, so you're on notice.  If that bothers

13   anybody, you can raise it.  I don't know why it would

14   bother anybody, frankly, but on recusal issues there's

15   circuit guidance.  We're not supposed to just throw it

16   in your lap and force you to deal with it like that, but

17   this doesn't strike me as a recusal issue at all.  But

18   for a brief moment I thought I might be a member of the

19   class and had a little crisis until I went and got the

20   firearm, looked at it closely, and it was a P226.

21              So just be advised.  If anybody has any

22   problems with it, you can make it known at any point.

23              Go ahead.

24              MR. JOYCE:  The plaintiff's proposed classes

25   are exceptionally broad but not quite that broad.

1          So again, by way of orientation, plaintiff

2     Ortiz brings nationwide class in Arizona, New Hampshire

3     subclass claims on behalf of all consumers who purchased

4     Sig Sauer's P320 model pistols, and they're alleging

5     that the pistols were defectively designed because they

6     can inadvertently discharge the round of ammunition if

7     dropped on the ground.  Commonly known as a drop fire.

8              THE COURT:  Yeah.

9              MR. JOYCE:  Plaintiff asserts multiple fraud

10    and warranty claims despite, one, failing to plead that

11    his pistol has manifested the alleged defect.  He didn't

12    plead it because it hasn't.  His pistol did not draw

13    fire.  Two, admitting that Sig Sauer has implemented a

14    fix, what the plaintiffs call a fix and admit in their

15    pleading is a fix, for the alleged drop-fire defect

16    through a free upgrade program that has been available

17    to Mr. Ortiz and all other P320 owners since August of

18    2017, and continues to be available to Mr. Ortiz and all

19    other owners of P320 pistols to this day.

20             And that is true whether the pistol was

21    transferred, you know, whether that person is an

22    original owner or a transferred owner, that upgrade

23    remains available to anyone in possession of a P320.

24             THE COURT:  As a matter of -- two quick

25    questions about that.  I'll interrupt you occasionally.

1           As a matter of logistics, that's just a matter

2    of shipping the -- do you bring it back to the --

3    logistically how does that work?

4           MR. JOYCE:  It comes back to Sig here in New

5    Hampshire.

6           THE COURT:  Like I just ship it back myself or

7    do I bring it back to the retailer?

8           MR. JOYCE:  You can do either.  You can do it

9    through a federal firearms licensee or you could ship it

10   back yourself, but the, you know, you've got to ship it

11   back unloaded obviously.  Sig covers all of the costs of

12   the shipment to and from.  So when we say no cost to the

13   consumer, we mean that, no cost to the consumer.

14          THE COURT:  Second question.

15          MR. JOYCE:  Yes.

16          THE COURT:  Which is I think more germane.

17          Is there a way to -- has Sig ever quantified

18   the risk of a drop fire?  Is there a way of quantifying

19   it and, you know, expressing it in terms of a

20   probability or a risk, and does that risk increase over

21   time with more use?

22          MR. JOYCE:  Well, I would say my first answer

23   to that question is there's no risk if the plaintiff

24   availed themselves of the voluntary upgrade.  And that's

25   an important point, you know, because you see some of

1    the case law that deals with, okay, you have an

2    unmanifested defect but is there a risk of future harm

3    or injury, and in this case not unless the plaintiffs

4    deliberately eschew the remedy that's available to them.

5    And under the case law you cannot basically self-impose

6    damages on yourself in order to create a claim that

7    doesn't otherwise exist.

8                THE COURT:  For not availing yourself of

9    the --

10                MR. JOYCE:  Of the remedy, correct.

11                Parenthetically plaintiff's counsel filed on

12    behalf of a different plaintiff, Mr. Gordon, a

13    materially identical class action in the United States

14    District Court for the Southern District of Texas, and

15    that's the Gordon v. Sig Sauer case, and that is before

16    Chief Judge Rosenthal.

17                That has gone through a motion to dismiss.

18    Chief Judge Rosenthal issued a decision, albeit under

19    different operable law --

20                THE COURT:  I read it.

21                MR. JOYCE:  -- looking at Texas law primarily.

22    That's where Mr. Gordon resides.  She applied Texas law

23    to the various causes of action that correlate

24    specifically with Mr. Gordon's case.

25                As Mr. Folsom will be arguing today, the Court

1    should apply New Hampshire law to the warranty-based

2    causes of action.  Mr. Folsom will be making that

3    argument.

4              Arizona, I should say, I misspoke, where Mr.

5    Ortiz resides.

6              In any event, the court there issued a

7    decision and the plaintiffs reacted to that decision by

8    filing this case within a week of that decision.

9              The plaintiffs have amended the complaint.

10   Sig believes that they haven't --

11             THE COURT:  I'm sorry.  What did you say about

12   within a week of the decision?

13             MR. JOYCE:  Within a week of Judge Rosenthal's

14   decision in Texas, the plaintiff filed -- plaintiff

15   Ortiz filed this case.

16             Now, Mr. Ortiz is not Mr. Gordon.  Same

17   plaintiff's counsel, however, filed -- reacted to that

18   decision by moving to start a separate action here in

19   New Hampshire.  They are still maintaining the Texas

20   court action.

21             Just by way of a status update, the plaintiffs

22   have amended the complaint.  Sig doesn't view that

23   complaint as solving the deficiencies that the judge

24   determined existed in the original filing and made a

25   motion to dismiss, and that remains sub judice, so the

1    parties are waiting to hear what Judge Rosenthal will

2    say about the amended complaint.

3             THE COURT:  So you're handling that case in

4    Texas?

5             MR. MARCHESE:  Yes.

6             THE COURT:  That's interesting.  So I'm just

7    -- the amendment is what interests me.

8             After a motion to dismiss you're permitted to

9    amend to cure whatever deficiencies led to the

10   dismissal?

11            MR. MARCHESE:  During the hearing the judge

12   asked if I could put some finer points on some of the

13   details of the allegations.  I told her that I could and

14   she gave me leave to amend so I did.

15            THE COURT:  Sure.

16            MR. JOYCE:  Certain of the claims were

17   dismissed with prejudice and certain without with leave

18   to amend.

19            THE COURT:  Got you.  All right.

20            MR. JOYCE:  Okay.  So we're here to talk about

21   Mr. Ortiz's case filed in New Hampshire of course, and

22   Sig believes that the Court should dismiss those claims

23   for multiple reasons.  First, the plaintiff lacks

24   standing to assert individual claims because he hasn't

25   suffered any injury.  Plaintiff's P320 pistol has not

1    manifested the alleged drop-fire defect and a free fix

2    is already available to him.  Plaintiff also lacks

3    standing to represent consumers in the 49 states where

4    he does not reside, including New Hampshire consumers.

5            All of plaintiff's claims should be dismissed

6    on these grounds.  There's no claim that plaintiff can

7    bring if he doesn't have the foundation of standing.  He

8    doesn't have standing because he hasn't suffered an

9    injury that's cognizable under the law.

10           THE COURT:  I'm curious about that whole --

11   that argument, only in the sense that -- the upgrade

12   argument, part of it I understand.  And whether I accept

13   it, it makes sense to me, but the -- let's take that out

14   of it for a minute.

15           Isn't the law different for a product like

16   this?  I mean, you say he hasn't suffered an injury yet

17   because there hasn't been a drop-fire incident.  That's

18   not like some appliance that's not working correctly and

19   your not having suffered that inconvenience.  It's a

20   life-threatening defect.  Does a plaintiff really have

21   to suffer a drop fire before standing is conferred?

22   Again leaving out the whole upgrade argument, what do

23   you say about that?

24           MR. JOYCE:  Well, I think if you compare it,

25   for example, to the Everett case involving plaintiffs

1   who claim the seatbelt buckles in vehicles they

2   purchased had a propensity to partially latch and

3   potentially provide insufficient restraint during a

4   crash, I think this case fits with Everett.  I mean, if

5   those things happened, someone could get hurt, right?

6   If a gun drop fires -- and remember, there's a number of

7   things that have to happen for this firearm to drop

8   fire, including that the plaintiff just deliberately

9   eschewed the remedy that's available to him.

10          Secondly, he has to have a loaded -- has to

11   have a firearm with a round in the chamber, and then he

12   has to drop it, right?  That's abuse of handling.  He

13   shouldn't be doing that.

14          The warning in the Sig Sauer manual that comes

15   with this firearm has a big picture of a gun that's

16   dropped and discharging.  You can see the blast right

17   outside the muzzle, and it says, warning, any firearm if

18   dropped can discharge.

19          THE COURT:  Don't drop it.

20          MR. JOYCE:  Don't drop it, right.

21          And the plaintiff says warranty claims,

22   misrepresentation claims, when we've got a big picture

23   half the size of the page in the warning manual that

24   says this is exactly what can happen if you drop a gun.

