*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO MAY 17, 2022

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                  *
DERICK ORTIZ, individually and on *
behalf of all others similarly    *
situated                          *
                                  *  1:19-cv-1025-JL
              Plaintiff,          *  February 4, 2022
                                  *  11:16 a.m.
         v.                       *
                                  *
SIG SAUER, INC.                   *
                                  *
              Defendant.          *
* * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MOTION HEARING
HELD VIA VIDEOCONFERENCE
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

Appearances:

| | |
|---|---|
| For the Plaintiff: | Benjamin T. King, Esq.<br>Douglas, Leonard & Garvey PC<br><br>Joseph Marchese, Esq.<br>Joshua Arisohn, Esq.<br>Bursor & Fisher PA |
| For the Defendant: | Benjamin B. Folsom, Esq.<br>McLane Middleton<br><br>Robert L. Joyce, Esq.<br>Brian Keith Gibson, Esq.<br>Littleton Joyce Ughetta Park & Kelly LLP<br><br>Brent Dwerlkotte, Esq.<br>Shook Hardy & Bacon LLP |

<u>Court Reporter</u>:                Liza W. Dubois, RMR, CRR
                                   Official Court Reporter
                                   U.S. District Court
                                   55 Pleasant Street
                                   Concord, New Hampshire 03301
                                   (603) 225-1442

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  Court is now in session and has before
 3   it for consideration a motion hearing in civil case
 4   19-cv-1025-JL, Derick Ortiz vs. SIG Sauer, Inc.
 5              Counsel, please identify yourselves for the record,
 6   starting with the plaintiff's counsel.
 7              MR. KING:  Benjamin King, local counsel for the
 8   plaintiff.
 9              MR. MARCHESE:  Good morning, everybody.  Joseph
10   Marchese for the plaintiff.
11              MR. ARISOHN:  Good morning.  Josh Arisohn of
12   Bursor & Fisher for the plaintiff.
13              MR. FOLSOM:  Good morning, your Honor.  Ben Folsom,
14   counsel for defendant, SIG Sauer.
15              MR. JOYCE:  Good morning, your Honor.  Robert Joyce,
16   Littleton Park, for SIG Sauer.
17              MR. GIBSON:  Keith Gibson, also from Littleton Park,
18   for SIG Sauer.
19              MR. DWERLKOTTE:  Good morning, your Honor.  Brent
20   Dwerlkotte, Shook, Hardy & Bacon, for SIG Sauer.
21              THE COURT:  All right.  Sorry to keep you waiting,
22   but, you know, I've been really sort of struggling with this
23   record and this briefing.  There's a lot of -- there's a lot of
24   talking past each other going on in this briefing, which is not
25   unusual, I know, for any -- any summary judgment briefing, but
```