25          That notwithstanding, this gun did have a

1   vulnerability for a drop fire at a very particular angle

2   that wasn't addressed in the -- in all the U.S. testing

3   standards.  There's about three or four predominant

4   standards that the industry tests firearms to when it's

5   looking for abuse of handling and that includes a drop

6   fire, and this angle that this firearm can be discharged

7   -- can discharge, it just wasn't covered.  It wasn't

8   addressed by any of the existing standards, which then,

9   you know, begs the question, is that okay?  Does that

10  mean that the standards should be improved?  Sig didn't

11  want to have that discussion with folks and therefore

12  instituted -- although it met every U.S. standard at the

13  time it was manufactured and produced and sold, it

14  wanted to make sure that its customers had the best that

15  engineering could offer, and they made this upgrade

16  available and that does that.

17          And there's no dispute in this case, your

18  Honor, that that upgrade doesn't work, it doesn't do --

19  essentially it doesn't give the plaintiff the firearm

20  that he says he thought he was buying at the time that

21  he purchased it.  That complaint is resolved by that

22  upgrade.

23          So the second -- so that's essentially the

24  standing.  Oh, so we have the Everett case, your Honor,

25  and then I think there's also another case that I would

 1   bring to the Court's attention, and that is the -- I

 2   think there are three cases that you'd want to look at

 3   that sort of create a spectrum.  There's the <u>Coghlan</u>

 4   case, the <u>Everett</u> case, and then the <u>Rule</u> case.  And in

 5   the <u>Rule</u> case, it's a little bit different than <u>Everett</u>

 6   because in <u>Everett</u> there was a potential for human

 7   personal injury involved in the event that there was

 8   some future occurrence which hadn't happened yet.

 9          In the <u>Rule</u> case, which is a First Circuit

10   case, remember that where -- to remind you, that's the

11   heartworm case, the medication for dogs.

12          THE COURT:  Yes.

13          MR. JOYCE:  The plaintiff's dog didn't suffer

14   any harm from the medication, didn't develop heartworm

15   while using it.  Nonetheless, Rule filed a putative

16   class action on behalf of all dog owners who had

17   purchased the medication.

18          The First Circuit upheld the district court's

19   dismissal of Rule's complaint briefing that the

20   unfitness of ProHeart 6 lay in its potential for causing

21   harm to the dog.  However, because plaintiff's dog did

22   not suffer any harm and there was no potential for

23   future harm given that the medication had already been

24   administered to plaintiff's dog, the plaintiff had not

25   suffered or sustained any compensable injury.

1          So going back to your original question, and

2    your Honor was careful to caveat to the question, if you

3    put aside the existence of the voluntary upgrade, and I

4    --

5          THE COURT:  You don't think that's necessary.

6          MR. JOYCE:  And I would say that would be a

7    mistake.  That's a whole -- that's a lot to try to push

8    off the table.  And it's really the voluntary upgrade

9    which is at the bottom of this because if you take a

10   step back from this action and look at it in its

11   broadest sense, they have eight causes of actions and

12   there's no there there.  The beef, the book of hurts

13   that they come with, there's a remedy available for it.

14   So I think you don't want to answer that question

15   without regard to the existence of the voluntary

16   upgrade.  I think it's a more complicated question

17   without that, but it is there.

18          The second basis for dismissal is that all of

19   plaintiff's warranty claims ignore that the warranties

20   that Sig Sauer offered was limited to repair or replace,

21   which he has eschewed, Mr. Ortiz.  Had he pursued the

22   express warranty that was available to him, he would

23   have received the Voluntary Upgrade Program available

24   for all P320 owners which provides the product which

25   plaintiff and others' claims you bargained for.

1          Plaintiff does not have an implied warranty

2    claim as a matter of operable law, and here, your Honor,

3    that is Arizona law, and Mr. Folsom will be addressing

4    that choice of law issue, because he doesn't have

5    privity of contract with Sig Sauer.  Under Arizona law

6    you don't have an implied warranty claim unless you have

7    privity of contract with the manufacturer.

8          Here the manufacturer is not the entity that

9    sold the firearm to Mr. Ortiz, and it was the FFL dealer

10   in Arizona.  So he has no potential for an implied

11   warranty claim under Arizona law.

12         Similarly under the MMWA.  MMWA is just a

13   federal statute that incorporates the state law.  If you

14   have no state law claim, and he has, then Mr. Ortiz does

15   not for implied warrant, he has no MMWA claim.

16         THE COURT:  Your co-counsel is going to be

17   addressing that Arizona law issue mostly?

18         MR. JOYCE:  I will.  I'm going to follow up in

19   more detail on this warranty claim.  I have some case

20   law for --

21         THE COURT:  Yeah, I was going to say I don't

22   remember seeing that in your brief at all, that whole

23   privity --

24         MR. JOYCE:  We made the argument that he has

25   no warranty claim.  We didn't focus I think as much as

1    we should have on Arizona law, and I have some cases

2    which I will give now to your Honor, and hopefully

3    someone will be taking that down so you don't have to

4    write it down, but we provided these cases to

5    plaintiff's counsel before the argument because we felt

6    that it would come up and in fairness wanted to provide

7    it to the plaintiffs, but I will give you those cites

8    now.

9           And you'd want to take a look, I think, your

10   Honor, at -- okay.  The first case, which is a good --

11   provides a good summary of Arizona law on warranty is a

12   case called Chaurasia versus General Motors.  That's at

13   212 Arizona 18 126 P.2d (sic) 165, 169 Arizona Court of

14   Appeals, 2006.

15          THE COURT:  All right.

16          MR. JOYCE:  The second case that is

17   informative and helpful on this issue is Flory versus

18   Silvercrest Industries, Inc., and that's 129 Arizona

19   574, 1981.  The sub-cites there are 579 to 81.  There's

20   also a P.2d cite, 633 P.2d at 388 to 90.

21          The third case that's worthwhile looking at is

22   Walsh versus Ford Motor Company, and that's 588 F.Supp.

23   1513 at 1527, D.D.C. 1984.

24          The next is Plagens versus National RV

25   Holdings Inc., 328 F.Supp. 2d 1068 at 1074.  That's the

1    District of Arizona in 2004.

2         Finally, there's <u>Haugland versus Winnebago</u>,

3    and that is 327 F.Supp. 2d at 1092.

4         And if I could just talk for a little bit

5    about those.  Since we're talking about this issue now,

6    I'll skip ahead and --

7         THE COURT:  I'll let you talk about it, but I

8    want to be upfront with you.  I'm not going to guarantee

9    I'm going to consider those cases.  We've been working

10   on this for a while, and I'm not sure if I'm inclined to

11   reboot, but we have the cites and --

12        MR. JOYCE:  They had been provided to

13   plaintiff's counsel before the hearing, your Honor.

14        THE COURT:  Yeah.  The problem is you didn't

15   provide it to the Court before the hearing and I've

16   already done a lot of work on the case and I have

17   another case to work on, too, so -- look, I might look

18   at it.  I might not.  What I'm trying to tell you is I'm

19   not making any promises.

20        MR. JOYCE:  Okay.  Understood, your Honor.

21        The argument is in the briefs, the argument

22   that --

23        THE COURT:  I looked at the arguments in the

24   brief but not the privity argument.

25        MR. JOYCE:  But that is part of operable

1    Arizona law, you know, to the extent that you find that

2    there is an implied warranty --

3                 THE COURT:  -- independent Arizona law outside

4    of cases you provided to find that privity argument that

5    you're making now, that's what you wanted me to do?

6                 MR. JOYCE:  I'm looking for you to take

7    judicial notice of Arizona law on the issue and have

8    provided some assistance to the Court in that regard

9    with those cites.  That would be my response.

10                THE COURT:  Thank you.  All right.

11                MR. JOYCE:  Okay.  Going back to the outline

12   of the basis for dismissal, the unjust enrichment claim

13   should be dismissed because it's precluded by the

14   existence of a valid warranty.

15                Moving to the class, the plaintiff's

16   definition of the classes, the courts within the First

17   Circuit routinely hold that nationwide breach of

18   warranty, unjust enrichment, and fraud claims are

19   inappropriate for class treatment given differences in

20   state laws applicable to these claims and the

21   individualized nature of the claims, and therefore

22   plaintiff's nationwide class definitions should be

23   stricken.

24                The plaintiff's solution to that lack of

25   commonality in the briefing is really threefold.  One is

1    that we shouldn't be talking about that now at a motion

2    to dismiss.  We should wait until the class

3    certification.  But when the case law instructs I

4    believe, you know, courts that have looked at these

5    issues in terms of the efficient way to handle putative

6    class actions is that if they don't make any sense on

7    their face, you shouldn't leave them in the case because

8    it complicates discovery in the case.  The lawyers will

9    argue about whether the discovery should pertain to a

10   potential nationwide class or be limited to the issues

11   associated with the narrower class.  It makes it a much

12   more inefficient litigation.