```
 1    I find myself -- I find myself not particularly feeling that
 2    well informed, to be honest.
 3              Let me ask a couple questions about this.
 4              First of all, I got a note here from the deputy
 5    clerk that says Attorneys Marchese and Joyce are going to be
 6    handling the -- I guess the oral presentation today, which is
 7    fine.
 8              Is that right?
 9              MR. MARCHESE:  Yes, your Honor.
10              MR. JOYCE:  Yes, your Honor.
11              THE COURT:  So let me just ask straight out.  I'm
12    going to disclose this sometime.  Sometimes when I feel like
13    I'm not getting anywhere in oral argument, I start asking the
14    local lawyers questions because they answer them directly in a
15    way -- because they have to see me all the time.  I see Folsom
16    and I see King like all the time.  So if I ask them direct
17    questions, if they don't know, they're going to tell me and
18    they're not going to talk me around a tree for ten minutes.
19              But I don't want to also -- I also don't want to
20    sucker-punch them here and put them on the spot if they weren't
21    prepared to make these arguments today.
22              So, I guess, are you -- would you prefer, Ben and
23    Ben, that I focus on national counsel here and not be, you
24    know, crawling all over you today?
25              MR. FOLSOM:  Your Honor, I'm happy -- I'm happy to
```

1   answer questions that you have to the extent I'm -- certainly

2   to the extent I'm able, but I know Mr. Joyce has -- is prepared

3   and is ready to handle the argument.

4           THE COURT:  And I'm perfectly happy with that,

5   Mr. Joyce.  Don't worry about that.

6           And Attorney King?

7           MR. KING:  Attorney Marchese is far more conversant

8   with the -- with the issues than I am, your Honor.

9           THE COURT:  Okay.

10          MR. KING:  I'll answer whatever I can, but I -- I

11  haven't participated in depositions or anything like that, your

12  Honor.

13          THE COURT:  Okay.  That's fair.  That's a straight

14  answer, too.  I appreciate it.

15          Not that your answer wasn't straight, Ben Folsom.

16          Okay.  Good.

17          Let me ask a couple questions straight out then.

18  This is for Mr. Joyce, I guess.

19          As I read your damages argument -- by the way, I'm

20  going to let you make your presentation, but just a few things

21  I've got to kind of get clear on.

22          As I read your damages argument, it seems to me to

23  be a hundred percent focused on contract damages.  I don't see

24  any argument about fraud damages or unjust enrichment damages.

25  Should I assume based on that that the -- as far as you're

1   concerned, the damages work the same way for those claims, the

2   tort claims, as they do for the, you know, contract warranty

3   claims?

4            MR. JOYCE:  That's correct, your Honor.  The benefit

5   of the bargain damage construct applies both to contract as

6   well as -- as well as tort claims.  There's no -- there's no

7   distinction in terms of how the damages work.

8            THE COURT:  Okay.  Now, I don't know that to be the

9   case and your briefing doesn't, you know, cite authority for

10  that proposition, but I was curious about it.  So I assume if

11  that's not the case, you'll let me know at some point.  Right?

12           MR. JOYCE:  Yeah.  That is a general construct and

13  if you take a look at, for example, the *General Motors* case and

14  the *Toyota* case and all those same causes of action that the

15  plaintiffs raise in this case were at issue in those cases and

16  the courts in those cases, which are analogous to this case,

17  apply the benefit of a bargain rule both to the contract and --

18           THE COURT:  Across the board.

19           MR. JOYCE:  And in the court cases.  And I think,

20  actually, the *General Motors* court specifically explained that

21  that same construct applies.  There's no reason to distinguish

22  the causes of action in that regard.

23           THE COURT:  Okay.  That certainly would make things

24  simpler.  I just don't know.

25           Mr. Marchese, what's your particular observation of

1   the Court's --

2           MR. MARCHESE:  I agree with what Mr. Joyce said.

3           THE COURT:  Okay.  Yeah.

4           MR. MARCHESE:  I'll leave it there.

5           THE COURT:  So if I'm able to grant -- because I was

6   thinking maybe I can't grant summary judgment on these tort

7   claims.  But you're -- it sounds like you're telling me,

8   Mr. Marchese, that if I agree with Mr. Joyce on the damages

9   argument -- I'm not saying I do, but if I do -- that eliminates

10  all your claims, not just your contract claims.

11          MR. MARCHESE:  I -- I would -- I would generally

12  agree, your Honor.  I mean, we -- we also have sought other

13  types of relief, like injunctive relief, but on damages --

14          THE COURT:  Yeah.

15          MR. MARCHESE:  -- yes.

16          THE COURT:  All right.  Two more issues.

17          I -- I put a little order out, I think it was on the

18  26th, saying, look, I'm not clear on the parties' positions on

19  these papers on whether the online -- you know, the website

20  and the plaintiff's use of it creates a contract here.  All

21  right?  There's a little sprinkling of discussion of it in some

22  of the class cert papers, but not in these papers.  And so

23  nobody really took me up on that, so I guess I want to get down

24  to it.

25          I mean, I guess my assumption is that the -- the

1   plaintiff's use or the plaintiff's position is that on that

2   website and the terms of use of the website create a contract.

3   The defendant's position is that it does not.

4           Is that right, Mr. Marchese?

5           MR. MARCHESE:  So we -- we'd like to clarify that,

6   your Honor.

7           You know, we're -- we're not seeking application of

8   New Hampshire law pursuant to the governing law clause as a

9   binding agreement.

10          THE COURT:  Okay.

11          MR. MARCHESE:  You know, upon further discussions

12  with my client.

13          THE COURT:  Yup.

14          MR. MARCHESE:  You know, rather, the fact that SIG

15  on its website includes a governing law clause that broadly

16  applies New Hampshire law, we think that's telling, we think it

17  should be considered as a factor, and it shows that SIG would

18  expect New Hampshire law to apply to a dispute like this one.

19  And we think that makes a lot of sense --

20          THE COURT:  Okay.

21          MR. MARCHESE:  -- given how central New Hampshire is

22  to the subject matter of the case.

23          THE COURT:  All right.  So your point is -- I think

24  I understand this because, of course, on the website they

25  also -- they also disclaim any liability based on anything on

1     the website.  So it's a little problematic if that's the

2     agreement for the plaintiff.

3                But your point is you're not saying New Hampshire

4     law applies because the website says it applies.  You're just

5     saying it applies as a matter of choice of law and that it's

6     significant as a factor in that test that the website does say

7     that.  Is that a good summary?

8                MR. MARCHESE:  Yes, your Honor.

9                THE COURT:  All right.  Okay.  We're actually making

10    progress here.  These are --

11               MR. JOYCE:  I'm happy to hear that, your Honor.

12               THE COURT:  Yeah.  All right.

13               MR. JOYCE:  I just --

14               THE COURT:  I wish I would have known that before.

15               MR. JOYCE:  Go ahead.

16               THE COURT:  I'm just saying I wish I would have

17    known that before today, to be honest, but whatever.

18               Go ahead, Mr. Joyce.

19               MR. JOYCE:  Okay.  Just -- just briefly, I don't

20    think there's a conflict of laws between Arizona and

21    New Hampshire on the core aspect of the SIG motion which goes

22    to the damages, right?  Both apply benefit of the bargain.

23    They apply the damages construct in the same way.

24               THE COURT:  Yeah.

25               MR. JOYCE:  There is a conflict as it relates to

1   the --

2                    THE COURT:  Liability.

3                    MR. JOYCE:  -- warranty claim and Mr. Gibson will be

4   addressing that issue.  But you don't have to reach the

5   warranty claim that there's no damages, obviously, is SIG's --

6                    THE COURT:  Yeah.  True.  Okay.

7                    This is just a purely practical question,

8   Mr. Marchese, okay, and it has nothing to do with -- and I mean

9   it when I say it has nothing to do with the disposition of this

10  motion.  It's just I'm -- it might -- frankly, it might betray

11  my lack of sophistication about how some of this class action

12  litigation works and goes.

13                   But I find myself wondering, right -- I mean, it

14  sounds like according to your expert your client stands to

15  recover, you know, whatever it is, 150 bucks or something,

16  right, cost of repair or whatever it was.  There's a few

17  different ways you approach it.  Right?  Not really just cost

18  of repair.  That's more of a defense argument.  But your expert

19  has an opinion.

20                   How does it work for a named plaintiff in a lawsuit

21  like this?  I don't mean to look under the hood so much of a

22  class action, but what motivates your client to be involved in

23  this, if that's what he's -- he could have his gun repaired or

24  he can recover what looks like very, very small damages.  How

25  does that work?

1          And I only -- I don't mean it in any disrespect or

2   to be critical.  I just don't understand it.

3          MR. MARCHESE:  Sure, your Honor.

4          So, first off, my client researched the gun before

5   he bought it.

6          THE COURT:  Yup.

7          MR. MARCHESE:  He went on the defendant's website,

8   saw that there were these safety claims, in particular, about

9   drop safety and otherwise.  He then relied on that, went and

10  bought the gun.  He bought the gun in September 2016.

11         In or about August 2017, he had it at work.  He's a

12  police officer.  He bought the gun for -- you know, as a duty

13  weapon, but also for recreational use.  He has kids in his

14  house.  He's a parent, you know, keep -- would bring the gun

15  home.  And his sergeant, his range master at work, told him

16  that he could no longer use the weapon because it was

17  dangerously defective because of the drop issue.

18         He then researched what was going on on his own,

19  had -- was sent home from work, had to get his old gun,

20  basically did not want to use his gun anymore because he had

21  heard that it was dangerously defective.  He did not use his

22  gun since the range master told him that.  And then he found

23  out that there was this drop fire issue with the gun, even

24  after the defendant had specifically stated to him that it was

25  drop safe.  And that greatly upset him.

1          And then when he applied for the so-called Voluntary

2     Upgrade Program, multiple times the defendant did not upgrade

3     his gun.  So he then turned to the class action mechanism.

4          THE COURT:  Uh-huh.

5          MR. MARCHESE:  And I think if you also look -- I

6     know that your Honor said that -- you know, that you were not

7     one for outrage at the beginning of this case, but if you look

8     at the facts of this case, they are outrageous.  And so people

9     like -- like Police Officer Ortiz step up when there's a

10    situation when, you know, companies like SIG, they feel that

11    they've been wronged, they have not been doing the right thing.

12         And, you know, this isn't a case about, you know,

13    there's no fruit in the Froot Loops.  This is a case about an

14    unreasonably dangerous gun --

15         THE COURT:  Yeah.

16         MR. MARCHESE:  -- that has actually physically

17    injured people, including other police officers like my client.

18         THE COURT:  Okay.

19         MR. MARCHESE:  That's -- that's how it works.

20         THE COURT:  All right.  Okay.  And so -- and I

21    respect the answer, but I -- but I've got to ask this.

22         I mean, are -- so you're telling me he was upset

23    about -- about receiving a gun that didn't match the marketing

24    as being drop safe, which is understandable to me, and you're

25    telling me that he felt like he got jerked around when he tried

1   to get the gun replaced.  And it did take five months to get a

2   response.  I noticed that in the papers.  Right?

3            But all that said, right, all that said, your expert

4   says he gets $130-something in damages.  So I guess what I'm

5   asking, are you telling me then that it's more of a -- he just

6   sees it as an important issue that needs to be --

7            MR. MARCHESE:  Yes.

8            THE COURT:  Okay.

9            MR. MARCHESE:  He has said that this is an important

10  gun safety issue.  I think he said that in one of the

11  declarations he submitted.  I don't know if it was in support

12  of class certification or summary judgment, but he said, I

13  regard this as an important gun safety issue and I'm ready to

14  go the distance.

15           He understands that, you know, he's not going to

16  retire or something like that off -- you know, this isn't a

17  big, you know, like winning the lottery or something like that.

18  He's got bona fide reasons for doing it.  And he -- he sees

19  this as an issue that's larger, you know, than just his

20  defective pistol.

21           There are hundred -- there's -- the record evidence

22  shows that there's over a 170,000 of these pistols that still

23  have the defective parts and the record evidence shows that

24  there continue to be disclosures of drop fire reports and drop

25  fire injuries even with respect to the pistols that have gone

1    through the upgrade program.

2              So it's a serious issue.  I regard it as a serious

3    issue as well.

4              THE COURT:  Understood.  Understood.  I didn't mean

5    at all to undermine the seriousness of the issue.  It was more

6    just a -- well, you answered it, actually, but it was more just

7    curiosity on what the plaintiff gets out of it and you've

8    answered that.  Okay.

9              Look, let's get into the -- let's get into your

10   arguments then.  It's a defendant's motion, so I'm going to let

11   you start, Mr. Joyce.  Go ahead.

12             MR. JOYCE:  Okay.  Thank you, your Honor.

13             So Mr. Ortiz, as we know, hasn't suffered bodily

14   injury or property damage.  We know and understand that he has

15   to establish a distinct and palpable economic injury to himself

16   in order to succeed on any of his causes of action, and that's

17   true whether the cause of action is in contract or in tort.

18             But the plaintiff here claims that he was damaged

19   because his P320 pistol that he purchased from SIG Sauer was

20   marketed as drop safe, but he says it contains what he calls a

21   drop fire -- a drop fire design defect.

22             This -- our motion doesn't address the alleged, you

23   know, contract warranty or misrepresentation claims in terms of

24   whether they have merit or don't have merit.

25             We certainly -- SIG's position is that we didn't

1    breach a warranty or misrepresentation.  But, again, that's not

2    the subject of this motion.  The subject of the motion is

3    whether the plaintiff has sustained compensable economic loss

4    as a result of the alleged breaches.

5              Plaintiff says that he does; he has received

6    economic loss.  You know, plaintiff's -- Mr. Marchese's

7    discussion of outrage or unhappiness or displeasure is not a --

8    is not a compensable economic --

9              THE COURT:  No.

10             MR. JOYCE:  -- loss.  Right.

11             THE COURT:  Understood.

12             MR. JOYCE:  So he's got to actually sustain an

13   economic injury.

14             I do note, in passing, however, to digress a little

15   bit, that Mr. Ortiz is apparently not too upset with SIG

16   because he's bought four 320s since the time that he bought

17   the -- the 320 that is the subject of this -- the subject of

18   this lawsuit.  Any suggestion that Mr. Ortiz thinks that the

19   upgraded 320 design creates any risk to himself is belied by

20   the fact that he bought four of them and uses them on a daily

21   basis at work and otherwise.

22             The -- but in any event, as I've said, Mr. Ortiz

23   says that he overpaid for his 320 and/or that the P320 has a

24   diminished resale value due to the presence of this alleged

25   defect.  That is what he says in the complaint.  You know, your

1    Honor will recall that we sort of previewed these issues in the

2    motion to dismiss when there was much discussion about whether

3    plaintiff even based on the allegations in the complaint given

4    the existence of the voluntary upgrade that addresses the drop

5    fire vulnerability stated a viable claim for damages.

6            At that time plaintiff highlighted a theory that

7    the -- which was an allegation and all that was necessary on

8    the motion to dismiss -- highlighted an allegation that the

9    P320, even if upgraded -- so if you have a gun that originally

10   had the -- the older design and then that gun was upgraded --

11   that there would be a tarnish on that gun that could affect the

12   resale value of the -- of the firearm.

13           And, your Honor, if you went back to the transcript,

14   will note that your Honor had questions about that and posited

15   that could be a plausible theory at the time.

16           In any event, that leads us to sort of set up the

17   construct for the damages calculus that will apply to determine

18   whether plaintiff has stated a -- a compensable claim for

19   damages.  And the first is the -- the first part of that

20   construct is one that we've already discussed and the good news

21   is that both plaintiffs and defendants agree that the -- the

22   recovery on -- upon either plaintiff's contract or tort claims

23   is governed by the benefit of the bargain rule.  Right?  So we

24   know that and that's established and agreed.

25           The benefit of the bargain rule, your Honor, is not

1   some exotic damages construct.  It's pretty straightforward and

2   it has been the basis of contract law.  And to the extent that

3   the -- the theory is economic loss in tort law, it's a core and

4   basic principle.  Right?  The basic rule is to put the

5   plaintiff in the same position as if there had been no breach.

6   Right?  The purchaser is entitled to be placed in the position

7   he would have been in had the seller performed the contract or

8   made good on the representation.

9            The corollary, your Honor, to that rule is that a

10  plaintiff may recover no more than is necessary to provide what

11  he would have obtained had both parties performed their

12  respective promises.

13           For that reason, the measure of damages is the

14  lesser of the cost to repair an allegedly defective product or

15  the difference in market value between the product as bargained

16  for and the product as was actually sold.  Again, that's the

17  lesser of those two measures of damages.

18           Applying this basic construct, postsale mitigation,

19  such as the SIG Sauer upgrade here, is relevant, necessarily

20  relevant, to the calculus of determining whether any damages

21  had been sustained and, if so, how much.

22           As a related construct, your Honor, the doctrine of

23  mitigation of damages holds that a plaintiff who suffers

24  damages as a result of either a breach of contract or a tort

25  has a duty to mitigate those damages and will not be able to

1   recover any losses which could have been avoided.  Thus, a

2   plaintiff's duty to mitigate may leave the plaintiff unable to

3   prove a right to restitution or damages.

4           I think that construct is clearly in place here,

5   your Honor.  It's -- it's pretty much hornbook damages law.

6   It's -- as I mentioned, the law is the same in New Hampshire as

7   it is in Arizona on those points.

8           So applying then the facts as we know them, as the

9   record -- as the record establishes to that construct, here's

10  what we know.  Right?  We know that the information provided by

11  SIG Sauer about the P320 upgrade program demonstrates it was

12  designed specifically to enhance the drop safety of the P320

13  pistol.

14          Plaintiffs concede that he read this information as

15  well as immediate information that was put out at the time of

16  the upgrade, as soon as the upgrade came out, which directly

17  links the program to an identified drop fire vulnerability in

18  the original design of the P320 pistol.

19          So Mr. Ortiz knew that there was a drop fire

20  vulnerability; he was told that, as plaintiff counsel mentioned

21  in the opening remarks, by his range master; and he was advised

22  that there was a -- a drop fire vulnerability with respect to

23  that firearm.

24          He knew that there was a Voluntary Upgrade Program

25  that addressed that vulnerability.  He knew that based on the

1    website, which he concedes that he reviewed.  He also knew that

2    because in his own documents that he produced in the case,

3    there was an article that discussed at length the drop fire

4    vulnerability as well as the upgrade that was available free of

5    charge, at no cost to Mr. Ortiz, that is with respect to

6    shipping or any of the repairs, that addresses that

7    vulnerability.

8            Plaintiff has never been precluded from

9    participating in the upgrade and is still not precluded.  Your

10   Honor, if Mr. Ortiz, as SIG Sauer requests, if his action is

11   dismissed today based on a failure to put forward a claim of

12   compensable damages, Mr. Ortiz contacts SIG Sauer and he gets a

13   new P320 firearm with the upgraded design, just like the four

14   other P320 firearms that he uses every single day.  The -- the

15   suggestion, your Honor, that -- by plaintiff that he was

16   somehow precluded from participating in the -- in the upgrade

17   program is belied by the record and his own documents.

18           Mr. Ortiz produced an email from SIG Sauer that

19   asked Mr. Ortiz to follow up on his application for the -- for

20   the upgrade program.  He simply never responded to the email.

21   This was not a general purpose email sent to P320 customers at

22   large.  This was a direct follow-up contact by SIG Sauer urging

23   Mr. Ortiz to follow up with respect to his request for a

24   voluntary upgrade.  He just simply never did it.

25           Again, plaintiff has the obligation to mitigate his

1   damages.  He has to take reasonable steps to avail himself --

2   avail himself of the upgrade which resolves the benefit of the

3   bargain issue that he -- that he has presented in this

4   complaint.

5             As a law enforcement officer, plaintiff would have

6   been entitled to a new P320 pistol with the upgraded design to

7   replace his preupdate upgrade P320 design.  Again, that is an

8   undisputed fact in the record.  The -- I'll get to this in a

9   little bit, the significance of this fact.

10            THE COURT:  What's -- wait a minute, Mr. Joyce.

11  What --

12            MR. JOYCE:  Go ahead.

13            THE COURT:  Mr. Joyce, what is undisputed in the

14  record?

15            MR. JOYCE:  As a law enforcement officer --

16            THE COURT:  Oh, yeah.

17            MR. JOYCE:  -- Mr. Ortiz doesn't have to wait for --

18  for his firearm to be upgraded.  That's number one.  Right?

19            Number two, he doesn't get his firearm upgraded with

20  new parts.  He gets -- because -- because the program for law

21  enforcement officers is that his firearm with the older design

22  is replaced with a new firearm that has the design which is

23  exactly the same pistol that he uses every day and has

24  testified that he had no concerns about with respect to safety

25  or security, that's the pistol that he gets under the law

1   enforcement program.

2              THE COURT:  Yup.

3              MR. JOYCE:  That is undisputed.  So that's

4   important, your Honor, on two fronts:  One is there's no -- had

5   he participated and he answered his email and he participated

6   in the program, gets a new firearm right away.  There's no

7   wait.  Second, he gets a -- he gets a new firearm.  So any

8   suggestion which -- and there was no proof of this point in

9   the -- in the -- in any event in the record, but any suggestion

10  that there is a taint on an old design firearm that has been

11  upgraded with respect to the potential resale value of that

12  firearm is not even relevant on the facts that we have here

13  because he has a new firearm.

14             Plaintiff has never suggested, and nor would -- nor

15  would it be logical to do so that the resale of the new P320

16  firearm with a -- that has the upgraded -- the upgraded design

17  is any different than a new P320 firearm that has the upgraded

18  design.  Right?

19             THE COURT:  Oh.

20             MR. JOYCE:  Go ahead.

21             THE COURT:  So wait.  I wasn't following you, but I