13          And I don't think the plaintiffs here have

14   made really any attempt to tailor their classes to

15   anything that makes sense in this case, including both

16   on the commonality issue, your Honor, and also in terms

17   of the definitions of the classes.  They brought this

18   class purportedly on behalf of everyone who has ever

19   purchased a 320, and by definition that would include

20   people that already have an upgrade, people that

21   purchased their firearms after the -- essentially the

22   upgraded product was a product that was originally sold

23   after 2017.  All of those people would, you know, as a

24   technical matter be part of the classes that the

25   plaintiffs have brought this case on behalf of, and that

1    just doesn't make any sense.

2         The plaintiffs bring a New Hampshire Consumer

3    Protection Act claim, and again Mr. Folsom will be

4    dealing with that claim, but that claim fails for the

5    simple reason that Mr. Ortiz is not protected under that

6    statute.  The breach is where the product was taken, not

7    where it was sold from.

8         THE COURT:  Yeah.  It seems to be consistent

9    with New Hampshire law.

10        MR. JOYCE:  There's a couple other arguments.

11   We moved through -- and your Honor was obviously

12   interested in a few things so I moved into sort of the

13   core of the argument on some of the things that I

14   outlined, so I'm just going to skip to a few points that

15   I think I want to emphasize --

16        THE COURT:  Sure, that's fine.

17        MR. JOYCE:  -- and then you'll be glad to know

18   I will sit down.

19        THE COURT:  I'll hear any argument that you

20   want heard.

21        MR. JOYCE:  Okay.  I wanted to talk a little

22   bit on the standing front.  The plaintiffs talk about

23   diminished resale value due to the alleged defect of --

24   due to the alleged drop-fire defect, which, your Honor,

25   to my mind is not a plausible argument on its face

1    because you're talking about -- he can't legally eschew

2    the remedy, so he has to be saying that basically the

3    firearm that I thought I was getting, which is now

4    available to him through the voluntary upgrade remedy,

5    somehow has a decreased market value if I want to go to

6    sell it.

7            And what would be the basis for the decreased

8    market value?  It can't be anything related to the

9    drop-fire issue because that's resolved.  He's admitted

10   that that's resolved.  So it would have to be -- any

11   diminished resale value has to be for some other reason,

12   but if it's for some other reason, then he hasn't proved

13   his case.  The diminished resale value has to relate to

14   the defect that he's complaining over.  If not, then he

15   has to prove up something else, and that's not in his

16   complaint.  He speaks only about this drop-fire issue

17   which is resolved.

18           THE COURT:  I'm not even sure if this is the

19   plaintiff's argument.  I have a couple questions about

20   it, but I mean just the idea -- I don't know, you buy an

21   automobile, and there's a recall, and you go to get the

22   recall done and then you go back to the dealer, they

23   implement the recall repair, but isn't there a taint?

24   Isn't there some kind of taint that buyers and sellers

25   recognize even if the recall repair was successful,

1   fully effective?  Isn't there some sort of taint that

2   affects the value of a product?

3          MR. JOYCE:  I don't think so.  I'm not going

4   to agree with that, no.  I mean, here you have a

5   superior product.  You know, it goes above and beyond

6   any existing standard in the U.S.  Not only does he have

7   the product that someone might have hoped or expected to

8   get, he's got a better product.

9          So I don't think -- that would be a

10  speculative theory, and I don't even think he has a

11  foundation to launch even on an attack on the pleadings

12  basis, which I understand that's where we are.  He

13  doesn't allege anything that gives him the standing to

14  make that claim.

15         And if you take a look, for example, your

16  Honor, at the <u>Toyota</u> case which is in the briefs, only

17  plaintiffs who pled something more than alleged

18  diminished value could proceed.  The something more

19  included having sold or traded in vehicles at a loss due

20  to depressed resale values, filing recalls, and

21  publicized alleged incidents.

22         In this case the plaintiff doesn't allege that

23  he ever resold the firearm at a loss, that he ever

24  attempted to resell the firearm and learned that there

25  was a loss attributable to this issue in the

1    marketplace.

2         THE COURT:  That's true.

3         MR. JOYCE:  He hasn't made any concrete

4    allegation to support the diminished value theory, and I

5    think that the case law is clear if you take a look at

6    the standing cases, including Toyota, including the

7    Kerin versus Titeflex Corp. case that we discussed,

8    which is that CSST case, I think he has to plead

9    something more to proceed under that theory, and I don't

10   think you can find any allegation in the complaint that

11   provides the necessary factual predicate to supply that

12   something more.

13        THE COURT:  Tell me a little bit about

14   this repair.  I understand that it's a two-component

15   deficiency that the upgrade repaired.  Trigger weight

16   and sear, right?

17        MR. JOYCE:  Right.

18        THE COURT:  Talk to me about sear, if you have

19   an understanding of it.  I mean, a mechanical

20   understanding of it.  If you don't, I don't want to put

21   you in that position.  But if you do, could you talk

22   about that a little bit?

23        MR. JOYCE:  Well, you know, the thing about a

24   drop fire is it says, well, you said the firearm

25   wouldn't discharge without a trigger pull.  In a

1  drop-fire situation the trigger is actually pulled.

2  It's gravity that's discharging the firearm.

3        In a drop fire and in inertia, the physics are

4  the weight is your enemy.  Those parts that weigh

5  heavier have greater force than velocity and therefore

6  can lead to the trigger being pulled, you know,

7  unintentionally.  Although the person who owns the

8  firearm certainly didn't intend for that discharge, but

9  the gun doesn't know any better because the trigger got

10  pulled.

11        So the lighter weight helps on the physics of

12  the fall and the sear also -- the difference in the sear

13  makes it far less likely that you will have a drop fire.

14        So there's the weight change for the trigger,

15  there's a weight change for the -- striker safety is

16  also made of lighter material, and there's another --

17  Steve Chaucer is here and he can remind me, but I think

18  there's another notch also on the sear which provides

19  basically belts and suspenders so that that trigger

20  doesn't release from the sear with the inertia of a

21  drop.

22        THE COURT:  I see.

23        MR. JOYCE:  So you basically have lightened

24  parts, a couple of lightened parts, and you also have

25  another notch on the sear which if it skips off of one,

1   it's going to hit that second notch.

2        THE COURT:  In terms of trigger pull weight,

3   if that's the right term --

4        MR. JOYCE:  Well, it's the weight of the

5   trigger itself.  It's not the --

6        THE COURT:  The pull weight is the actual

7   weight of the trigger.

8        MR. JOYCE:  Well, the pull weight is the

9   pounds per square inch required to pull the trigger

10  back.  Here they actually -- the part, the trigger has

11  less weight to it so it's --

12       THE COURT:  The trigger weighs less, not the

13  amount of force required to pull the trigger but the

14  trigger itself.

15       MR. JOYCE:  Correct.  Right, right.

16       So with the drop you get -- when the energy is

17  supplied by the drop, the heavier the part is the more

18  likely that is to move to a point of discharge, and when

19  you lighten that up in combination with the other fixes,

20  it was a good engineering project.  They solved the

21  vulnerability.  And to Sig's great disappointment, we

22  got sued in this case anyway and we don't think we

23  should have been and that's why we made a motion to

24  dismiss.

25       THE COURT:  Understood.  Understood.

1          MR. JOYCE:  I am going through -- I think one

2     of the other issues that I did not address is on the

3     fraud.  You know, obviously the plaintiff doesn't

4     address the necessity of individualized reliance

5     increase with respect to his fraud-based claims.  States

6     have different laws in terms of reliance and other

7     issues on fraud claims.  It makes it impossible to

8     maintain, you know, a nationwide class action.

9          In the Texas action, reviewing material,

10    identical class-based fraud claims found that such

11    claims would require resolving whether each class member

12    when purchasing a P320 relied on the statements made in

13    Sig Sauer's marketing campaigns in deciding to purchase

14    their P320 pistol.

15          So really I think that was the point that --

16    the actual point that I was trying to make is that the

17    individualized reliance associated with fraud claims

18    requires you to dive down into the individualized facts

19    of each purchaser and therefore lacks the commonality

20    there.

21          The court in Texas struck down those fraud

22    claims as a matter of law and did not give leave to

23    replead those claims, your Honor, but the plaintiffs

24    come back with the same request for class certification

25    of fraud claims here in this court.

1          As a technical matter, your Honor, on the

2     warranty, I mentioned that the plaintiffs were quick to

3     file the New Hampshire complaint after the Texas

4     decision and they were so quick that they got their

5     notice backwards.  They filed a lawsuit and then Sig was

6     notified of the loss and that's a technical basis for

7     the dismissal of warranty.  Sig understands that if it's

8     dismissed on that technical basis they can come back and

9     refile an action getting it right, so we're emphasizing

10    the merits-based arguments to the Court but that

11    technical deficiency does exist as well.