22  think I am now.  What you mean by a new one is an upgraded one.

23             MR. JOYCE:  It's a new firearm that already has the

24  upgraded design in it.  Right?  That it --

25             THE COURT:  That -- but that's what -- that's what

1  he brought the four more of.  But --

2           MR. JOYCE:  Yes.

3           THE COURT:  -- when I -- when I get -- when I get

4  the upgrade, that's my old firearm upgraded.

5           MR. JOYCE:  No.  Not when you're a law enforcement

6  officer.

7           THE COURT:  Ah, okay.

8           MR. JOYCE:  You get a new P320.  Right?  So the --

9  it's difficult to describe that without being confusing, but he

10  doesn't get his old firearm upgraded.  He gets a brand-new P320

11  that has the new design in it.  Right?

12           THE COURT:  But if I'm a civilian and I do the

13  upgrade, I get my firearm upgraded.

14           MR. JOYCE:  That's correct.

15           THE COURT:  Okay.

16           MR. JOYCE:  But Mr. Ortiz is not a civilian and the

17  only claim that's before the Court is Mr. Ortiz's claim.

18           THE COURT:  Yup.

19           MR. JOYCE:  And the question before the Court is

20  whether Mr. Ortiz has a viable claim.

21           So we -- we've got to take the facts as the -- as

22  Mr. Ortiz's experience presents them.

23           The -- the P320 -- as I mentioned before, the P320

24  upgrade program remains available to all P320 owners today and

25  that certainly includes Mr. Ortiz.  If, as I said, he calls up

1    SIG today, after -- after this motion and he -- he says, I want

2    to participate in the upgrade program, he gets a new P320 that

3    has the upgraded design.

4             Plaintiff has presented no evidence to support his

5    diminished resale value claim related to upgraded P320 pistols

6    and in any event, that theory of damages does not fit his case

7    because as discussed above -- as we've just discussed,

8    plaintiff would have been provided a new, upgraded P320 under

9    the upgraded program.

10            And plaintiff concedes, or at minimum at least does

11   not dispute, he's put no facts into the record that would allow

12   him to do so, that the upgraded design to the P320 pistol

13   eliminates any drop fire vulnerability in that pistol.

14            Plaintiff's expert, Mr. Munsell, doesn't express an

15   opinion that there is any defect in the upgraded design.

16   Mr. Ortiz uses four of those pistols on a daily and regular

17   basis and Mr. Ortiz has conceded that he has no safety concerns

18   with respect to the P320 design.

19            Mr. Marchese presented some records to some

20   anecdotal information that there may be a claim out there with

21   respect to the new P320 design SIG Sauer pistol that

22   experienced a drop fire.  First of all, that's not true, that

23   -- that there aren't such claims out there; second of all,

24   anecdotal information that somebody heard somewhere that a --

25   that a P320 with an updated design may have discharged under

1    unknown circumstances and without expert support, that that

2    discharge resulted from some sort of design defect in the

3    firearm, or, some - you know, obviously this is a summary

4    judgment motion.  This is not a -- this is not a motion to

5    dismiss.  That is not competent evidence to support a claim

6    that there is a -- that the upgrade does not resolve the drop

7    fire -- the drop fire vulnerability.

8            I also note on that point, your Honor, that all

9    the evidence goes one way.  The testimony from the SIG Sauer

10   engineers set out at length that the -- the testing regimen

11   that the upgraded design was subject to and that testing

12   regimen establishes that the -- that the new design far exceeds

13   any standard in the U.S. or elsewhere with respect to abusive

14   handling, including drop fire vulnerability.  So there's no

15   evidence that the plaintiff has submitted into the record that

16   the -- that the drop fire vulnerability hasn't been resolved.

17           I'd also note in that regard, more to debate this

18   point, your Honor, that the Munsell report, plaintiffs claim

19   that Munsell hasn't affirmatively conceded the point.  I don't

20   think that matters because he hasn't put any evidence to rebut

21   the -- all the evidence, as I say, that goes one way.

22           But I do note that it -- a fair reading of the

23   Munsell report is that he does concede the report, that he does

24   concede the point.  He -- he has statements in the -- in his --

25   in his -- in his report to that effect.

1        So, your Honor, a couple of -- a couple of other

2   issues.

3        The -- I think that, you know, the crux of the --

4   the crux of plaintiff's -- a couple other points, I should say.

5        The crux of plaintiff's opposition to the -- to

6   the motion rests on two false premises, two premises that an

7   examination of the record cannot support.  One is that he was

8   somehow denied participation in the upgrade program.

9        The facts don't support that.  He has a -- he

10  contacted SIG, SIG contacted him back.  There was an exchange

11  with respect to asking for a point of contact with his agency

12  because -- because on the law enforcement program, if there's

13  an exchange of the P320 pistols where they get new pistols, the

14  protocol was to work through a point of contact and exchange

15  all the law enforcement agency's guns at one time.

16       Mr. Ortiz clarified that he was an individual, they

17  didn't buy his gun, it wasn't issued through the agency, so he

18  was acting as an individual.  SIG Sauer reached back out to him

19  to continue the process and Mr. Ortiz simply never followed up.

20  Even after he learned that the P320 -- he just simply never

21  followed up.  He has a duty to take reasonable steps to avail

22  himself of the remedy that existed.

23       The second point that -- that plaintiffs posit

24  which was not a -- if you look back at their complaint, it is

25  not a -- it is not an allegation that was ever raised in the

1    complaint and they never produced evidence to support it is

2    that the upgrade program somehow doesn't resolve the drop fire

3    vulnerability that he -- he complains of and lies at the core

4    of these allegations.

5            And that's just simply not true.  All the evidence

6    goes one way on that, your Honor.  This is a motion for summary

7    judgment.  If the plaintiffs were looking to take a serious run

8    at assertion that the drop fire doesn't resolve or, rather, the

9    upgrade doesn't resolve the vulnerability, they had an

10   obligation to put that evidence into the record, competent

11   evidence, and they have not done so.

12           THE COURT:  What's not competent about those two

13   instances?  I don't get it.  I mean, I know you -- I know you

14   have a different interpretation of them and I accept it --

15           MR. JOYCE:  They're not -- they're not the upgraded

16   design, your Honor, they're preupgrade.

17           THE COURT:  One of them says it is.  Isn't there the

18   one -- you know, there's the cop drop and then there's the one

19   in the bag, right?

20           MR. JOYCE:  Preupgrade, preupgrade.

21           THE COURT:  Do you accept -- hmm.  All right.  I

22   read the papers differently, but I guess I'll have to

23   reexamine.  You know, I'm pretty sure they're the upgraded

24   design on the record I'm familiar with.

25           MR. JOYCE:  Mr. Gibson, can you --

1              MR. GIBSON:  Yeah.

2              MR. JOYCE:  Can I have --

3              THE COURT:  Yeah.

4              MR. JOYCE:  Can you clarify that point for the

5     judge.

6              MR. GIBSON:  Sure.

7              So, your Honor, there was -- we did produce a

8     document which was an RMA, which is when a customer calls in

9     and says, I have an issue, and he claimed or suggested that it

10    went when dropped, sent his gun in, and when SIG looked at it,

11    there was no evidence that the gun had been dropped.  When you

12    drop a gun, there's evidence on the outside of it.  There's

13    markings on the slide or the barrel, depending on where it's

14    hitting.  And so the determination was there was no evidence it

15    had been dropped and the individual never followed up on that.

16             So I think that's where Mr. Joyce is referring to

17    anecdotal evidence.  There was someone who called in and

18    suggested that.  When they sent the pistol in, there was no

19    evidence to support it had been dropped.  And then he just

20    never followed up.

21             So that is, I believe, the instance you're talking

22    about.

23             THE COURT:  What about the one in the bag.

24             MR. GIBSON:  You're talking about the one in

25    Killeen, Texas, at a car wash?  There's a bag that falls and --

1  am I not talking about the same one you're talking about, your

2  Honor?

3  　　　　THE COURT:  I'm talking a female, I think.

4  　　　　MR. GIBSON:  Yup.  There was a female at a car wash

5  and she has her P320 in a bag and as it's falling, it goes off.

6  　　　　THE COURT:  Right.

7  　　　　MR. GIBSON:  And I think the determination, at least

8  from SIG's perspective, is something in the bag got caught on

9  the trigger and pulled it.

10  　　　　THE COURT:  Yup.

11  　　　　MR. GIBSON:  And that hasn't been -- you know, I

12  think that's the point is there's some anecdotal evidence, but

13  there's no investigation done of that.  We've never seen that

14  gun.  And plaintiff certainly hasn't presented anything beyond

15  just these anecdotal allegations that would support that the

16  postupgrade has any drop fire vulnerability whereas SIG has put

17  in a ton of testing records --

18  　　　　THE COURT:  It might not make that much difference

19  to your argument, but my memory is she -- she had it in a bag

20  and the bag like swung.  And -- and it discharged.  And, by the

21  way, it might very well be what you're describing; it could

22  have been a trigger pull.  But, I mean, no one knows.  It was

23  in a bag.  And it seems to me that while you may be correct, I

24  can't take your interpretation at summary judgment; I have to

25  take it from the plaintiff's perspective at summary judgment,

1    at least on -- on something that's in dispute.

2          And it seems to me that, like, if it -- if it

3    collided with something in the bag and discharged, that's the

4    functional equivalent of a drop.

5          I realize this is very, very attenuated stuff, by

6    the way.  I'm not trying to suggest this is strong evidence.  I

7    even have a question, I think, for Mr. Marchese about this

8    which is, like, suppose he's right and there are two

9    postupgrade anecdotes of discharge.  I'm not sure if any

10   firearm is completely drop safe under every conceivable -- so,

11   I mean, I don't know if that would render it not drop safe,

12   that there's been two occurrences, but it probably does.  I

13   don't know if it renders it not drop safe, but it probably does

14   preclude summary judgment if I can't resolve about whether

15   these two instances which -- with apologies to Mr. Joyce -- are

16   both postupgrade.

17         Do you follow what I'm saying, Mr. Gibson?

18         MR. GIBSON:  I do, your Honor, but I think that goes

19   back to Mr. Joyce's point that the allegations in the complaint

20   are not that the upgrade program doesn't -- doesn't address the

21   vulnerability.

22         MR. JOYCE:  Your Honor, this is Robert again.  So

23   there's a -- a couple things to say about that.  Right?

24         So the -- Mr. Ortiz himself, right, who is the

25   plaintiff in the case, has testified that he has no concerns

1    with respect to the safety of the upgraded design.

2              THE COURT:  Yeah.

3              MR. JOYCE:  Mr. -- Mr. Marchese's argument is

4    disconnected to his own client.  Mr. -- Mr. Marchese is not

5    the plaintiff in the case.  Mr. Ortiz is.  And Mr. Ortiz has

6    testified under oath that he has zero concerns with respect to

7    the safety, including drop protection, of the P320 pistol.  So

8    that is not his claim.  Mr. Marchese can't make a claim that

9    his -- that his plaintiff will not support and does not

10   support.  That's first of all.

11             Second of all, an anecdotal report of a drop

12   somewhere where the pistol hasn't been examined and where

13   there's no expert testimony to support the proposition that it,

14   number one, was a drop fire and, number two, that the drop fire

15   resulted from a defect in the design of the pistol, is not

16   competent evidence on a summary judgment motion.

17             Just imagine, your Honor, if that is -- if that was

18   a -- if this was a product liability case, right, on a motion

19   for summary judgment, not a motion for dismiss, and the defense

20   comes in with expert testimony as we have here, right, the

21   engineers from SIG Sauer, that explain that the design of the

22   firearm surpasses every standard for drop-fire protection --

23             THE COURT:  Yeah.

24             MR. JOYCE:  -- and the plaintiff comes in and says,

25   okay, I don't have an expert on this issue, your Honor, but I

1    heard -- and my gun hasn't ever drop fired -- but I have heard

2    that there were these two other occasions where this occurred,

3    anecdotal information not supported by examination of the

4    pistol, not supported by any testimony as to what actually

5    happened, not supported by an expert that links the occurrence,

6    the discharge of the pistol, to something wrong with the design

7    or manufacture of that firearm.  That is not competent evidence

8    to defeat a motion for summary judgment, your Honor.  So I

9    would -- I have to respectfully disagree that these -- this

10   anecdotal information means anything in the context of our --

11   of our motion here.

12           MR. MARCHESE:  Your Honor, the information is in

13   business records that we got from SIG.  I mean, these are

14   incident reports in SIG's business records.  So to the extent

15   there's some sort of a hearsay challenge, that -- that's an

16   exception to the rule.

17           MR. GIBSON:  Your Honor, if I could --

18           THE COURT:  I don't think it was so much of a

19   hearsay argument, to be honest, but I get it.

20           All right.

21           MR. GIBSON:  Your Honor, just real quick, if I could

22   clarify, because I went back and looked at plaintiff's paper

23   and the other instance with the female detective you're talking

24   about is a Detective Brittany Hilton.  And that's actually an

25   incident that is -- that is in suit and there is no allegation

1   of drop or impact.  Her claim there is that just by picking up

2   her purse, the pistol went off.

3               THE COURT:  Hmm.

4               MR. GIBSON:  And she's filed a request for admission

5   that confirms that she didn't drop or impact her pistol causing

6   it to discharge.

7               So that -- saying that one is a drop fire is just --

8   it's just inaccurate.

9               THE COURT:  Too attenuated, yeah.

10              MR. MARCHESE:  Your Honor, I disagree with that

11  characterization.  The papers speak for themselves.  And the

12  bottom line, that gun went through the upgrade program just

13  like the other guns that we have drop fire incident reports

14  from.  They already went through the upgrade program.

15              THE COURT:  Yeah, but your claim is -- look, I was

16  arguing your position a minute ago, but Mr. Gibson is adding

17  something to it which you may or may not have knowledge of.

18              But the fact that it went through the upgrade

19  program and then discharged doesn't make it a drop fire.  It

20  might be a drop fire, unless -- Mr. Gibson's basically telling

21  me the plaintiff in that case isn't even representing it to be

22  a drop fire.  I mean, I don't know how a -- I don't know how a

23  firearm discharges without a trigger pull or contact of some

24  type, but --

25              MR. MARCHESE:  But there's no dispute that

1    Mr. Ashburn's gun was dropped.  There's no dispute, your Honor.

2    Mr. Ashburn, drop fire --

3                THE COURT:  Yeah, yeah.

4                MR. MARCHESE:  -- upgraded gun.

5                MR. GIBSON:  Well, and that's the one, your Honor,

6    that I mentioned, that that was his claim when he called in and

7    when SIG looked at it, there's absolutely no evidence of that

8    and Mr. Ashburn never followed up.  So --

9                MR. MARCHESE:  But I'm the nonmovant --

10               THE COURT:  Yeah.

11               MR. MARCHESE:  -- and I get all -- the benefit of

12   all reasonable inferences, your Honor.

13               THE COURT:  Yup.  That's true.

14               MR. MARCHESE:  We don't take SIG's word for it.  And

15   they can't even keep straight which -- which drop fire incident

16   it is.  Right?

17               THE COURT:  Well, come on.  It's not about whether

18   they can keep it straight at oral argument.  Let's not get

19   silly here.  Okay?  I understand your point, but, you know,

20   that's not what's going to carry the day, whether Mr. Gibson

21   is -- and I'm confused about which -- you know, let's focus on

22   the record here.

23               Okay.  Mr. Joyce, did you finish your presentation?

24               MR. JOYCE:  Just -- just briefly, your Honor.

25               There is a -- a series of cases that I think is

1    helpful to the Court's examination of this -- of this -- of the

2    issues, the damages issues; the *General Motors* case, the *Toyota*

3    case, the *Kommer* case, the *Hewlett-Packard* case.  They all --

4    they all examine a scenario where there was allegedly a breach

5    of warranty or a misrepresentation such that at the time of

6    sale the plaintiff is alleging that there was -- they did not

7    get the benefit of the bargain.  And in most case there was a

8    postsale remedy provided, just as there is in this case.

9           So I -- I do think that those cases are helpful to

10   the Court's analysis.  I know that you probably have already

11   read them.  But the --

12          THE COURT:  I have read them and I -- to be honest,

13   that was my main focus when I started focusing on this

14   briefing, like what -- just the legal issue of whether there's

15   precedent for the idea that, you know, a recall of some type --

16          MR. JOYCE:  Right.

17          THE COURT:  -- cures a discounted claim.  Your

18   position is that it does.

19          MR. JOYCE:  It does, right.

20          And then, you know, the plaintiffs look to

21   distinguish those -- those cases by arguing, for example, in

22   the *General Motors* case that there was a, you know, ignition

23   recall as opposed to the upgrade program that SIG Sauer

24   presents.  And that's a distinction with that.  It's a

25   semantical difference on the facts of this case.

1          The point that the *General Motors* court was making

2    is that there was a remedy available that fixes the problem and

3    that same -- that same fact is present -- is present here.

4          In the -- the other point that plaintiff makes with

5    respect to an attempt to distinguish those cases is that in

6    those cases, we -- the plaintiff was in a position to avail

7    himself or herself of the -- of the upgrade.  And as I

8    mentioned before, the record establishes that that is -- that

9    is true here today.  The upgrade was always available to

10   Mr. Ortiz and continues to be available to Mr. Ortiz.

11          THE COURT:  Yeah.

12          A couple questions, Mr. Joyce, and if you want to --

13   if they're more in Mr. Gibson's bailiwick and you kick them

14   over to him, I don't mind.

15          MR. JOYCE:  Sure.

16          THE COURT:  The testing that SIG did on this model,

17   right, it passed ANSI, ANSI/SAAMI, right?  It passed --

18          MR. JOYCE:  Right.

19          THE COURT:  -- NIJ.

20          MR. JOYCE:  Right.

21          THE COURT:  Was there -- was there any other testing

22   that it either passed or didn't pass?  In other words, is there

23   any knowledge of other standards to which it was subjected?

24          MR. GIBSON:  Do you want me to take this?

25          MR. JOYCE:  I'm going to defer --

1              THE COURT:  Yeah.

2              MR. JOYCE:  -- and have Keith answer that.

3              Keith?

4              MR. GIBSON:  Yeah.

5              So, your Honor, the NIJ and the SAAMI is what it's

6     referred to are the two most recognized standards that firearms

7     are tested to across the board.  But beyond that, there are

8     individual states that have certain test requirements,

9     Massachusetts, California, New York --

10             THE COURT:  Yeah.

11             MR. GIBSON:  -- if you want to sell in those states.

12             Then if SIG has a contract with a particular agency,

13    including what happens with the Army program, there may be

14    certain test requirements as part of that contract.  And some

15    of those do have drop fire standards.

16             So beyond the -- the NIJ and SAAMI, the 320 may have

17    been tested to other standards pursuant to a contract, but the

18    NIJ and the SAAMI ones are the ones that are across the board,

19    so all of SIG's products are tested to those standards.

20             I hope that answers your question.

21             THE COURT:  Yeah.

22             MR. MARCHESE:  So just to be clear, your Honor, the

23    P320 platform was subjected to the Army's drop testing protocol

24    and it failed.

25             THE COURT:  Yup.  I know.

1          MR. MARCHESE:  Same thing for Caracal.  Yet -- yet

2     the safety claim was absolute, was that it's drop safe.  It

3     didn't say drop safe asterisk just with respect to SAAMI and

4     NIJ.  Didn't say anything of that.  It just said drop safe.

5          THE COURT:  Let me ask you this, because I kind of

6     wondered it when you -- and, by the way, I was aware of those

7     facts and -- I appreciate you raising them, but I was aware.

8          Those are claims, though, that are on the website,

9     right, that your client says he relied on, right, on the

10    website.  In fact, he goes so far as to say if he didn't -- if

11    he hadn't read all that, he wouldn't have bought the firearm.

12    Right?

13         But you now have said -- you've disclaimed the

14    website as a choice of law determiner, right?  Are you -- are

15    you disclaiming the website as a source of your contract claim

16    then?  I mean, what -- what is the contract?  Is it the owner's

17    manual?  What actually is the contract?

18         MR. MARCHESE:  So with respect to -- with respect to

19    the express warranty claim --

20         THE COURT:  Yup.

21         MR. MARCHESE:  -- the claims that we have, it's the

22    safety representations on the website, okay, that the gun is

23    drop safe, that it will not fire when you want it to.

24         One of the reasons that I talked to you about --

25    with respect to the plaintiff not seeking to enforce the

1    governing law provision as a binding contract --

2              THE COURT:  Yeah.

3              MR. MARCHESE:  -- is because you -- you sent out a

4    text order saying that you felt like you didn't have all the --

5    all the facts.  And -- and I went back and I conferred with my

6    client and he -- he confirmed with me that he did not agree to

7    those terms or even remember seeing the governing law contract

8    when he was -- when he was on the site.  So there's no --

9    there's no assent.

10             But he -- he did -- he knows he went to the website,

11   he knows he researched the gun before he bought it, and he saw

12   that absolute claim, drop safe.

13             THE COURT:  Yeah.  All right.  I'll let you -- I'll

14   let you start your presentation, Mr. Marchese, and you've --

15   you've sat there patiently, so I'm sure there's a lot of things

16   you want to tell me.

17             MR. JOYCE:  Your Honor, can I just mention one thing

18   that I meant to mention in my -- so I --

19             THE COURT:  Of course.

20             MR. JOYCE:  Your Honor mentioned the plaintiff's

21   expert reports, you know, Gaskin and -- Gaskin and Weir.  Those

22   reports are irrelevant on the facts of the case and the record

23   of the case because they -- they ignore the existence of the

24   upgrade.  They don't put any evidence in with respect to any

25   diminished resale value of their -- their conjoint analysis has

1    nothing to do with resale value.

2            And in any event, as we mentioned before, any

3    suggestion that there's tarnish on an upgraded gun in the

4    resale market -- first of all, there's no evidence of that,

5    Gaskin and Weir don't put that in, and second of all, it's

6    removed from the facts of this case because as we mentioned

7    before, Mr. Ortiz, as a law enforcement officer, actually gets

8    a new gun, not an upgraded gun, a new gun that has the new

9    design.

10           So it's -- it's Gaskin and Weir's modeling and

11   analysis.  Even if it were admissible, and we don't think it

12   is, the Court doesn't need to address that on this motion.

13   It's just simply irrelevant on the facts of the case.

14           THE COURT:  Yeah.  You're asking your summary

15   judgment motion to do a lot of work, though.  I mean, I've got