12          Mr. Folsom is going to argue two things, your

13    Honor, on his choice of law, which is the reason why

14    Arizona law is going to apply to Mr. Ortiz's claims, and

15    then the second is the New Hampshire consumer fraud

16    statute.

17          Thank you.

18          THE COURT:  Why don't we do this.  Rather than

19    address the New Hampshire CPA and the choice law now,

20    why don't we let plaintiff's counsel respond to the

21    arguments you've made.

22          MR. JOYCE:  Okay.

23          THE COURT:  And then we'll go back.

24          MR. MARCHESE:  Thank you, your Honor.

25          THE COURT:  Yep.

1            MR. MARCHESE:  So this is a putative class

2    action concerning a dangerous gun safety issue.

3    Specifically, the case concerns a design defect with the

4    defendant's P320 pistols which were first sold in 2014.

5            As originally designed, every P320 pistol has

6    a drop-fire defect, meaning that the P320 is unduly

7    prone to firing when dropped on the ground.

8            The cause of that defect is that the P320 was

9    originally designed with a trigger mechanism that was

10   too heavy, which defense counsel alluded to earlier.

11           Despite that drop-fire defect, defendant

12   represented to consumers on its website and in its other

13   marketing materials that the P320 was drop safe and it

14   would not fire unless you want it to.

15           Those claims were made from 2014 through at

16   least 2017 and they were made including as part of the

17   defendant's safety without compromise marketing

18   campaign, but those representations about drop safety

19   were false.

20           The plaintiff bought his P320 pistol for about

21   $500 from a firearms dealer in Arizona in September --

22           THE COURT:  When you say false, let me just

23   ask you though, it met all applicable standards, didn't

24   it?  It's just that -- that's what defense counsel

25   argues.  Is he wrong about that?

1          MR. MARCHESE:  Defense counsel argued that the

2     gun had a vulnerability.

3          THE COURT:  A vulnerability not addressed by

4     the applicable standard.

5          MR. MARCHESE:  But it was addressed by the

6     Army when the Army told them that the gun was defective

7     in 2016 because of a drop-fire defect.  So it was

8     defective enough for the Army to tell them that if they

9     didn't fix the drop-fire defect, they weren't going to

10    get the contract with the military.

11         THE COURT:  Yeah.  All right.

12         MR. MARCHESE:  And I just think that civilians

13    should just get the same sort of benefit that our men

14    and women in uniform were getting when the Army had its

15    weight behind that statement that the gun was defective.

16         So prior to the plaintiff's purchase he read

17    on the defendant's website and in one of the defendant's

18    marketing brochures that the gun was drop safe; that it

19    wouldn't fire unless he wanted it to.  And he relied on

20    those claims in deciding to purchase the weapon, and he

21    alleges that he would not have bought it had he known

22    that those claims were not true or he wouldn't have paid

23    as much.  So effectively that he was overcharged for the

24    defective pistol, and he's bringing his suit for money

25    damages and injunctive relief.

1            I want to go back and talk about that contract

2    with the Army.  So Sig won a contract with the

3    Department of Defense to make a military version of the

4    P320 in 2016.  The military version of the pistol used

5    the same design as the civilian versions that our case

6    is about with the heavier trigger mechanism, and during

7    testing in April of 2016 the Army confirmed that the

8    pistols fired unintentionally when dropped, which the

9    Army deemed to be a deficiency with the guns.

10           The Army traced the deficiency to the issue

11   with the trigger and directed Sig to modify the trigger

12   mechanism to correct the deficiency.  So there's no

13   question that the defendant had actual notice of that

14   defect back in April of 2016.

15           Sig replaced the heavy triggers with a lighter

16   trigger mechanism on the military version of the

17   pistols, but it did not change anything on the civilian

18   version of the P320s for more than one year, and did not

19   offer to do so either.

20           Sig admits that it then conducted additional

21   testing after hearing from the Army and their testing

22   confirmed drop-fire discharges with the P320.  Sometime

23   in late 2017 Sig then changed the design of the civilian

24   P320 by replacing the original heavy trigger with a

25   lighter trigger mechanism, but before that change was

1   made Sig had sold more than 500,000 defective pistols to

2   consumers.

3           Then in August of 2016 Sig announced the

4   so-called voluntary upgrade for its P320 pistols.  As

5   part of that program, which sometimes takes up to four

6   to six weeks, Sig installs the lighter trigger and an

7   improved sear to address the drop-fire safety issue, but

8   Sig did not provide effective notice of the program to

9   its consumers and it misrepresented the very nature of

10  the program, sometimes expressly stating that the guns

11  were safe in their original design and that the upgrade

12  had nothing to do with drop safety.

13          And as a result, there are still hundreds of

14  thousands of these defective P320s out on the streets in

15  consumers' hands.

16          THE COURT:  Doesn't that overstate it when you

17  say that it doesn't have anything to do with drop

18  safety?  I mean, it wasn't emphasized in those

19  materials, but nothing to do?

20          MR. MARCHESE:  I believe in our complaint we

21  actually have the Q&A, and the allegations that we made

22  I think quote defense executives and employees talking

23  about how the voluntary upgrade has nothing to do with

24  drop safety.  Nothing to do.

25          I'd like to move to the standing argument.

1              So plaintiff Ortiz has sufficiently alleged an

2    injury in fact that confers Article 3 standing for his

3    claims.  He's alleging a design defect that's inherent

4    in every P320 that was made pursuant to the original

5    design, and he alleges a resulting economic injury for

6    himself and on behalf of the putative class members.

7              He paid for a gun that was represented as drop

8    fire but instead received a gun with a drop-fire defect

9    and that's quintessential economic harm, your Honor,

10   suffered at the point of purchase.

11             The plaintiff and the putative class members

12   can pursue money damages because they received less than

13   what they bargained for at the time of purchase and were

14   overcharged as a result, and First Circuit case law

15   holds that this type of economic damage can serve as the

16   basis for Article 3 standing.  And we cited the

17   Gustavsen case, 903 F.3d 1, and the Nexium Antitrust

18   Litigation case, 777 F.3d 9, in support of that

19   proposition.

20             Moreover, plaintiff Ortiz alleged damages in

21   the form of diminished resale value among other things,

22   and we talked about that -- or Sig's counsel talked

23   about that.  Here diminished resale value damages are

24   plausible because there's a very real likelihood that a

25   defective P320 will discharge a round unintentionally

1   when dropped, and also because of the publicized

2   incidents of severe physical injury that have occurred

3   due to the defect, and we've alleged those in the

4   complaint in paragraphs 27 to 31.  So I do think it's

5   plausible that there's a taint on the P320s at resale,

6   especially when you're hearing about busted femurs and

7   busted legs and broken bones that have occurred because

8   of these drop-fire incidents.  So we've made those

9   allegations in the complaint, and I think we have

10  alleged sufficiently that the diminished resale value

11  damages are plausible.

12          And, you know, one other thing I would say.

13  We're at the motion to dismiss stage, and I think what

14  you and defense counsel were talking about earlier about

15  diminished resale value may have actually been getting

16  into some issues of fact that wouldn't really be --

17          THE COURT:  That go beyond the four corners?

18          MR. MARCHESE:  Yeah, that wouldn't be

19  appropriate to decide at the motion to dismiss stage.  I

20  would like some discovery on that if your Honor was

21  coming out on that issue that way.

22          THE COURT:  To be honest with you, I was

23  really more -- I thought I was focused on the pleadings

24  and I was really sort of looking at it in your favor.

25  Just, you know -- he's basically saying that it's

1   impossible given what the facts are that there could be

2   resale reduction, value reduction, and I understand

3   given the possibility that on your pleadings I thought

4   maybe there could.

5           MR. MARCHESE:  I agree.

6           THE COURT:  But I don't know if it gets into

7   the fact of beyond the four corners.  It's more of a --

8   here's the thing, I draw inferences in your favor at

9   this point.  That's the law.

10          MR. MARCHESE:  Yes, and we'll take that

11  inference.

12          So, now, the defendant made the same Article 3

13  standing arguments in his motion to dismiss in the

14  Gordon case, which is the case pending in the Southern

15  District of Texas, but those arguments were rejected by

16  the court down there.

17          The cases that defendant cited on this point,

18  they either cut our way, they're not relevant, or

19  they're out-of-circuit cases that are not binding.