16   to determine -- you know, I'm accustomed on summary judgment to

17   determining if something's admissible, for sure, because

18   sometimes people try to slide in inadmissible evidence like

19   hearsay.

20           But, you know, it's almost like, you know,

21   determining the relevance of expert reports, expert opinion,

22   you know, that's getting closer to -- that's getting closer to,

23   you know, *Daubert*, whereas I've got to figure that out just to

24   figure out if your motion should be granted.

25           I'll put it this way.  I'm not -- I'm not saying

1   what you're arguing now is unreasonable or even wrong.  I'm

2   just not sure about it yet.  And if I -- if I deny this motion,

3   I probably would be very open to revisiting it, maybe even sua

4   sponte, maybe even on my own, if I end up agreeing with your

5   position on those opinions.  We'll see what happens.

6           MR. JOYCE:  Can I just comment on that briefly, your

7   Honor, because it is -- I think it is an important point.

8           THE COURT:  Yeah, of course.

9           MR. JOYCE:  The -- the damages model has to -- has

10  to fit the legal construct as to how damages are determined and

11  analyzed.  And as we mentioned at the beginning of the argument

12  on the -- in the construct, postsale mitigation is relevant to

13  the determination of the existence, and if it exists, the

14  amount of damages.

15          We've seen that in the -- in the -- in the *GM* case,

16  in the *Toyota* case, in the *Kommer* case, in the *Hewlett-Packard*

17  case.  The Gaskin and Weir report ignores the existence of the

18  upgrade.  They don't model anything with respect to the value

19  of an upgraded gun.  Right?

20          So I think it is not a factual analysis that we're

21  looking for you to determine.  We're just looking for you to

22  determine -- to follow the construct for how to determine

23  whether damages under a benefit of a -- under the benefit of

24  the bargain standard.

25          Those reports simply ignore the existence of the

1    upgrade and as a matter of law, you cannot do that.  You cannot

2    stop the analysis halfway through and ignore the remedy that

3    SIG Sauer has provided at no charge to --

4              THE COURT:  Yeah.

5              MR. JOYCE:  -- to Mr. Ortiz.  And that's what those

6    reports do.

7              THE COURT:  But let me ask you this then, because

8    this is, I'm sure, something Mr. Marchese is going to raise

9    here soon.

10             Look, what about the -- his argument that the

11   upgrade's just not available to me; I took a shot and I

12   went -- I got ghosted for five months.  We had some

13   communications and then nothing and in five months I get an

14   email that says -- the subject line doesn't talk about the

15   upgrade; the subject line doesn't even -- all it says is -- I

16   think it mentions the model, right?  And it just says, what do

17   you want to do about this?

18             I mean, that -- I understand that that might very

19   well have been an attempt to reconnect on the upgrade, but five

20   months is a long time and couldn't a jury look at that and say,

21   no, he tried and it didn't happen; he tried to mitigate --

22   whether you want to call it a straight contract, mitigation of

23   damages, or you want to just look at it as a related sort of

24   idea that there's been a recall and a fix, what about the

25   plaintiff's argument that it wasn't available to me, I

1    undertook reasonable efforts to take advantage of it, and they

2    were -- it was unavailable?

3              MR. JOYCE:  Mr. Ortiz hasn't submitted any proof

4    that he sustained compensable damages in that interim period,

5    that he sustained economic loss in that interim period, the

6    Gaskin and Weir model what that, you know, what those damages

7    may be.  So -- if any.

8              So they have not -- they have not put in proof that

9    Mr. Ortiz sustained economic loss by reason of the time it took

10   to engage in the -- in the upgrade program.

11             MR. MARCHESE:  Your Honor, just to respond to that

12   briefly.

13             THE COURT:  Yeah, yeah.  I'm not -- you know, I

14   don't know how much persuaded by it, frankly, but go ahead.

15             MR. MARCHESE:  All right.  I mean, the bottom line

16   is the plaintiff didn't have use of his gun from August 2017

17   when he was sent home from work and told not to bring it back.

18   And then in November 2017 he applied for this voluntary -- the

19   so-called Voluntary Upgrade Program and then he was told that

20   SIG was going to get back to him, quote, shortly.  And then

21   five months later, he got some vague email correspondence.

22             So, you know, he did take reasonable steps and he

23   was damaged because he -- he lost the use of his property, of

24   his gun, for over half of the year.

25             And, again, the -- the standard for this motion is

1    does the plaintiff create with evidence a genuine issue of

2    material fact with respect to this issue and I think we've

3    carried that burden.

4              THE COURT:  All right.  Feel free to have at it,

5    Mr. Marchese, on everything you want me to hear.

6              MR. MARCHESE:  Thank you.

7              So just briefly, your Honor, a little bit of -- of

8    background with respect to the alleged defect itself.

9              The plaintiff has proffered at least seven

10   categories of undisputed evidence demonstrating the drop fire

11   defect with P320s.  That would be, first, SIG's own presale

12   drop fire testing results from December 2013 showing a drop

13   fire at the negative 30-degree orientation; then SIG's

14   follow-on drop testing in April 2014, just after sales began in

15   the market.  That was at a 45-degree orientation.  After SIG

16   got the failed drop test result in that April 2014 test, they

17   stopped testing because they didn't want any more -- any more

18   negative test results.

19             Then in 2016, Caracal reported a drop fire to SIG

20   during its testing.  That was at a negative 30-degree

21   orientation.  And in response to that, SIG replaced the trigger

22   mechanism to remove the defective parts that caused the drop

23   fires so that Caracal did not have to buy a single defective

24   gun in the first instance.  That's how SIG handled that.

25   Otherwise, SIG would not have been able to sell the guns to

1    Caracal.

2            Number four, in the beginning of 2017, Connecticut

3    Officer Vincent Sheperis reported a physical injury to his left

4    knee to SIG after a drop fire discharge, and SIG admits in its

5    answer that it knew of Officer Sheperis's injury and the drop

6    fire incident in January 2017.  Two similar drop fire incident

7    reports followed from other police departments in 2017.

8            The Army reported a drop fire discharge during its

9    own testing protocol in early 2017.  SIG confirmed that drop

10   fire test result with its own internal testing and, again, the

11   Army didn't receive a single gun with those defective parts.

12   The Army said, if you -- if you want to sell us a single gun,

13   you have to take the defective parts out, give us an

14   engineering change, and that's what SIG did.

15           When SIG can't sell the guns, they -- they make a

16   change to the defective parts in the first instance.  They

17   don't give somebody else the defective guns and say, you know

18   what, you can come back to us voluntarily, if you will, to --

19   you know, to try to not get yourself shot with our -- with our

20   guns by accident.

21           Omaha Outdoors in The Truth About Guns reported drop

22   fire discharges to SIG in August 2017.  That's what prompted

23   the -- well, it prompted SIG to reaffirm the safety of its guns

24   falsely in a press release and then it prompted the rollout of

25   the Voluntary Upgrade Program three days later.

1          And, finally, the plaintiff's firearms expert,

2     Mr. Munsell, dropped tested the P320 and found that 64 percent

3     of drops -- there were 64 percent of the time there were drops

4     when the barrel angle was between 26 and 36 degrees.  And so he

5     concluded that the P320 was defective and unreasonably

6     dangerous.  All that's undisputed.

7          From 2014 to 2017, August 2017, SIG sold more than

8     314,000 P320s and over 171,000 of those still have the original

9     defective parts.  That's undisputed.

10          THE COURT:  So are these -- I mean, I was trying to

11     get a handle on all these different things.

12          Munsell finds that for drops in which the angle of

13     the barrel was between 26 and 36, 64 percent produced

14     uncommanded discharge.

15          MR. MARCHESE:  Yes.

16          THE COURT:  For drops between 26 and 52, 71 percent

17     of the tests produced failures or near failures.  Right?

18          MR. MARCHESE:  Right.

19          THE COURT:  Are these orientations like the same as

20     that 26 to 36 or are they different, the negative 26 to

21     negative 36.  I'm a little bit maybe confused about the --

22     the -- how -- how all this, between the two experts --

23          MR. MARCHESE:  Well, there's one -- there's one --

24     there's only one firearms expert --

25          THE COURT:  Oh, it's Munsell.

1              MR. MARCHESE:  Right.  Right.

2              THE COURT:  Munsell.

3              MR. MARCHESE:  All right.  So that's just by way of

4    background, your Honor.

5              With respect to plaintiff's damages evidence, we

6    have a theory of overpayment damages and it's supported by our

7    expert --

8              THE COURT:  But what about the -- I'm just trying to

9    understand the difference between the 26 -- between 26 and 36

10   and then between 26 and 52.  I guess it's just a wider --

11             MR. MARCHESE:  It's a -- it's a wider, I guess,

12   combination of angles at which the gun was dropped when it was

13   tested by Mr. Munsell.

14             THE COURT:  All right.  Okay.  Go ahead.  I'm sorry.

15             MR. MARCHESE:  So with respect to damages, the --

16   you know, the plaintiffs have put forth expert evidence; the

17   economist, Colin Weir, calculated damages based on the results

18   of a choice-based conjoint study designed and performed by

19   Stephen Gaskin, who's an independent survey expert.

20             Conjoint analysis, it's a widely accepted survey

21   technique.  It demonstrates reliable measures of consumer

22   choices and market value for particular product attributes.

23   And the methodology can isolate the market value solely

24   attributable to a particular product attribute or feature by

25   using survey data to generate something called Part-Worths of

1      feature levels to the overall product utility.

2                  THE COURT:  Yeah.

3                  MR. MARCHESE:  Gaskin's conjoint survey was designed

4      using supply side factors which included real-world

5      market-based pricing of P320s during the class period as well

6      as historically fixed quantity of P320s sold during that time

7      period.  And that -- that is one of the differences between --

8      between this case and the *General Motors* case.

9                  *General Motors* was -- was actually dismissed because

10     the plaintiff's expert, damages expert, admitted that only --

11     his survey did not calculate market value, did not account for

12     supply side factors, accounted only for demand side factors.

13     And so --

14                 THE COURT:  Why not just use cost of repair?  I

15     mean, why get into this --  you know, why get into this sort of

16     fortune-telling?  Cost of -- are you -- are you just saying

17     that you reject cost of repair as a form of damages in this

18     case?

19                 MR. MARCHESE:  We -- we believe that benefit of the

20     bargain is -- is the right measure of damages and it is not the

21     same as cost of repair.

22                 THE COURT:  Understood.  Understood.  But why --

23     why isn't cost of repair the -- the much more identifiable

24     measure here?  You know, benefit of the bargain in this kind of

25     situation is -- it involves the kind of --

1          MR. MARCHESE:  Because --

2          THE COURT:  -- tea-leaf reading that you're talking

3   about.

4          MR. MARCHESE:  Because -- and I am going to get into

5   this, but -- but when you're talking about cost of repair,

6   you're not -- you're not taking into account the fact that when

7   you -- you know, you're going to be without the use of your gun

8   for some period of time.  You don't know if the gun is -- is

9   going to be -- be quote, unquote, like, fixed by the repair.

10   And you also are concerned that there is going to be some

11   tarnish, some taint, on the gun which was defective and with

12   respect to its value for resale.  So I don't think it's the

13   same.

14          But -- but keeping with Mr. Gaskin's survey, he

15   tested product attributes, including drop fire susceptibility,

16   meaning whether a gun was prone to unintentionally discharge a

17   round when dropped.  And as part of the information -- this is

18   important.  As part of the information provided to respondents

19   about the drop fire feature, the survey instructs that the

20   owner can contact the manufacturer to make repairs under

21   warranty, i.e., a free-of-charge repair.  This accounts for

22   SIG's so-called voluntarily upgrade program in the damages

23   analysis.  That was on page 21 of Mr. Gaskin's -- Mr. Gaskin's

24   expert report, his initial expert report.

25          So the defendant says that we ignore the Voluntary

1    Upgrade Program, but that's false.  It was expressly baked into

2    Gaskin's conjoint study.  And without it the damages

3    calculation would have been much higher.  And we say this in

4    our objection to defendant's motion at page 27.

5         So this is yet another way to distinguish the cases

6    that SIG points to because, again, the *General Motors* case, the

7    ignition switch case, there was no account taken in for -- for

8    any potential remedy or -- or, you know, recall.  We don't

9    agree that SIG is -- has conducted a recall here.  But that's

10   a -- that's a distinction between our case and those cases.

11        So SIG actually failed to respond to that argument

12   which we had in our objection to their summary judgment motion.

13   They had a reply brief.  It was silent as to that.  Mr. Joyce's

14   still saying that we've ignored it, that the reports don't

15   account for it, and that's just false, your Honor.

16        So the plaintiff has reliable expert evidence that

17   the Voluntary Upgrade Program does not obviate plaintiff's

18   damages.  You know, the -- there's a -- at minimum, there's an

19   issue of fact here whether the Voluntary Upgrade Program fully

20   mitigates the plaintiff's damages or not.  And because there's

21   that issue of fact, the Court must deny the motion on that

22   point.

23        THE COURT:  And there's an issue of fact because --

24   I want to make sure I understand this.  All right?  Because I'm

25   trying to picture a trial here.

1          There's an issue of fact because of the postupgrade

2     anecdotal drop fire evidence or because even if -- even if a

3     repair cured drop fire, you still don't think, because of what

4     your experts say, that that makes the plaintiff whole.

5          MR. MARCHESE:  I -- I think both, because of both.

6     And also there's a -- you know, and that's to set aside the

7     issue that plaintiff has demonstrated that he took reasonable

8     steps to apply for the upgrade program.

9          THE COURT:  Yeah, your argument that it was

10     unavailable, yeah.  Yeah.

11          So what do you think of Mr. Joyce's argument?  He

12     says to that --well, you know, I guess that's how you started,

13     right?  You know, his argument was that, well, he needs

14     evidence on the economic damages of the five months that he

15     didn't -- between the time where he tried to do the upgrade and

16     the time that SIG reasonably made that possible.

17          MR. MARCHESE:  So -- so what I'm trying to say,

18     your Honor, is that is baked in to -- to our expert damages

19     calculations.  Okay?  Our experts calculated -- because this is

20     a putative class action lawsuit.

21          So our experts -- you know, ultimately the conjoint

22     analysis allowed the experts to determine the reduced market

23     value for the P320s with the drop fire defect compared to

24     otherwise identical P320s without that defect on a classwide

25     basis.  And based on the results, Mr. Gaskin concluded that the

1    reduction in market value with a gun with a drop fire defect

2    was about 25 percent of the purchase price; so for the

3    plaintiff, about 135 bucks.

4              THE COURT:  Yup.

5              MR. MARCHESE:  Now, I will tell you that another

6    court in your district, in this district, found a nearly

7    identical conjoint damages analysis to be relevant and reliable

8    in another consumer class action case.  And that was Judge

9    McAuliffe in the case captioned In Re: Dial.  It's -- we cite

10   that case --

11             THE COURT:  I'm very familiar with Dial, yeah.

12             MR. MARCHESE:  Yeah.  And the defendant here has not

13   given you any reason to depart from that.  Again, Weir and

14   Gaskin, they worked together to ensure that appropriate supply

15   side factors were being considered and incorporated into the

16   conjoint study.  They isolated the market value for the drop

17   fire defect.

18             The plaintiffs -- I took the plaintiff's deposition.

19   The plaintiff's expert, he admitted that historic market

20   pricing accounts for demand and supply side factors and he

21   admitted that Gaskin's survey used actual market prices and

22   quantity of pistols sold.

23             THE COURT:  I don't think you meant to say the

24   plaintiff's deposition, right?  You just said --

25             MR. MARCHESE:  I'm sorry.  I took -- I took the --

1    the defendant's expert's deposition, Dr. Lemon.

2              THE COURT:  Yeah.

3              MR. MARCHESE:  And Dr. Lemon made those admissions.

4    Thank you, your Honor.

5              THE COURT:  I just wanted the record to be clear.

6    That's all.

7              MR. MARCHESE:  So, you know, look.  While there

8    could be some legitimate difference of expert opinion on the

9    matter about the relevance and reliability of the methodology

10   that was used by the plaintiff, that's not a valid basis for

11   excluding the expert opinion under *Daubert* and, at best, the

12   criticisms that were levied against Weir and Gaskin go to the

13   weight of the evidence and not its admissibility.

14             You know, we -- we -- we distinguished the

15   defendant's cases I think pretty solidly in our briefing.

16             You know, another -- another matter here is that,

17   you know, *General Motors*, they -- they -- they instituted a

18   recall and, basically, the -- I think the plaintiffs have

19   gotten the benefit of that, of that repair.  That's not the

20   case here.  Our -- our plaintiff was denied the repair when

21   he -- when he took reasonable steps to apply for it through the

22   Voluntary Upgrade Program.

23             So to turn to the Voluntary Upgrade Program, that

24   was announced by SIG on August 8, 2017, by press release.

25   Jordan Hunter, who I deposed, he was responsible for creating

1    and developing parts of the Voluntary Upgrade Program.  He

2    testified that the purpose of the program was to address the

3    drop fire defect.

4            Now, neither the press release for the program nor

5    the program itself actually says that there's a safety hazard

6    or a defect with the P320.

7            THE COURT:  I know, but your client knows there is

8    one, so what difference does that make?  I don't understand

9    arguments like this.  It's great to dirty up SIG but doesn't

10   really help me decide the motion.  Because your client isn't

11   saying he didn't know it wasn't safe.  Your client is saying he

12   knew.  He found out.

13           MR. MARCHESE:  We also do have claims for fraud,

14   your Honor, and fraudulent concealment.  And what I'm saying

15   here is that SIG, you know, emphasized falsely how the P320

16   met all industry and military safety standards, but, in fact,

17   it did -- the P320 did not pass the Army standard for drop

18   tests, it did not pass Caracal's test, and they omitted any

19   mention of drop test failures and injuries of which SIG had

20   actual knowledge.

21           So even the name of the program was misleading.  It

22   was a voluntary program.  It was not a mandatory safety recall.

23   And we know that SIG knows how to, you know, recall -- do a

24   mandatory recall and call out safety hazards with its products

25   because we gave the Court an example of two current safety

1   recalls that SIG has with other defective firearms, one of

2   which was implemented after one incident report, one incident

3   report, but, worst of all, the frequently asked questions

4   section of the VUP stated categorically with the P320 was safe

5   in its current configuration.

6          So, you know, it -- they said that the gun met and

7   exceeded all safety standards.  That was false.  And all that

8   was done, Mr. Jordan -- Mr. Hunter testified to, to cover up

9   the defect to suppress the use of the program because SIG had

10  to engage in a balancing act to meet its responsibilities under

11  the Army contract and the other contract obligations it had

12  which were very lucrative.

13          THE COURT:  Yeah.

14          MR. MARCHESE:  SIG treated the Army differently than

15  nonmilitary consumers.  SIG treated Caracal differently than

16  any user consumers.  But SIG did not invest any money in

17  getting the human resources or the replacement parts to replace

18  defective parts across the board for nonmilitary P320 users.

19          So, you know, again, in combination with the fact

20  that the plaintiff here even applied for the Voluntary Upgrade

21  Program and didn't get an upgrade, that's enough to deny

22  summary judgment, you know, on this motion, which is limited to

23  the plaintiff's claims.

24          Also, we wrote this in our brief, the VUP doesn't

25  compensate the plaintiff for other types of damages that he's

1   seeking, punitive damages or for injunctive relief, and he's

2   allowed to elect his remedies.  We talk about how he never

3   agreed to limit his remedies to an exclusive remedy or anything

4   like that.  He's allowed to elect his remedies under the law

5   and, you know, he's -- he is conducting himself through --

6   through this lawsuit and all the damages that are available to

7   him through his claims at law.

8          So I think at the end of the day we -- we can look

9   at the record and see that there are a lot of disputed material

10  facts based on the record evidence that require denial of the

11  motion.  One of them is whether SIG failed to provide the

12  plaintiff with a voluntary upgrade after he took reasonable

13  steps to apply for one.  One question is whether SIG misled and

14  deceived consumers about the purpose of the Voluntary Upgrade

15  Program and the P320s drop fire safety.

16         Another is whether the Voluntary Upgrade Program

17  fully mitigates the plaintiff's damages resulting from the drop

18  fire defect.  Another is whether the -- whether SIG was

19  unjustly enriched from the defective P320s.  Yet another is

20  whether the Voluntary Upgrade Program eliminates the drop fire

21  safety hazard.  We talked about how there's still reports in

22  the record evidence of upgraded guns drop firing.

23         So those are the points that we want to -- you know,

24  we wanted to focus on.

25         THE COURT:  All right.

1          MR. MARCHESE:  You know, I can talk to you about

2   other choice of law issues, if -- if you like.  Obviously, you

3   know --

4          THE COURT:  All right.  Look.  Here -- how I

5   understand the choice of law -- I guess you can talk to me

6   about it if you want, I have some -- I guess I have some --

7   like -- when your client test fired at that range, that was --

8   that was in -- he says he test fired the gun, right?

9          MR. MARCHESE:  Right.

10          THE COURT:  That was in Arizona, right?

11          MR. MARCHESE:  Right.

12          THE COURT:  Yeah.  I mean, it looks to me, right,

13   like New Hampshire -- you know, New Hampshire choice of law

14   applies the five-part test and that's going to suggest that

15   Arizona law applies to these warranty claims.  That's how it

16   looks to me, just because of the five factors, the way they

17   kind of shake out.  We can go through them --

18          MR. MARCHESE:  So can I -- can I just address --

19          THE COURT:  Yeah, yeah.

20          MR. MARCHESE:  So, number one, I mean, the easy part

21   is SIG concedes that when you apply the *Clark* factors for the

22   fraud-based claims, New Hampshire law should apply.

23          THE COURT:  Oh, yeah.  I think for the tort -- I

24   think for the fraud and unjust enrichment, that's all New

25   Hampshire law.  I think both sides agree to that.