20          So the Everett case that my adversary

21  discussed, it doesn't even involve an allegation of a

22  design defect, your Honor.  Rather, the allegations in

23  that case were based on a manufacturing defect with some

24  seatbelts.  And in Everett the seatbelts never

25  malfunctioned, but here we allege right in the four

1  corners of the complaint that there have been numerous

2  incidents where the P320 users were shot and injured as

3  a result of a drop-fire incident.  So the alleged defect

4  here has very much been manifested in that way, and we

5  have a real safety issue on our hands.

6            And the Coghlan case, that cuts in our favor.

7  That was a case about someone who was promised a

8  fiberglass boat, and instead they got fiberglass in a

9  wood boat.  Well, my client was promised a drop-safe

10  gun, and instead he got a drop-fire defective gun.  So

11  that cuts in our favor.

12            Sig also cited to --

13            THE COURT:  Let me ask you a question, though.

14  Why not take advantage of the upgrade?  If the upgrade

15  doesn't cure the defect, it doesn't undermine your

16  position even from a litigation standpoint.  I mean, why

17  not get it?  Why ever possess a less safe firearm?

18            MR. MARCHESE:  What I can tell you is that my

19  client, you know, he was outraged about the fact that --

20            THE COURT:  Yeah, I don't know.  I'm not big

21  on outrage as a means for sustaining litigation.  I'm

22  not trying to be --

23            MR. MARCHESE:  And I'm going to get to the

24  voluntary upgrade and why it doesn't root out any claims

25  shortly.

1          I just want to talk about the Rule case, which

2    is a First Circuit case, the heartworm medicine for the

3    dogs.  That case is distinguishable.  There the court

4    based its ruling that the plaintiff didn't have standing

5    on the fact that she had used up all the pet medicine at

6    issue and faced no continuous risk of harm or diminished

7    resale value.  And that's different from our case where

8    the plaintiff alleges not only that he overpaid for the

9    pistol in the first instance, but also that he's harmed

10   in the form of the diminished resale value.  So we think

11   that, you know, the Court can draw a distinction in our

12   favor for the Rule case.

13          For the first time in its reply brief the

14   defendant cited the Kerin case, also a First Circuit

15   case.  That case was about a manufacturing defect with

16   outdoor stainless steel piping that provided gas to an

17   outdoor fire pit in the plaintiff's home, and the claim

18   was that the piping could fail if it was hit by

19   lightning and the plaintiffs sued for economic damages.

20   The court dismissed for lack of standing because the

21   risk of future harm, i.e., a lightning strike, was too

22   remote and speculative.

23          But again, this case is distinguishable from

24   the Kerin case because the drop-fire design defect is

25   manifest in every P320 pistol as originally designed.

1   We're not talking about lightning strikes here, your

2   Honor.  I mean, we have allegations in the complaint of

3   numerous incidences where people are getting shot by

4   these guns through a drop fire.  It's not like winning

5   the lottery or getting hit by lightning.

6          Here the complaint seeks economic damages and

7   sufficiently alleges actual publicized injuries

8   resulting from the drop-fire incidents, thereby

9   demonstrating that the risks here are real and not

10  speculative like a lightning strike.

11         And to your point, the plaintiff's claims are

12  not muted by the Voluntary Upgrade Program, and the

13  plaintiff alleges that the Voluntary Upgrade Program

14  would not make him whole.  It simply does not compensate

15  him for lost use of the firearm during the upgrade

16  period, which I told you we have information that that

17  sometimes takes four to six weeks.  It does not

18  compensate for diminished resale value.  It does not

19  provide full compensation for the benefit of bargain

20  damages.  And the plaintiff asserts legal claims that

21  provide for remedies that go beyond what the so-called

22  Voluntary Upgrade Program provides, including statutory

23  damages, punitive damages, and trebling damages.  We

24  also seek some injunctive relief that the Voluntary

25  Upgrade Program does not address.  So the voluntary

1    upgrade does not mute any of the plaintiff's claims.

2            THE COURT:  Your treble damages, is there any

3    -- besides New Hampshire Consumer Protection Act, are

4    there any other trebling statutes?

5            MR. MARCHESE:  The one I just talked about,

6    that was the one that I was thinking about.  I can't

7    think of any other standing here right now, but, you

8    know, whatever is in the complaint is in the complaint.

9            THE COURT:  Is there any difference between an

10   inherent design defect and a potential defect in, you

11   know, the entirety of the production lot of a product

12   that may or may not ever manifest itself?  What's the

13   difference?

14           MR. MARCHESE:  Well, I mean, what we're

15   talking about here -- and maybe one of the ways we can

16   talk about that is that Everett case where there was a

17   manufacturing defect with some seatbelts, but I think in

18   the course of ten years not one seatbelt had

19   malfunctioned.  That's not what we're talking about

20   here.  And if I was to amend the complaint --

21           THE COURT:  We've got malfunction, but we just

22   don't have your client's malfunction.  But we have

23   malfunction.

24           MR. MARCHESE:  Oh, yeah, we have malfunction

25   and we have maiming happening.  So the result in the

1   defect is very, very real, you know, and the notice of

2   the defect has been insufficient, not clear, not

3   conspicuous.  It's actually -- you know, the defect has

4   really been, you know, has really been concealed

5   somewhat by the defendant's statements.  I think even

6   the CEO came out and said, oh, there have been no

7   reported incidents of the -- of a drop fire in the

8   market.  I mean, that's, you know, that's outrageous.

9           THE COURT:  Well, it's outrageous -- it comes

10  down to, I'm assuming -- you know, I'm trying to not

11  assume the worst here.  I'm assuming that comes down to

12  a different definition of what actually constitutes drop

13  fire, right?  That's the only way I can --

14          MR. MARCHESE:  Look, I don't know what the CEO

15  was thinking, but that's what the CEO said.

16          So I'd like to move on to standing about class

17  claims.  I think those arguments about no standing to

18  represent a class, they're premature at the pleading

19  stage.  I think in the First Circuit you're going to see

20  that there's case law that says, number one, a motion to

21  strike class claims are drastic in disfavor of a remedy

22  at this juncture, and those arguments should be taken up

23  after the plaintiffs had an opportunity to take some

24  discovery and make a class certification motion.

25          We cited First Circuit authority for that

1  point, including the decision in <u>College of Dental</u>

2  <u>Surgeons of Puerto Rico versus Connecticut General Life</u>

3  <u>Insurance Company</u>, 585 F.3d 33.

4           Plaintiff also has standing to bring claims on

5  behalf of a nationwide or at the very least a

6  multi-state class.  He alleged a common course of

7  conduct resulting in the same type of injury for

8  everyone in the putative class, and class treatment

9  would therefore be appropriate.

10          In our briefing we argue that plaintiff will

11  be able to certify a nationwide class by applying New

12  Hampshire choice of law rules.  I don't know if you want

13  me to talk about that now or --

14          THE COURT:  No, you can respond to him when he

15  addresses it.

16          MR. MARCHESE:  When he addresses it?  Okay.

17          So I'll talk about the class definitions.

18          The defendant says they're overbroad.

19  Plaintiff needs some discovery to accurately pin down

20  the scope of the class.  For example, helpful discovery

21  would include the exact date when the defendant changed

22  the design of the P320s.  I don't have that now.

23          It would include the exact dates that the drop

24  safety claims were made and where they were publicized.

25  It would include details and timing about the

1     defendant's drop-fire testing itself and the results of

2     that testing.  And using that evidence, the plaintiff

3     could tailor his class definitions in a motion to

4     certify a class, or the Court could alter a class

5     definition sua sponte, or the Court could even create a

6     subclass.

7               And so the right time to address those issues

8     about class definitions I think is at the class

9     certification stage and not at this juncture.

10              Regarding warranty claims, we sufficiently

11    plead warranty claims based on the stand-alone

12    representations by the defendant in their advertising

13    that the P320 pistols were drop safe and would not fire

14    unless intended.  Those claims were not true because of

15    the design defect.  We do not base our warranty claims

16    on Sig's limited lifetime warranty, which does not even

17    apply to design defects but rather to manufacturing

18    defects.

19              The plaintiff sufficiently pleads a claim for

20    breach of implied warranty of merchantability.

21              THE COURT:  Is there any difference between a

22    warranty that a product is defect-free and a warranty

23    that it will perform at a certain level, or is that just

24    the way it's pleaded?

25              MR. MARCHESE:  So I think you're talking about

1    the Mag-Moss.  Those are different.  There are two

2    prongs under Mag-Moss, and one prong is the free of

3    defects prong.

4         The other prong is about a specified time and

5    a specified level.  We're not talking about the

6    specified time and a specified level.

7         THE COURT:  You're talking about defect-free.

8         MR. MARCHESE:  They said drop safe, and so

9    we're talking about defect-free.

10        THE COURT:  Okay.  Yeah.

11        MR. MARCHESE:  So under breach of implied

12   warranty we sufficiently allege that the guns were not

13   of fair average quality.  Indeed, the United States Army

14   found them to be deficient and required them to be fixed

15   before providing them to our soldiers.