```
1                MR. MARCHESE:  So breach -- so breach of implied
2      warranty of merchantability, that's what I'd like to talk to
3      you a little bit about.
4                THE COURT:  Okay.
5                MR. MARCHESE:  You know, the plaintiff's claims are
6      grounded in the UCC, which is uniform in every state.  We think
7      New Hampshire law should apply under both the *Clark* factors and
8      the Second Restatement.  You know, and that's because the P320s
9      were defectively designed in New Hampshire, manufactured in
10     New Hampshire, they were drop tested in New Hampshire, they
11     were advertised as drop safe originating in New Hampshire, and
12     they were sold by SIG from New Hampshire.  So we think
13     New Hampshire's interest in applying its law is greater than
14     any other state's interest.
15               THE COURT:  Yeah.
16               MR. MARCHESE:  And under the Restatement analysis, I
17     think the most important factors, because the -- the factors
18     don't have to be considered equally.  The most important
19     factors to consider for breach of implied warranty of
20     merchantability are the place of performance and the location
21     of the subject matter of the contract.  And both of those are
22     exclusively New Hampshire because the only place where the
23     pistols were made unmerchantable was New Hampshire.  So
24     New Hampshire law should apply to the implied warranty claims
25     at minimum.
```

```
 1              THE COURT:  The only place -- say that again.