16        Mag-Moss we just talked about.  You know, we

17   think that notice was sufficiently given prior to filing

18   the complaint, and I'd like the Court to note that the

19   Army notified Sig of this issue in 2016.  I mean, I'd

20   say that's actual notice for years.  So that's adequate

21   notice in the class context.

22        The defendant had ample time to cure but they

23   haven't taken steps to do so, and that's what Judge

24   Rosenthal ruled also when that same argument was made to

25   her in the Gordon case in Texas.

1          And we did provide a notice letter, you know,

2     prior to the filing of the complaint.  I'm not sure if

3     that was said by my adversary.

4          Unjust enrichment.  The First Circuit has

5     recognized a plaintiff's right to plead a claim for

6     unjust enrichment in the alternative to contract-based

7     claims, and we cited the Lass v. Bank of America case,

8     695 F.3d 129.  It's First Circuit, 2012.  And thus, the

9     plaintiff's warranty and unjust enrichment claims should

10    move forward simultaneously.

11          The defendant did not move to dismiss Count 5,

12    fraudulent concealment; Count 6, fraud; or Count 7, the

13    Arizona consumer protection statute claim.  So I would

14    argue that those claims should all move forward past the

15    pleading stage, and I would also object to the Court's

16    consideration of the cases about Arizona warranty law

17    that --

18          THE COURT:  Privity cases.

19          MR. MARCHESE:  Yeah, that the defendant

20    e-mailed me yesterday when I was on the plane and didn't

21    put in any of the briefs.  So I'd like the Court -- I'd

22    like the Court not to consider those because they didn't

23    make it into any of the briefing.

24          THE COURT:  I'll put it to you this way.  I

25    have the cites.  I'm going to take a look at them.

1    Should I decide to consider them, I'm going to give you

2    an opportunity to respond.

3              MR. MARCHESE:  Okay.  I mean, what I did see,

4    I think those were summary judgment cases, your Honor.

5    We're at the motion to dismiss stage.  And I think those

6    cases are also about, like, a limited warranty that that

7    defendant had, but our client's claims are not about,

8    you know, are not about Sig's limited liability

9    warranty.  They're about the freestanding

10   representations about drop safety that the defendant

11   made all over its website and marketing material.

12             THE COURT:  Looking ahead at the class

13   certification, though, do you have a makeable case --

14   have you pleaded a makeable case for fraud on a common

15   classwide basis?

16             MR. MARCHESE:  I think I did, and I'm going to

17   tell you why.

18             THE COURT:  Okay.  That's my question.

19             MR. MARCHESE:  So I gather you're talking

20   about reliance, right?

21             So I believe, and I cited some cases to you

22   where nationwide fraud claims have been certified in

23   consumer class actions.  My firm did two of those.

24   That's Ebin v. Kangadis, I don't have the cite but it's

25   in the briefs, and Hart versus B -- I think it's BHH,

1    <u>LLC.</u>   Hart is spelled H-A-R-T.   And one case was about

2    olive oil, another case was about bug repeller, but the

3    essence of what those cases say is that, you know, when

4    you have misrepresentations that are so central to a

5    product that reliance must be presumed because of the

6    centrality of the misrepresentations in a consumer

7    context, and here I would argue that the drop safety,

8    the gun safety representations are those types of

9    representations, are those types of claims.   So that

10   reliance can be effectively applied on a classwide

11   basis.   That's my argument.

12           You may have to -- that's it in a nutshell.

13           THE COURT:   I got it.

14           MR. MARCHESE:   All right.   The New Hampshire

15   Consumer Protection --

16           THE COURT:   Besides here and Texas, are there

17   any other Sig P320 cases out there, class?

18           MR. MARCHESE:   Yes.

19           THE COURT:   There are?

20           MR. MARCHESE:   Yes.

21           THE COURT:   Can you tell me?

22           MR. MARCHESE:   Yeah, there's one called

23   <u>Hartley</u>.

24           THE COURT:   What district?

25           MR. MARCHESE:   Where is it?

1          MR. JOYCE:  That is in Missouri, federal court

2     in Missouri.

3          MR. MARCHESE:  Now, that case does not concern

4     the drop-fire defect.  That's an out-of-battery

5     discharge case.  And I understand from the public filing

6     that that case the parties have reached agreement for a

7     classwide settlement and applied for --

8          THE COURT:  That's not your case then?

9          MR. MARCHESE:  That's not my case.  And I

10    think there's a motion for preliminary approval on that.

11         THE COURT:  Counsel, are there any others out

12    there?  Any other Sig gun --

13         MR. JOYCE:  No other class action cases.  That

14    was it.

15         THE COURT:  Thank you.

16         MR. MARCHESE:  So the New Hampshire Consumer

17    Protection Act.  Defendant argues --

18         MR. FOLSOM:  Do you want to hear from

19    defendants first on that?

20         THE COURT:  I did want to hear from them

21    first.

22         MR. MARCHESE:  Oh, okay.  Sorry.

23         THE COURT:  And I'll give you the last word on

24    it.

25         MR. MARCHESE:  Very well.

1          MR. JOYCE:  Your Honor, can I just very

2     briefly reply to a few of the things that he said?

3          THE COURT:  Yes.

4          MR. JOYCE:  So, I mean, first of all, as an

5     advocate, it's always hard to sit through motions to

6     dismiss where you have to hear things recited as if they

7     are facts and that are not, so I will be patient and

8     not --

9          MR. MARCHESE:  I tried to stick to the

10    complaint.

11         MR. JOYCE:  -- take up your Honor's time with

12    that.

13         But in the plaintiff's complaint, and then I'm

14    hearing plaintiff say that we have the voluntary upgrade

15    and says it has nothing to do with drop fire, that's

16    just not -- if you even look at the plaintiff's

17    complaint, that's just not even true.

18         If you look at paragraph 48 of the plaintiff's

19    complaint when they're citing our FAQs that support the

20    -- explain to folks what we're doing and why, what is

21    the P320 Voluntary Upgrade Program, you know, they say

22    we're offering this program.  It says what we're doing.

23    Why is this upgrade happening?  And it says right under

24    that that it meets the standards, but there's this

25    vulnerability that was found and we're going to fix that

1    for you.

2              So it's just not true.  Even if you look at --

3    take all the plaintiff's complaint allegations as true,

4    which you have to, it's not even consistent with their

5    own pleading.  When they're saying that corporate

6    representatives said the upgrade had nothing to do with

7    drop safety, they're talking about the addition of a

8    mechanical disconnector, which is described at paragraph

9    15 in the complaint, and they say the mechanical

10   disconnector, which is another change that Sig made to

11   improve the trigger performance, that had nothing to do

12   with the voluntary upgrade because that was true, it

13   didn't -- rather, with the drop safety.

14             So we said, we changed these parts and that

15   has to do with the drop safety.  We changed the

16   mechanical disconnector, and that had nothing to do with

17   the drop safety but we're adding it because we think it

18   improves the performance of the gun.  So that's what

19   he's referring to.

20             And then if you look at page 15 of his

21   complaint, you'll see that that comment correlates

22   expressly with the mechanical disconnector.

23             With respect to the standing issue, and

24   there's reference to the CSST case which talked about

25   speculative future injury, that case there was 145 or so

1   instances where lightning hit the CSST tubing.  It's not

2   like some highly speculative thing that has never

3   happened before.

4           And then the seatbelts.  The allegation, which

5   had to be taken as credible, was that there was a

6   propensity for these seatbelts to unlatch.

7           What's the difference between an understanding

8   which had to be accepted as true that there was

9   propensity for something to happen but it hasn't

10  happened in the marketplace yet?  That's somehow totally

11  different?

12          There is a potential risk in both those

13  instances of future harm that hasn't happened to the

14  plaintiff and in neither of those cases do we have

15  what's here, which of course is the Voluntary Upgrade

16  Program, and they were dismissed anyway.

17          With respect to the claims that plaintiff is

18  claiming that somehow their warranty claims that they

19  mentioned, oh, we said it was drop safe and it was in

20  relation to existing standards, but assuming for the

21  sake of argument here that that is to be regarded as

22  offending contract, that goes to the reason for the

23  breach of the warranty.  The warranty was I'm going to

24  give you a defect-free product.

25          And the plaintiffs conceded their warranty

1    that -- the warranty they're proceeding on is that there

2    was a defect; that the product was not free from defect.

3    That's exactly the express warranty that Sig gives, that

4    this product is free from defect, and what it says is,

5    if we screwed that up, if we make a mistake and give you

6    something with defect, this is what we will do.  We will

7    repair or we will replace it if you bring it back to us.