 2              MR. MARCHESE:  The only place that the guns were

 3   made unmerchantable -- it's breach of the implied warranty of

 4   merchantability.

 5              THE COURT:  Yeah.

 6              MR. MARCHESE:  And the only place that the guns were

 7   made unmerchantable, where they were designed defectively,

 8   manufactured defectively --

 9              THE COURT:  Oh.

10              MR. MARCHESE:  -- is in New Hampshire.

11              THE COURT:  You literally mean made unmerchantable.

12   Okay.

13              MR. MARCHESE:  Yes.  That's what I mean.

14              THE COURT:  Okay.

15              MR. MARCHESE:  You know, and New Hampshire has a

16   greater interest than any other state in regulating this kind

17   of conduct.

18              THE COURT:  Uh-huh.

19              MR. MARCHESE:  So that's -- so that's -- unless you

20   have any other questions, your Honor, I -- that's -- that's all

21   I have, unless there are -- you know, there's a response.

22              THE COURT:  I've got a few questions, and a few of

23   them are going to involve both counsel.

24              You know, Mr. Joyce made sure to point out to me

25   sort of forcefully that, remember, because he's a law
```

1    enforcement official, he gets a new -- he gets a new P320.

2              You don't dispute that, Mr. Marchese.

3              MR. MARCHESE:  I don't know where that is in the

4    record, your Honor.

5              THE COURT:  Do you dispute it?

6              MR. MARCHESE:  I -- I don't dispute that that is

7    SIG's -- that that is SIG's policy, but that is not what

8    happened with respect to the facts in this case --

9              THE COURT:  Yeah, understood.

10             MR. MARCHESE:  -- with my client.

11             THE COURT:  Understood.  He didn't get a new gun.  I

12   get that.  Yeah.  Understood.  All right.

13             MR. MARCHESE:  And they recognized that he was a

14   police officer.  You can see that in the email exchange.  There

15   was no gun coming.

16             THE COURT:  Yeah.  What's the evidence in the

17   record -- I think you kind of called it baked in to an expert

18   opinion before, but I'm --

19             MR. MARCHESE:  Okay.  Page -- so --

20             THE COURT:  Well, I didn't finish the question.

21             MR. MARCHESE:  Sorry.

22             THE COURT:  What's the evidence, record evidence, if

23   it's there, regarding, A, reduction in resale value, right --

24   and I'm trying to -- I understand your expert, but I'm trying

25   to talk about record evidence, right, because we don't have an

1    attempt to resell here; we don't have some kind of resale data

2    that somebody did a survey.  We've got an expert opinion and I

3    get that.  But is there any kind of record evidence on either

4    resale value or the idea that the voluntary upgrade doesn't

5    eliminate the resale value diminution?

6              MR. MARCHESE:  So with respect to the first part of

7    that, there is deposition testimony from the plaintiff about

8    how he did research resale value of -- of the gun on I guess

9    secondary online, you know, markets for -- for guns.  And he --

10   he saw that -- that guns that had been upgraded were being sold

11   at a price less than what postupgrade guns were being sold for.

12             With -- and can you remind what the second part of

13   your question was?

14             THE COURT:  What is the record evidence that -- that

15   the Voluntary Upgrade Program doesn't -- doesn't address that?

16   I guess you sort of just mentioned it.

17             MR. MARCHESE:  And -- but also the record evidence

18   with regard to why -- you know, what -- with the record

19   evidence with regard to what, if anything, the voluntary

20   upgrade does to mitigate overpayment damages is the fact that

21   at page 21 of Mr. Gaskin's expert report, which talks about the

22   information provisions for the drop fire susceptibility

23   attribute that he tested for, it includes a statement that you

24   can call the manufacturer and get a repair under warranty to

25   repair the -- the default.

1          And that's -- that's something that they were told

2     in the survey.  And that's something that they're taking into

3     account and -- you know, when -- when -- when they're choosing

4     the different product attribute features, you know, that

5     they're presented with in the survey.

6          So -- so our survey accounts for a repair program

7     like the Voluntary Upgrade Program.  We do not ignore the fact

8     that the defendants have a Voluntary Upgrade Program like we've

9     been accused to be doing and even though we -- we have

10    expressly pointed that out in our objection papers, the

11    defendant was silent, silent, in their reply.  And Mr. Joyce

12    still was -- was saying that we've ignored it.  But he knows

13    that that's not true.  He knows that we put --

14          THE COURT:  He's just arguing --

15          MR. JOYCE:  We're going through a series of

16    questions and I feel like I -- I need an opportunity to

17    respond, you know.

18          THE COURT:  Yeah, you're -- you're -- you do,

19    Mr. Joyce, you get a opportunity, but I've got to run this the

20    way I've got to run it and I want to keep questioning him.  So

21    you're going to be getting an opportunity.

22          Look, we've been going 90 minutes.  I have more to

23    cover -- not a lot more, and but I do have more -- and

24    Mr. Joyce obviously wants to tell me more and so do you,

25    Mr. Marchese.  So I need to give the court reporter a break.

```
1                    MR. JOYCE:  Okay.

2                    THE COURT:  Okay?  So we're going to take about a --

3     we're going to make -- I'm just going to make it easy.

4     One o'clock, we're going to reconvene.  Okay?  I just need to

5     give the reporter a break.  She's been going 90 minutes.  All

6     right?  Is that okay with everybody?