8    That's it.  And that's all the plaintiff gets here.

9          So when they're talking about these other

10    alleged damages under warranty period that the plaintiff

11    wants to proceed on, this speculative resale value, they

12    don't get that.  That's not part of the limited

13    warranty.  They get repair or replace.  That's what they

14    signed up for, and that's exactly what Sig has already

15    provided this plaintiff.

16          It's telling that the one question that

17    plaintiff, who is obviously an able advocate, great on

18    his feet and a smart guy, the one question that he

19    really couldn't answer was why there's no there there.

20    Why did this person simply not return his firearm and

21    get it upgraded.

22          THE COURT:  Outrage isn't going to do it.

23          MR. JOYCE:  No.  We don't think so under the

24    law, your Honor.

25          And then he says, well, plaintiff says, oh,

1    well, we want you to assume that there's four to six

2    weeks' delay in getting an upgrade done.  First of all,

3    that's not true.  But second of all, we'll never know

4    the answer to that one, your Honor, because Mr. Ortiz

5    never gave Sig a chance to do that and he has no

6    standing to make that argument.

7              So with that, I think I will sit down, your

8    Honor.

9              THE COURT:  Let me just ask this question

10   before we get to that.  And I mean this in a respectful

11   way, a deferential way, because it's a deferential

12   standard, right?  I mean, what could be the scope of

13   damages here, like on a per gun basis?  And you're a

14   professional at this game.  I'm not.  I handle three

15   class actions a year maybe, all right, and sometimes I

16   wonder about the math.  You must have an idea.  What are

17   you thinking?

18             MR. MARCHESE:  I mean, the scope of damages --

19   I told you there are by my estimate 300,000 of these

20   that are on the market that -- there were 500,000 on the

21   market, but then there were 300,000 where I understand

22   probably have not got a voluntary upgrade.  And there

23   are some, you know, there's some measure, you know, of

24   the purchase price.  Like what is a gun that's

25   defective, you know, that has a drop-fire defect worth

1   to you compared to a gun that's safe?

2          THE COURT:  Well, its worth to anybody.  It's

3   whatever the cost is of the upgrade.  Unless you don't

4   buy into the upgrade, but you haven't said that.

5          MR. MARCHESE:  I'm sorry.  I didn't hear you.

6          THE COURT:  Unless you don't buy that the

7   upgrade wasn't effective, and you have not alleged that.

8          MR. MARCHESE:  We have not alleged that.

9          THE COURT:  So it's a question of loss of use

10  while the upgrade happens and I guess any diminution in

11  what you say is resale value.

12          I don't think the idea that -- the defendant

13  is not going to want to hear this, but I don't think the

14  idea that there's been a diminution in resale value,

15  even post-upgrade, is necessarily farfetched.  I think

16  it's something that I can wrap my mind around.  I don't

17  know how it plays out beyond 12(b), but it's something I

18  can wrap my mind around.  But I'm just trying to do the

19  math and I'm just sort of curious about --

20          MR. MARCHESE:  Look, some of that -- it really

21  does get into some kind of expert discovery, and I just

22  don't -- you know, I don't have that right now for you,

23  your Honor.

24          THE COURT:  Understood.  That's a straight

25  answer.  Go ahead.

1    MR. JOYCE:  Is that question being posed to

2  me, your Honor?

3    THE COURT:  No, it wasn't.  I know what your

4  answer is.  It's somewhere around zero.

5    MR. JOYCE:  Yeah.  That's probably correct,

6  your Honor.

7    THE COURT:  And I didn't mean that to be a

8  wise guy.

9    MR. JOYCE:  I know, your Honor.

10    THE COURT:  All right.  Go ahead.

11    MR. FOLSOM:  Thank you, your Honor.  I'm going

12  to address two discrete issues here.

13    One of them is the New Hampshire choice of law

14  issue which was -- really arose in response to our, the

15  portion of our motion to strike the nationwide class

16  allegations, and then the second is the sufficiency of

17  the New Hampshire Consumer Protection Act claim.

18    On the choice of law, sitting in this forum,

19  the Court applies New Hampshire choice of law, and

20  really the question is what's the appropriate choice of

21  law test here --

22    THE COURT:  Yeah.

23    MR. FOLSOM:  -- under New Hampshire law.  And

24  I should say here I'm focusing -- given that this arose

25  in the context of issues of predominance in terms of

1  questions of law, I'm focusing here on the claims that

2  sound in contract:  the express warranty, implied

3  warranty, and then WA claims, and leaving aside the tort

4  claims for now.

5          With respect to the claims that sound in

6  contract, the appropriate test is the restatement of the

7  conflict of laws, and the issue is that you apply the

8  law of the state with the most significant relationship

9  to the contract.  That's the law that's going to govern.

10          And there are a number of factors the

11  restatement looks to to determine what that state is:

12  place of contracting, place of negotiation, place of

13  performance, location of the subject matter of the

14  contract, domicile, residence, nationality, place of

15  incorporation of the parties.  And here the purchase,

16  the contract, it occurred in Arizona.

17          I heard counsel say, and it's in their

18  complaint, that Mr. Ortiz purchased the P320 from a

19  firearms dealer in Arizona.  And in terms of -- and

20  so -- this is where I would point to the two district

21  court cases that we cited in our briefs, Fenwick and

22  Payne, which were both factually similar to the

23  allegations here.  Both class actions.  Both putative

24  nationwide class actions.  Both involving alleged

25  misrepresentations about the quality of a product.

1          And in both of those cases the courts found

2     that it was the state where the product was purchased

3     that had the most significant relationship to the

4     contract because that's where the consumer is buying the

5     product.

6          So in <u>Fenwick</u> you had a defective

7     cholesterol-reducing drug.  As here, the defendant was a

8     company with its headquarters in the forum state.  There

9     were alleged misrepresentations about the quality of the

10    product that emanated or came from the forum state, yet

11    the Court found that it was the home state of each

12    person who purchased the drug that had the most

13    significant relationship.

14          In <u>Payne</u>, defect in a camera, some aspect of a

15    camera memory.  Again, advertising, marketing, sales

16    took place throughout the country, and as that Court

17    found, each state has the most significant relationship

18    with the individual transactions that took place in its

19    state.  The breach of warranties existed at the time of

20    contract when the plaintiffs purchased the cameras in

21    the various states.

22          So they cite to cases from New Hampshire that

23    applied the <u>Clark</u> five-factor analysis which is more

24    appropriate for -- used in tort cases.

25          And they've cited to a district court case

1   here, the Caldwell case, but that was -- although the

2   warranties were involved in that case and breach of

3   warranties were alleged, that was really more of a

4   personal injury case.  It was surgical mesh.  The

5   plaintiff -- the named plaintiff had suffered physical

6   injuries and they were seeking personal injury type

7   damages, including compensatory damages, loss of

8   consortium, et cetera.  In that case, the Caldwell case,

9   there was no discussion of whether the Clark factors

10  should apply or the restatement of conflicts factors

11  should apply.

12         If the Court has any questions on the choice

13  of law -- okay, I'll move on to the New Hampshire

14  Consumer Protection Act.

15         As the Court knows, our argument on the New

16  Hampshire CPA is the territoriality argument.  You have

17  a case here where the plaintiff received the alleged

18  misrepresentations in Arizona, or at least that's the

19  fair reading of the complaint.  He purchased the gun in

20  Arizona.  There's no allegation that these statements

21  from Sig Sauer were received by him anyplace other than

22  where he resides.

23         The cases from this court applying New

24  Hampshire law make it clear that where there are alleged

25  misrepresentations involved, the offending conduct is

1   where the alleged misrepresentations were received.

2   This is the BAE Systems case.  The Enviromatics case.

3           In Enviromatics you had a Virginia company who

4   was the defendant.  They shipped product to a plaintiff

5   in New Hampshire, so you have a New Hampshire plaintiff,

6   together with materials containing the alleged

7   misrepresentations.  And there the Court found there was

8   a New Hampshire CPA claim because the deceptive act of

9   misrepresenting the condition of the product occurred in

10  New Hampshire when Enviromatics, the plaintiff, received

11  the pump and its allegedly false documentation.

12          So it's the act of receiving the statements or

13  the alleged misrepresentation that is the key here,

14  which makes sense.  I mean, if you, you know, have a

15  generalized statement emanating from a certain place, in

16  order to have a claim under the CPA that there's been a

17  misrepresentation you need someone receiving that

18  misrepresentation.

19          Unless the Court has questions on that

20  front --

21          THE COURT:  I'm good.  I understand your

22  argument.

23          Give me one moment, actually.  Hold on a

24  second.

25          If I find standing, are you still moving to

1  dismiss all these claims?  Right?  Does that matter to

2  your motion to dismiss all these claims?

3           MR. JOYCE:  I think I'd better address that

4  one.  If you find standing --

5           THE COURT:  Counts 5, 6 and 7, right, the

6  Arizona consumer fraud.

7           MR. JOYCE:  -- all the warranty claims would

8  still be gone under Arizona law.