7                    MR. JOYCE:  Yes.

8                    MR. MARCHESE:  Yes, your Honor.

9                    THE COURT:  See you in about 15, a little bit less.

10              (Recess taken from 12:47 p.m. until 1:03 p.m.)

11                   THE COURT:  Okay.  Sorry, everybody.  Thank you --

12    thank you for waiting.  I appreciate it.

13                   Ben Folsom, I didn't get a lunch break, man.  What

14    are you doing?

15                   MR. FOLSOM:  You've got eagle eyes there, Judge.

16                   THE COURT:  No, I'm just kidding.

17                   Okay.  Look.  Where is Mr. Marchese?  There he is.

18                   So Mr. Marchese answered my question and you wanted

19    to respond, Mr. Joyce, you know, regarding evidence in the

20    record regarding reduction in resale value and --

21                   MR. JOYCE:  Right.

22                   THE COURT:  --- the Voluntary Upgrade Program's

23    effect on resale value.

24                   MR. JOYCE:  Yes.

25                   THE COURT:  And you wanted to be heard, so please go
```

1    ahead.

2              MR. MARCHESE:  Your Honor, can I just briefly add

3    one --

4              THE COURT:  I can't hear you, Mr. Marchese.

5              MR. MARCHESE:  Can you hear me?

6              THE COURT:  Can you hear me?

7              MR. MARCHESE:  (Nods head.)

8              THE COURT:  You're -- oh, wait a minute.  It might

9    be my volume.  Hold on.  Try it again.

10             MR. MARCHESE:  Testing.

11             THE COURT:  That was on me.  I turned down the

12   volume.

13             MR. MARCHESE:  So may I just add one brief

14   supplement to my answer before the break where you asked me

15   where the record evidence was about the Voluntary Upgrade

16   Program not offsetting the plaintiff's overpayment damages?

17             I'd like to also refer you to the rebuttal

18   declaration of Colin Weir.  There's a section that says Gaskin

19   and I account for SIG Sauer's Voluntary Upgrade Program.  It's

20   paragraphs 70 to 72.  And the next section, which says -- it's

21   titled SIG Sauer's Voluntary Upgrade Program does not offset

22   the harm caused by SIG at the time and point of sale.  And that

23   starts with paragraph 73, so that section as well.

24             I would just point the Court to that record evidence

25   which supports what the survey respondents provided answers to,

1   which is that they were told that there was going to be a

2   repair available in the survey.  And knowing that, and knowing

3   that it was going to be free of charge, they still concluded

4   that they were overcharged by 25 percent.

5                So thank you, your Honor.

6                THE COURT:  Mr. Joyce.

7                MR. JOYCE:  Thank you, your Honor.

8                A couple of quick points and then I'm going to

9   introduce Brent Dwerlkotte who will speak to what is and what

10  is not in the -- in the Gaskin and Weir reports.  He's our

11  resident expert lawyer with respect to conjoint analysis and

12  will speak to that issue.

13               But, briefly, and by -- by way of a prefatory remark

14  on that subject, your Honor asked a question with respect to

15  why the plaintiff has simply refused to acknowledge the cost of

16  repair remedy or not elected it.  But the -- as I mentioned

17  when we reviewed the construct for damages, under benefit of

18  the bargain, right, the benefit of the bargain measure of

19  damages is the lesser of the cost of repair of an allegedly

20  defective product or the difference in market value.

21               It's the lesser.  The plaintiff doesn't get to

22  choose.  Right?  So if there is a cost of repair that was

23  available, and there was here, that is the measure of damages.

24  You don't get to ignore that and move to a decrease in market

25  value.  And the obvious reason that plaintiff doesn't want to

1    use the cost of repair measure of damages, which is the lesser

2    of the two and is therefore, the operable measure, is because

3    that is zero.  Right?  The -- the repair is available to

4    Mr. Ortiz at no cost -- at no cost to him.

5                With respect to the Gaskin and Weir reports as to

6    whether they account for the Voluntary Upgrade Program, when

7    you look at those reports -- and, your Honor, I have to ask a

8    question.  Do we have the ability to put up this -- these

9    documents on a share file or if not I'll just refer --

10               THE COURT:  Well, I guess we could.  I guess Kellie

11   to make a -- can make you the host.  Do you know how to do it?

12               THE CLERK:  Yes, I can make him the --

13               THE COURT:  I mean I know how to do a screen share,

14   Mr. Joyce, but you'd have to do it.  Do you know how to do it?

15               MR. JOYCE:  Yeah, I think Mr. Gibson has -- I do

16   not.

17               THE COURT:  Who's going to -- who's going to do

18   this?

19               MR. JOYCE:  I think Mr. Gibson could put it up.

20               THE COURT:  All right.  Go ahead, Mr. -- make him

21   the host, Kel, please.

22               THE CLERK:  Yes, your Honor.

23               THE COURT:  This is do or die, Mr. Gibson.  The

24   whole motion rides and falls on whether you can handle this

25   screen share.

1                THE CLERK:  All right.  You should be cohost now, so

2      you should be able to share.

3                MR. JOYCE:  Okay.  Keith, can you --

4                MR. GIBSON:  Do you want me to put up the question

5      from the survey?

6                MR. JOYCE:  Put up the -- yeah.  I mean, put up

7      the -- I think both of the aspects that I want to point out --

8                MR. GIBSON:  Okay.

9                MR. JOYCE:  -- that's in the Gaskin report.

10               MR. GIBSON:  I'll do the footnote first.

11               MR. JOYCE:  Yeah.

12               MR. GIBSON:  Can everyone see that?

13               THE COURT:  Yup.

14               MR. JOYCE:  We can, yeah.

15               So, your Honor, are you able to see that?

16               THE COURT:  Yup.

17               MR. JOYCE:  Okay.  So if you look at footnote 6,

18     okay, footnote 6 says:  Defendant began offering free,

19     voluntary upgrades in 2017 to prevent older class pistols from

20     drop firing.  Should the Court wish me to model the effect of

21     this upgrade on the reduction in market value for used class

22     pistols in the resale market, I have created an alternative

23     survey design, which I present in Exhibit P.

24               So that was a -- he concedes he hasn't done that.

25     Right?  He -- he has a -- he has a survey that he said he could