9           THE COURT:  But the tort.

10           MR. JOYCE:  The fraud claims would still --

11           THE COURT:  I think they survive.

12           MR. JOYCE:  -- exist, but the New Hampshire

13  consumer fraud statute would not.

14           THE COURT:  All right.  Either of you can

15  answer this.

16           One thing we spent some time looking for was

17  case law on Arizona Consumer Fraud Act and what the

18  pleading standard is there.  Is it sort of a Federal

19  Rule 8 or a Federal Rule 9?  Does anybody know?

20           MR. JOYCE:  Yeah, I believe that that would be

21  -- since it's a fraud-based misrepresentation statute it

22  has to be the heightened pleading standard that applies.

23           THE COURT:  Is there any case law for that?

24           MR. JOYCE:  I can supply that.  Perhaps both

25  sides could address that in a short one-page letter to

1   the Court.

2           But I have some case law that I think you

3   would want to take a look at, the Sellinger versus

4   Freeway Mobile Home Sales, 110 Arizona 573.

5           THE COURT:  110 Arizona 573?

6           MR. JOYCE:  Yes.  I think that that outlines

7   the private cause of action for consumer fraud under

8   Arizona law.  I think that might be a helpful cite.

9           THE COURT:  All right.

10          MR. JOYCE:  But among other things, that

11  requires injury.  One of the things the plaintiff said

12  is we didn't move to dismiss certain causes of action,

13  but of course we did because we attacked standing and

14  that goes to everything.

15          THE COURT:  That covers the case.

16          If I want more law on the pleading standard

17  under the Arizona Consumer Fraud Act, I'll let you know.

18          All right.  Go ahead and respond.

19          MR. MARCHESE:  So we argue that the plaintiff

20  will be able to certify a nationwide class by applying

21  New Hampshire choice of law rules.  Under New Hampshire

22  law a choice of law analysis is only necessary when a

23  New Hampshire law actually conflicts with another

24  state's law.

25          So we contend that New Hampshire law can be

1  applied across the board, especially for claims where

2  there are no meaningful differences between state laws,

3  such as the unjust enrichment and the fraud or

4  fraudulent concealment claims.  But even for claims

5  where there are meaningful differences between the state

6  laws, plaintiff argues that New Hampshire's choice of

7  law rules would dictate applying New Hampshire law

8  across the board.

9          We suggest using the five-factor test laid out

10 in Caldwell.  This case is, you know, it's got some

11 fraud claims, tort-based claims, unjust enrichment,

12 consumer protection, and some warranty.  We would

13 suggest that the Caldwell five-factor test would be the

14 test that the Court should use.

15          It would simplify the judicial task before the

16 Court to apply New Hampshire law across the board, and

17 it would also advance New Hampshire's governmental state

18 interests here, which are substantial given that the

19 defendant is based in New Hampshire and all the alleged

20 misconduct took place in and emanated from New

21 Hampshire.  The manufacture and design of the guns, all

22 of the representations about drop safety, any of the

23 efforts to misdirect consumers about what the Voluntary

24 Upgrade Program is really about, all of that emanated

25 from New Hampshire.

1          Moreover, New Hampshire law supports very

2     sound policies for warranty claims, do not require

3     privity with the manufacturer or reliance, and so based

4     on a choice of law analysis New Hampshire law should be

5     applied nationally.  Even if the Court rules that the

6     laws of the various states should apply, however, the

7     plaintiff can still certify multi-state classes that

8     include consumers from different states that have

9     similar laws.

10          Regarding the New Hampshire Consumer

11    Protection Act, the defendant argues that the

12    plaintiff's New Hampshire Consumer Protection Act fails

13    because there was no offending conduct that took place

14    in New Hampshire, but that's wrong.

15          First, I would just note that there's no state

16    residency requirement for bringing suit under the New

17    Hampshire Consumer Protection Act.

18          THE COURT:  Right.

19          MR. MARCHESE:  Second, the definition of trade

20    and commerce under the act encompasses advertising or

21    offering for sale anything of value wherever situated.

22    Wherever situated, not just in New Hampshire.

23          And third, the plaintiff has cited cases

24    supporting his argument that the statute applies to

25    offending conduct that takes place in New Hampshire.

1            We cited the Muller and the Pacamore case.  So

2    under the act the location of the misconduct is the

3    determinative question.  The act applies if the

4    offending conduct took place in New Hampshire, like it

5    did here.  Again, the faulty design of the guns, the

6    marketing claims about the drop safety, and the cover-up

7    of the design defect all occurred in New Hampshire.  In

8    the Gordon case the defendant admitted that all of those

9    things occurred in New Hampshire and we cited that in

10   our brief.  So this claim should survive.

11            And moreover, we allege that -- we've alleged

12   that the defendant's misrepresentations were

13   disseminated on their website and on uniform marketing

14   materials which were obviously also received in New

15   Hampshire, too.

16            That's all that I have for now, your Honor.

17   Do you have any questions?

18            THE COURT:  No.

19            MR. MARCHESE:  All right.  Thank you.

20            THE COURT:  I'm good.  Just give me a moment

21   and let me check my notes here.

22            Talk to me about the difference of the scope

23   of discovery in this case.  Both sides, please.  If we

24   have nationwide claims on top of Ortiz's individual

25   claims, how does discovery look different?  I know it

1    looks different, but how?  Could you describe that?

2            MR. MARCHESE:  I honestly don't think it's

3    going to look that different.  You know, maybe we would

4    need like sales figures or something like that for the

5    nationwide sales as opposed to, you know, broken out by

6    state, but that's, you know, that's not hard to do.

7            I really don't think that the discovery would

8    look very different.  I mean, what would we need?  We

9    just need the advertising about the drop safety claims,

10   documents relating to the testing for drop fires,

11   documents relating to the voluntary upgrade, documents

12   relating to the design and manufacture of the guns and

13   any changes that they made to the design after 2017.

14           I don't really think it's going to differ that

15   much to be honest, your Honor, so I don't think

16   there's -- you know, this whole thing about, oh, it's

17   going to be such a big undertaking now that the

18   nationwide claims are in, that's just not true.

19           THE COURT:  What do you say?

20           MR. JOYCE:  Well, first of all, I hope you

21   have a couple of resources to hire a couple other

22   clerks, because we're going to be arguing 50 different

23   states' laws on some of these causes of action.

24           THE COURT:  But that's my problem, not yours,

25   right?

1          MR. JOYCE:  Well, it is our problem, too,

2    because we're going to be briefing with my friend over

3    there, plaintiff's counsel, as to whether we agree

4    whether the laws are identical or not and what they are.

5    So it adds a substantial burden to the case, so -- and

6    that's with respect to -- I mean, you have to go through

7    the individual claims, too, in determining whether they

8    require reliance and then it becomes impossible, so

9    whenever reliance is a factor you can't have a class

10   action.  There's no commonality.

11         THE COURT:  Thank you.

12         All right.  Gentlemen, I appreciate your

13   submissions.  I anticipate getting an order out here

14   pretty quickly.  I think I know what I want to do, but I

15   want to look at a couple issues you raised today.

16         I am not likely to get into the whole privity

17   issue under Arizona law, but if I do, you'll be given an

18   opportunity to say something about it, all right?

19         MR. MARCHESE:  Yes.

20         MR. JOYCE:  Your Honor, let me just say one

21   thing on that.

22         THE COURT:  Yeah.

23         MR. JOYCE:  The Court's going to have to

24   address that sooner or later --

25         THE COURT:  True.

1          MR. JOYCE:  -- because it's going to come up

2    on summary judgment, right?

3          THE COURT:  You're absolutely right.

4          MR. JOYCE:  So I think we should -- if I can

5    respectfully suggest that we do tackle it, and if the

6    plaintiff wants an opportunity to respond to that, the

7    Court take that, and then let's just -- you know, again,

8    it's not an issue that's going to go away.  It's front

9    and center.

10         THE COURT:  You're right.  Here's the problem.

11   It's not an issue that's going to go away, but I'm going

12   to go away Wednesday night for a month to try a case in

13   Puerto Rico so it might be later.  I take the

14   suggestion.  I appreciate the spirit in which it's

15   offered, it's not a bad idea, but I've got to give it

16   some thought.

17         MR. JOYCE:  Understood.  Thank you.

18         THE COURT:  All right.  I appreciate the

19   presentations and I'll get an order out here shortly.

20         We're adjourned.

21         (Conclusion of hearing at 4:28 p.m.)

22

23

24

25

C E R T I F I C A T E

    I, Susan M. Bateman, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings, to the best of my knowledge, skill, ability and belief.

Submitted: 3-3-20      /s/   Susan M. Bateman _____
                          SUSAN M. BATEMAN, RPR, CRR