```
 1    use, but he didn't do it.  Right?
 2              And then if you can take a look at, your Honor --
 3              THE COURT:  Wait a minute.  Wait a minute.  Wait.
 4              MR. JOYCE:  -- the survey that they did provide.
 5              THE COURT:  Hold on a minute.  I'm not sure -- it
 6    doesn't say the opposite of what you're suggesting.  I mean,
 7    he's saying they began offering free upgrades in 2017.  Should
 8    the Court wish me to model the effect of this upgrade on
 9    reduction, I've created an alternative survey design, which is
10    an exhibit to my report.
11              What --
12              MR. JOYCE:  But he didn't conduct the survey, your
13    Honor.  There's no survey.  It's a -- it's a design that he
14    didn't put into effect.  There is no survey.  Right?  He said,
15    I could do it if you want me to, but I haven't done it.  Right?
16              THE COURT:  Oh, yeah.
17              MR. JOYCE:  For summary judgment.
18              THE COURT:  A survey design.  Got it.  Okay.  Got
19    it.
20              MR. JOYCE:  There's no survey.  Okay?  There's no
21    actual survey.
22              If you take a look at the -- the survey that he did
23    provide which plaintiff suggests takes into account the --
24    the Voluntary Upgrade Program, there are two things that
25    Mr. Dwerlkotte is going to speak to this at some length.
```

1            But this is a customer preference survey.  This is

2    not the calculation of damages, right?  So in the customer

3    survey, he has a point on page 21, the last point there, so

4    he's got that the customer is told in this survey, you have a

5    firearm with a defect that -- a drop fire defect and if you

6    look at the last point, it says:  You will not be aware of this

7    problem until it occurs.  Right?

8            So you're only going to find out about this after --

9    until after you actually have a discharge event.  And so if you

10   drop your firearm and it goes off, right, then you can go and

11   talk to the manufacturer and ask for a warranty repair.  That's

12   not the Voluntary Upgrade Program.  You don't have to wait

13   until your firearm drops on the ground and goes off to get the

14   upgrade.

15           So this -- this question doesn't even pertain to the

16   actual operation of the voluntary upgrade.

17           The -- and then he further says:  You can

18   immediately -- you have to stop using your pistol and then you

19   can contact them to repair it under a warranty.  It doesn't say

20   that the fix -- you know, that the -- that there is a -- a

21   fix, right, that there is a solution to this drop fire

22   vulnerability.  That is not in the -- that is not in the

23   question.  Right?

24           So this bullet point in no way captures the actual

25   reality of the upgrade program.  You don't have to wait until

1    your gun goes off and the fix actually works.  It -- that is

2    not in this question.

3             But more importantly, your Honor, for purposes of

4    the -- of the motion that we have brought, right, all this is

5    is a survey question.  The point that we have and that we have

6    made is there's nothing in the damages calculation that

7    isolates a decreased value of an upgraded P320 in the reports

8    that either Gaskin or Weir present.

9             And Mr. Dwerlkotte is going to speak to that point,

10   your Honor.

11            MR. DWERLKOTTE:  Good afternoon, your Honor.  Brent

12   Dwerlkotte for SIG Sauer.

13            Is it okay with the Court if I pull up a document as

14   well?  I think this will --

15            THE COURT:  Sure.  Just let Mr. Gibson know what to

16   do.

17            MR. DWERLKOTTE:  I'm sorry.  Well, I can just read

18   it.  Never mind.  I can -- I can just read it.  Just three

19   quick points, your Honor, in response to Mr. Marchese.

20            One is this -- the idea that a conjoint analysis can

21   measure both supply and demand, that's just simply not true,

22   your Honor.  The -- the expert report of Dr. Lemon spells this

23   out.  I think also Gaskin and Weir both would recognize that a

24   conjoint analysis in and of itself isn't sufficient to do both.

25   It only does the demand side, your Honor.  And so I want to

1    make sure that that part is clear.

2          What Mr. Marchese suggested is that in order to try

3    to account for some of the market side issues that an economist

4    would typically see is that they came up with proxies for, I

5    believe, market prices and fixed sale prices.  And the record

6    evidence in this, your Honor, is that they didn't use market

7    prices.  They used MSRPs.  Those are suggested retail prices,

8    not actual prices.  Fixed sale.

9          They also didn't use sales figures from SIG Sauer.

10   They used numbers -- figures that were sent to authorized

11   retailers.  So those aren't even sales.  There's many other

12   reasons we can't measure market with the conjoint analysis,

13   your Honor, and so point one.

14         Point two, as Mr. Joyce noted, the -- the only

15   form of damage here that appears to be missing from Weir and

16   Gaskin's alleged theory here is the cost of repair.  And if you

17   look at -- it's Colin Weir's rebuttal declaration at paragraph

18   89.  And if it's all right with the Court, I'd like to just

19   read it real, real briefly.

20         It says:  If one accepts plaintiff's theory of

21   liability, all class members purchased a P320 that contained a

22   dangerous drop fire defect --

23         THE COURT:  Wait.  When you read, you've got to slow

24   down for the reporter.

25         MR. DWERLKOTTE:  Understood.  Thank you, your Honor.

1          THE COURT:  Yup.

2          MR. DWERLKOTTE:  As such, every consumer will have

3    experienced the protracted risk of owning the P320 until or

4    after the rollout of the voluntary upgrade, the loss of the use

5    of prospect thereof of the P320 while participating in the

6    program, the risk of being excluded from the program, and the

7    ongoing taint of owning a pistol with a defect and every one of

8    them has been harmed by paying too high of a price at the time

9    and point of sale.  This is the harm that has been measured by

10   the Gaskin survey which expressly contemplates the future

11   availability of repair of the defect.

12         Well, your Honor, that -- that amalgam of various

13   loss of use, risk of harm, all of that is -- is -- there is no

14   allowance for that under any legal theory.  You can't simply

15   mash all of those things together and come up with an

16   overpayment figure, as they've done here.

17         And so those are the -- and then the final point,

18   your Honor, I think your Honor noted that you're very familiar

19   with the Dial court opinion and I would just refer your Honor

20   to our reply brief on page 5 of the motion to exclude Gaskin

21   and Weir for the three critical points for why In Re: Dial is

22   inapposite in this case.

23         Thank you, your Honor.

24         THE COURT:  Thank you.  All right.

25         I want to -- I just want to bounce back to

1  Mr. Marchese on this.  I want to make sure that your answer was

2  what I understood it to be.  All right?

3          I'm asking about what record evidence there is,

4  right, regarding the reduction of resale value attributable to

5  the drop fire defect and the evidence that the voluntary

6  upgrade didn't eliminate the issue.  And it sounds like what

7  your answer was doing, if I understood it correctly, you're

8  just talking about the Voluntary Upgrade Program not offsetting

9  the reduction in the value of the gun itself, not the resale

10 value of the gun.

11         Is that the same thing to you?  Are those two things

12 the same, value of gun and resale value of gun?

13         MR. MARCHESE:  So I don't think those are the same

14 thing --

15         THE COURT:  Well, all you talked about was value

16 of the gun.  You didn't answer my question then about whether

17 the -- the Voluntary Upgrade Program addresses resale value of

18 the upgraded gun.

19         MR. MARCHESE:  Well, with respect to resale value,

20 what I said in regard to the record evidence was that the

21 plaintiff had reviewed online gun retailer sites on the

22 secondary market and he saw that guns that had -- the P320s

23 that had received the upgrade -- basically, you know, used guns

24 that had received the upgrade -- were selling less than P320s

25 that had been originally manufactured with the modified design.

1          THE COURT:  Uh-huh.

2          MR. MARCHESE:  Mr. Joyce referred to footnote 6 of

3   Mr. Gaskin's report.  That has to do with an analysis of used

4   class pistols.

5          So, you know, I -- you know, we're talking about

6   pistols that were -- that were not used.  I think Mr. -- you

7   know, Sergeant Ortiz or Lieutenant Ortiz purchased his -- his

8   SIG pistol new.

9          And I would just like to respond to everything that

10  Mr. Joyce and Mr. Dwerlkotte said.  I think all of those

11  criticisms go to the weight of the evidence at best and not to

12  the admissibility of it.  I mean, those are criticisms about

13  survey design and --

14         THE COURT:  Yeah.

15         MR. MARCHESE:  That -- that's not a basis to exclude

16  the expert opinions.

17         THE COURT:  I understand, Mr. Marchese, that your

18  point is, look, the -- any -- regardless of anything you can

19  say about the Voluntary Upgrade Program and what it

20  accomplishes, your point is that it wasn't really available to

21  your client because he attempted to undertake it and it didn't

22  really pan out, or at least it didn't pan out for too long of a

23  period of time.

24         But -- I want to take a step back from that because

25  your papers say that New Hampshire doesn't recognize cost of

74

1   repair as a measure of damages for breach of warranty.  And

2   what's the -- I don't understand the authority for that because

3   that's not my understanding of New Hampshire law.  What is that

4   assertion based on, that New Hampshire doesn't recognize cost

5   of repair here as a -- as a form of damages?

6           MR. MARCHESE:  Your Honor, I -- I would have to rest

7   on our papers.  I'm just not --

8           THE COURT:  Okay.

9           MR. MARCHESE:  -- that adept with the details to

10  answer that question, just being honest.

11          THE COURT:  That's a straight answer.  No problem.

12  I appreciate it.

13          Let me just ask some factual questions, if you know

14  them, Mr. Marchese.

15          Do you know when your client accessed the website,

16  like as a matter of just time, when he did it in proximity to

17  buying the gun?

18          MR. MARCHESE:  So he purchased the gun in

19  September 2016.

20          THE COURT:  Yeah.

21          MR. MARCHESE:  The best I can tell you is that he --

22  he accessed the website first in September 2016 before he

23  purchased the gun or shortly before that, you know, maybe in

24  like, you know, August 2016.

25          THE COURT:  Okay.  So August, September 2016.

1          MR. MARCHESE:  But it was certainly prior to

2   purchasing the P320.

3          THE COURT:  Do we -- do we -- we've, you know,

4   looked at the website.  Do we -- and your representations about

5   the website in your evidence.

6          Do you -- do we know from Ortiz whether the

7   notification regarding the terms of use and -- not just terms

8   of use, of course, but other warranties on the website, right,

9   because terms of use is not an issue anymore, really, because

10  you're -- you're disavowing that as a basis for choice of law.

11         But do we know if the website looked different then

12  than evidence that we have or that we can see?

13         MR. MARCHESE:  Well, I'm not -- I'm not sure, you

14  know, what you mean completely by look different, but what I do

15  know --

16         THE COURT:  I was just -- what I mean is did it have

17  different information on it and was the information that's on

18  it that he relied on presented differently -- you know, font,

19  size, the usual things we talk about.

20         MR. MARCHESE:  I don't have any reason to believe

21  that, you know, one way or the other, your Honor.

22         THE COURT:  Okay.

23         MR. MARCHESE:  All I know is that he said he

24  researched the gun before he -- before he bought it; he said he

25  saw that there were claims about safety, particularly drop

1    safety, and he remembered that and relied on it when making his

2    purchase decision.

3                THE COURT:  Okay.  All right.  I have -- I've asked

4    Mr. Marchese the questions I had for him.

5                It's your motion, Mr. Joyce, so I'll let you take it

6    home here.

7                And if he says anything that's particularly

8    provocative, Mr. Marchese, of course I'll let you respond.

9                Go ahead, Mr. Joyce.

10               MR. JOYCE:  No, your Honor.  I think -- unless you

11   have further questions for us, I think we've reviewed, you

12   know, the basis of the -- of the motion.

13               I think that if you -- if you hearken back to the

14   construct, you know, the time-honored principles with respect

15   to the benefit of the bargain test, which is the lesser of the

16   cost of repair or the market value, and the cost of repair here

17   is zero and the -- the -- the -- with the understanding that

18   postsale mitigation efforts are available, you have a postsale

19   remedy is necessarily relevant because the -- the point of the

20   benefit of the bargain is to put the purchaser in a position

21   that they would have been in if they -- the contract or the

22   representation were honored, but not to put them in a better

23   position than they would have been.  And, further, you know,

24   with the related construct of mitigation, plaintiff's damages

25   here are -- are zero.

1          And, you know, with respect to the -- the

2    communication between SIG and the plaintiff here involving the

3    voluntary recall, at no point did SIG ever tell Mr. Ortiz that

4    he was not entitled to the voluntary upgrade.  And I think that

5    Mr. Ortiz has to take reasonable steps to avail himself of the

6    remedy that was there to be had.  There are hundreds of

7    thousands of people, your Honor, that have participated in

8    this -- in the program successfully.  So --

9          THE COURT:  Sure, but -- but we have a record -- I

10   agree with you.  But we have a record on what he did and --

11         MR. JOYCE:  He should have followed up.  He's got to

12   respond to his emails.

13         THE COURT:  That's up to -- that's up to you and me,

14   that's not up to a jury, that he should have followed up?  I

15   mean, he did follow up.  The five-month gap was between his

16   last attempt and your next attempt.  So a jury shouldn't decide

17   how much he was supposed to keep following up?  That should be

18   up to me?

19         MR. JOYCE:  Well, I think he -- I think he should

20   have followed up once, your Honor.  That's all it would have

21   taken.  And he didn't do that.  Right?  So --

22         THE COURT:  Wait a minute.  Wait a minute.  Wait a

23   minute.

24         How do we know that's all it would have taken?  I

25   mean, that's what a trial's for, right?  You might be right;

1    that might be all it would have taken.  But we don't know that.

2    I don't know that.

3            Now, this only matters, I know -- this only matters

4    if I accept Mr. Marchese's argument that this gap rendered

5    the -- rendered the Voluntary Upgrade Program unavailable.  I

6    recognize that.  But, I mean, to -- to kind of hair-split it, I

7    don't know, that he should have followed up or it only would

8    have taken one more attempt, that seems to me to be a little

9    outside of the summary judgment arena.

10           Anyway --

11           MR. JOYCE:  I think it's -- I think, you know, at

12   best, the plaintiffs have a theory that the remedy was delayed,

13   not that it's not available, and there is nothing that the

14   plaintiffs have submitted into the record that isolates a

15   financial consequence to Mr. Ortiz with respect to that delay.

16           THE COURT:  Okay.

17           MR. DWERLKOTTE:  Your Honor --

18           THE COURT:  Yeah.  Go ahead, sir.

19           MR. DWERLKOTTE:  I apologize, your Honor.  I just

20   wanted to add one note in response to Mr. Marchese indicating

21   that there were, you know, weight issues as to what we were

22   talking about with Gaskin and Weir.  Certainly there are many.

23   I think Mr. Marchese and I would disagree on that.

24           But the fundamental threshold issue, your Honor, is

25   a legal one, and that's whether or not the amalgam of forms of

```
1   relief they think that they can package into one thing to call
2   an overpayment damages is something recognized under
3   New Hampshire or Arizona or any other law and the answer to
4   that is no.
5               And that's all, your Honor.  Thank you.
6               THE COURT:  Thank you.
7               Mr. Marchese, I will give you the last word, if you
8   want it.  If you're good, you're good.
9               MR. MARCHESE:  I'm good.
10              THE COURT:  Okay.
11              MR. MARCHESE:  Have a good weekend, everyone.
12              THE COURT:  Well, wait.  I'm not done yet.  I'm not
13  done yet.
14              MR. MARCHESE:  Oh.
15              THE COURT:  The trial date.  You know, I know I sent
16  out a request that you all talk and you wanted -- said you
17  wanted to do it in October.  I'm not ruling that out, but that
18  was longer -- that was further away than I was anticipating.
19              Can somebody fill me in how you kind of got there?
20  Is it just -- is it your own trial schedules?  Is it anything
21  in particular?  How do we get to the fall?
22              MR. MARCHESE:  Your Honor --
23              MR. DWERLKOTTE:  Go ahead, Joe.
24              MR. MARCHESE:  Yeah.  Your Honor, what we did was
25  met and conferred.
```

1          THE COURT:  Yeah.

2          MR. MARCHESE:  And we -- you know, a lot of this is

3    keyed off of -- just assuming for a moment that you do not

4    grant the defendant's summary judgment motion and that you do

5    certify some sort of class.

6          THE COURT:  Uh-huh.

7          MR. MARCHESE:  A -- a notice will have to go out to

8    the putative class members to inform them of the pendency of a

9    class action suit under which their rights would be affected

10   and give them the opportunity to exclude themselves from the

11   suit or, you know, to stay in the suit for the time being.

12         THE COURT:  That's true.

13         MR. MARCHESE:  And sometimes -- sometimes there's --

14   you know, depending on what the notice would be, if it's some

15   sort of publication and if it's print, you know, the -- the

16   magazine may say, hey, I need 30 days or I need 45 days to get,

17   you know, the notice in there.  And also the form and the

18   content of the notice is usually something that is haggled over

19   between defendant and plaintiff and there's usually a little

20   bit of back-and-forth on that.

21         And so all of that takes some time.  And we assumed

22   that, you know, maybe your Honor would be prompt with getting

23   the orders out, but then when you add in all of that extra time

24   and then you look at our schedules, we -- and we looked on the

25   Court's schedule, too, and, you know, consulted with Mr. King,

1    and we came up with, I think, October 4.

2              THE COURT:  All right.

3              MR. MARCHESE:  I know that seems kind of far away,

4    but that's how we got there.

5              THE COURT:  Yeah.  And I've got to admit, you know,

6    the class action process does build in some time -- time for

7    delays, potential delays and the like.

8              All right.  Yeah.

9              MR. DWERLKOTTE:  Your Honor, I think -- just to add

10   to that, I think the notice process typically, to get it set

11   up, to get, you know, to get it agreed to, the language and

12   everything to get out, I mean, that's -- we're looking at a

13   minimum three to four months.  We could get it done in that

14   time, but, again, being presumptuous on the Court's schedule

15   and timing of rulings, we were, you know, I think fairly

16   conservative in when we thought we could get the trial date.

17             THE COURT:  Okay.  All right.  We'll probably end up

18   going with that.  I think we will.  I don't want to be jerking

19   you around.

20             I haven't taken a hard look at Concord -- not

21   Concord, but at October myself, but I will, and we'll probably

22   get that -- we'll get that issued and nailed down.

23             Okay.  All right, gentlemen.  Look, I appreciate

24   your presentations.  I ought to have an order out here

25   relatively shortly, actually, and you were helpful today.  So,

1     you know, we did make some progress on some of these things and

2     I think I'm in a better position to rule.

3                    Any questions before we sign off here?

4                    MR. MARCHESE:  No, your Honor.

5                    MR. JOYCE:  I just want to thank the Court for

6     their -- for the time and the opportunity to be heard.  Very

7     much appreciated.

8                    THE COURT:  That's the business we're in here.  I

9     appreciate the effort by you guys.

10                   We will -- I'll see you when I see you.  We're

11    adjourned.

12                   MR. JOYCE:  Thank you.

13                   MR. MARCHESE:  Thank you, Judge.

14                   (Proceedings concluded at 1:31 p.m.)

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 2/16/22          */s/  Liza W. Dubois*
                           LIZA W. DUBOIS, RMR, CRR