UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Derick Ortiz,

       v.                                   Civil No. 19-cv-1025-JL
                                          Opinion No. 2023 DNH 015

Sig Sauer, Inc.

**MEMORANDUM ORDER**

The class action "predominance" requirement in Federal Rule of Civil Procedure 23(b)(3), as applied to fraudulent concealment and unjust enrichment claims, is the main focus in this motion, where a single named plaintiff moves under Rule 23 to certify a class of individuals who purchased an allegedly defective semi-automatic pistol, the SIG P320.  The defendant, Sig Sauer Inc., is a New Hampshire-based firearms manufacturer that produces the P320 pistol.  The plaintiff, Derick Ortiz, is an Arizona law enforcement officer who purchased the civilian version of the P320 in 2016 to use as his primary duty pistol.

Ortiz filed suit against Sig Sauer in 2019, asserting contract, breach of warranty, fraud, and unjust enrichment claims premised on a purported design defect in the P320 that makes it susceptible to "drop firing," or discharging after being dropped.  Following a motion to dismiss and a motion for summary judgment, only Ortiz's fraudulent concealment and unjust enrichment claims are subject to this class certification motion.

Under the fraudulent concealment claim, Ortiz asserts, in pertinent part, that Sig Sauer was aware of the drop defect and failed to disclose this material fact, and that the class members relied on this omission and overpaid for what they considered to be a defect-free pistol.[1]  As for

---

[1] The court refers to the P320's drop fire defect and Sig Sauer's false representations regarding the P320's drop safety throughout the opinion, sometimes without qualifying these as alleged or

the unjust enrichment claim, Ortiz contends that Sig Sauer secured a benefit by selling a

defective pistol at an inflated price, and it would be unjust for it to retain this benefit.  Ortiz seeks

to certify a nationwide class of individuals from 50 states, who purchased the P320 prior to

August 8, 2017.  Alternatively, Ortiz moves to certify an unjust enrichment subclass and a

fraudulent omission subclass, each of which limits its membership to P320 owners from specific

states.  Sig Sauer argues that class certification of the nationwide class and either subclass is

improper under Rule 23.

The court has class action jurisdiction over this case under 28 U.S.C. § 1332(d)

(diversity).  After considering the parties' submissions, and receiving evidence and oral

argument, the court denies Ortiz's motion, largely based on Rule 23(b)(3)'s predominance

requirement, which bars certification when issues affecting individual members of the class

predominate over issues that are common to the class.

First, the court denies certification of the nationwide class as to the unjust enrichment

claim because the threshold, choice-of-law analysis raises individual legal and factual inquiries,

which predominate over common issues.  Specifically, as part of the choice-of-law analysis, the

court must identify 'actual conflicts,' or outcome-determinative differences, between New

Hampshire law and the laws of 49 other interested states.  This exercise requires the court to find

distinctions between New Hampshire law and the foreign laws, and to adjudicate individual class

members' claims under these different legal standards.  Next, the court denies certification of the

unjust enrichment subclass due to the predominance of individual, factual inquiries that go to the

crux of the claim under applicable New Hampshire law--whether Sig Sauer's retention of the full

_____

purported facts.  To clarify, the existence of a design defect is not an established fact in this
litigation, nor is the falsity of the Sig Sauer's representations regarding the drop safety of the
P320.

sale price of the P320 would be <u>unconscionable</u> in each transaction.  Finally, the fraudulent concealment claims cannot be managed in a class format, for the nationwide class or the fraudulent omission subclass, because the claims require individual proof of reliance on Sig Sauer's false representations regarding the drop safety of the P320.

## I.     <u>Applicable legal standard</u>

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013) (quoting Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979)).  To obtain class certification, the plaintiff must establish by a preponderance of the evidence that Rule 23(a)'s four prerequisites are satisfied.  <u>See</u>, <u>e.g.</u>, In re Nexium Antitrust Litig., 777 F.3d 9, 17-18 (1st Cir. 2015).  Specifically, the plaintiff must show:

> (1) the [proposed] class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Where, as here, the plaintiff moves to certify the proposed class under Rule 23(b)(3),[2] he must also satisfy the rule's predominance and superiority requirements.  This requires a showing

---

[2] Ortiz also moves to certify injunctive relief classes under Rule 23(b)(2), which provides that "[a] class action may be maintained if Rule 23(a) is satisfied and if . . . the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Ortiz's only argument specific to Rule 23(b)(2) consists of a recitation of this standard, a request for a mandatory recall of the P320 "with clear and adequate notice," and a cursory statement that "the Defendant uniformly withheld critical information about the P320."  Pl.'s Mot. for Class Cert. (doc. no. 40-1) at 30.  The court does not delve into the merits of certifying under Rule 23(b)(2), as Ortiz's argument is wholly undeveloped.  <u>See</u>

that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. P. 23(b)(3); see also In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 18 (1st Cir. 2008).

These rules "do[ ] not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011). The court, in turn, must engage in a "rigorous analysis," which may involve "prob[ing] behind the pleadings." Id. (quoting General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 160 (1982)); see also In re Nexium, 777 F.3d at 18.

## II.   **Background**

The court recites facts relevant to class certification, as presented in the parties' submissions to the court and in the record. This case centers on an alleged design defect in the SIG P320 pistol, a semi-automatic 9-millimeter pistol manufactured by Sig Sauer. Ortiz alleges that the version of the pistol that he purchased in 2016 is defective because it is susceptible to drop firing.

Prior to entering the P320 pistol into the U.S. commercial market, Sig Sauer performed drop testing on the pistol. The goal of drop testing is to determine whether the primer ignites (or nearly ignites) after being dropped under a variety of circumstances, including from different heights and angles, and onto a range of impact surfaces. When the primer ignites, this means that the pistol would have fired if it had a live round.[3] Sig Sauer's technicians "encountered

---

Higgins v. New Balance Ath. Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) (the court "is free to disregard arguments that are not adequately developed.").

[3] See Deposition of Sean Manning ("Manning Dep.") (doc. no. 41-9) at 28:3-16.

primer ignition" after dropping the P320 on "a couple" of occasions during the testing, including during tests administered in December 2013 and April 2014, "and the engineers were immediately notified."[4]

Based on its testing, Sig Sauer determined that the P320 satisfied the drop safety standards promulgated by the National Institute for Justice[5] and the American National Standards Institute / Sporting Arms and Ammunition Manufacturers Institute.[6]  Sig Sauer began selling the pistol in January 2014.  By August 2017, the end of the proposed class period, consumers in the U.S. commercial market had purchased 314,059 P320 pistols.[7]

### A.    Reports of P320 drop fires and initiation of the Voluntary Upgrade Program

Around late 2016 or early 2017, Sig Sauer received notice of drop fires in certain pistols. Caracal, a foreign firearms manufacturer that contracted with Sig Sauer to sell a version of the P320 under Caracal's brand name, notified Sig Sauer that dropping the pistols at a -30°

---

[4] Manning Dep. (doc. no. 41-9) at 53:13-23; see also doc. no. 41-2 (tabulating the results of drop tests conducted on ten guns in December 2013 and noting that the seventh gun fired on impact when dropped at an orientation described as "muzzle up horizonal bottom up"); doc. no. 41-3 at 3 (April 2014 report from P320 drop testing, noting that "SAAMI, NATO, and additional 45° drop tests were conducted on two pistols (one with a full magazine well, one with an empty magazine well).  The pistol with . . . the empty magazine well performed on orientation 12 when it fired on impact").

[5] The National Institute for Justice is "the research, development[,] and evaluation agency of the U.S. Department of Justice."  About the National Institute of Justice, https://nij.ojp.gov/about-nij.

[6] This refers to the Sporting Arms and Ammunition Manufacturers Institute's "Voluntary Industry Performance Standard," which "provides [] firearm designer[s] and manufacturer[s] with recommendations for test procedures to evaluate new designs of centerfire and rimfire rifles, shotguns[,] and handguns as defined under the Federal Gun Control Act of 1968."  Doc. no. 50-7 at 8.  The "[t]est parameters simulate conditions where abusive mishandling could possibly result in accidental discharge."  Id.

[7] See Deposition of Thomas Taylor (doc. no. 50-4) at 19:14-24.

orientation resulted in discharge.  Meanwhile, the U.S. Army notified Sig Sauer that it observed

discharges when dropping Sig Sauer's M17 and M18 handguns at the same -30° orientation.

The M17 and M18 handguns have "a substantially similar design" as the P320 pistol.[8]

Later that year, an employee at Omaha Outdoors, a store that sells Sig Sauer products

including the P320, emailed two individuals at Sig Sauer to inform them that Omaha tested "four

different [P]320s" and found that "three of these four [P]320s . . . consistently" fired or nearly

fired when dropped at a -30° angle.[9]  The Omaha employee attached a video of the drop testing

to the email; the video was also posted on YouTube.  Days later, individuals connected to a blog

entitled The Truth About Guns confirmed Omaha's findings upon conducting drop tests on a

newly purchased P320, and then notified Sig Sauer.[10]  After that, Sig Sauer replicated Omaha's

test with the same results.[11]

Shortly thereafter, on August 8, 2017, Sig Sauer issued a press release announcing the

launch of its "Voluntary Upgrade Program."  In the press release, Sig Sauer explained that the

P320 passed ANSI/SAAMI, NIJ, and other safety and testing protocols, but "[r]ecent events

indicate that dropping the P320 beyond U.S. standards for safety may cause an unintentional

---

[8] Expert Report of William P. Munsell, Jr. (doc. no. 50-13) at 5; see also Deposition of Adrian J.
Thomele ("Thomele Dep.") (doc. no. 41-6) at 66:1-15 (noting that the "basic design concept" of
the triggers and "basic principles" of the M17, M18, and P320 pistols were "the same," though
the sear spring was different).

[9] See Andrew Tuohy August 5, 2017 email (doc. no. 40-20) at 2-3; Thomele Dep. (doc. no. 41-6)
at 77:3-10 (discussing the videos of drop tests that Tuohy attached to his email and confirming
that the drops occurred at -30° orientation); Deposition of Sean Toner ("Toner Dep.") (doc. no.
41-7) at 69:3-19 (same).

[10] See Deposition of Jordan Hunter (doc. no. 41-8) 37:16-38:13.

[11] Thomele Dep. (doc. no. 41-6) at 98:24-99:2; Hunter Dep. at 132:18-21

discharge."[12]  Accordingly, the press release continued, Sig Sauer was offering P320 owners "a number of enhancements in function, reliability, and overall safety including drop performance."[13]

Sig Sauer also provided information about the VUP on its website.  The website explained that the upgraded design, which was also incorporated into all subsequent shipments of new P320s, "reduces the physical weight of the trigger, sear, and striker while additionally adding a mechanical disconnector."[14]  According to the website, customers could participate in the VUP at no cost, and once Sig Sauer received the pistol from the customer in the mail, the turnaround time in the U.S. commercial market would be approximately three to four weeks.[15]  Sig Sauer asserts, and Ortiz does not deny, that law enforcement officers receive different benefits under the VUP.  They are eligible for a new, upgraded P320, and they do not need to return their pre-upgrade pistol until after they receive the new one.[16]  As of May 2021, 142,485 P320 pistols (roughly 45.4% of the P320 pistols sold with the alleged drop fire defect) were upgraded through the VUP.[17]

### B.    Plaintiff Ortiz's experience with the P320

Ortiz is a police officer in the Snowflake-Taylor Police Department in Arizona.  Around September 30, 2016, roughly a year before Sig Sauer launched the VUP, Ortiz purchased a P320

---

[12] Doc. no. 41-2 at 2.

[13] Id.

[14] Doc. no. 41-3 at 2

[15] See doc. no. 41-3 at 2, 9; see also Toner Dep. (doc. no. 50-2) at 85:13-87:11.

[16] See Declaration of Tom Jankiewicz (doc. no. 50-12) at ¶ 5.

[17] Expert Report of Andrew Y. Lemon (doc. no. 61-2) at 26.

for \$539.38 from ProForce Law Enforcement, a dealer in Arizona.[18]  He selected the P320 as his

duty weapon, though he also occasionally used it for recreational shooting.[19]

Prior to the purchase, a ProForce representative showed Ortiz the pistol and explained

certain features, including its modularity and the fact that it could be disassembled without

pulling the trigger.[20]  The representative also sent a sample of the pistol to Ortiz's workplace.

Ortiz test-fired the pistol and liked the "feel [of the P320] in [his] hand"; he also felt that he "shot

it substantially better than [he] shot" his previous duty weapon.[21]  Ortiz  "loved the idea of [the

P320's] modularity, as well as . . . the idea that it was safe," in that "it couldn't go off . . .

without somebody pulling the trigger."[22]

Ortiz also researched the pistol online before purchasing it, and he learned from "several

locations, including [Sig Sauer's] website" and YouTube, that the P320 was drop safe.[23]

Sig Sauer provided the court with a snapshot of relevant portions of its website as they

appeared throughout the class period.  Sig Sauer's website includes a page dedicated to the P320,

which describes the pistol as "the most adaptable pistol available today," with features including

"serialized stainless steel," "[a] smooth, crisp trigger pull," a "striker-fired operating system,"

---

[18] See Deposition of Derick Ortiz ("Ortiz Dep.") (doc. no. 63) at 64:1-20.

[19] See August 12, 2021 Declaration of Derick Ortiz ("Ortiz Decl.") (doc. no. 40-2) at ¶ 3, 76:12-21.

[20] See Ortiz Dep. (doc. no. 63) at 51:7-52:15.

[21] Id. at 47:9-23.

[22] See id. at 48:25-49:25.

[23] See Ortiz Decl. (doc. no. 40-2) at 69:4-19.

"interchangeable grip modules," "convertible calibers," and "multiple pistol sizes."[24]   The phrase
"safety without compromise" appears in capital letters below this information.   Directly
underneath that, the page reads: "We've designed safety elements into every necessary feature on
this pistol.   From the trigger, to the striker and even the magazine, the P320 won't fire unless you
want it to."[25]   The webpage then lists the following features related to drop safety: the striker
safety, which "prevents the striker from releasing unless the trigger is pulled"; the disconnect
safety, which "[p]revents the pistol from firing out of battery," the 3-point takedown safety; the
"tabbed trigger safety," and the magazine disconnect safety."[26]   Elsewhere on the website, Sig
Sauer published a "webisode" video in which it touted the modularity, engineering, reliability,
and quality of the P320, and also stated that the pistol was "drop-safe, less prone to accidental
discharge, and much safer to field strip."[27]

     Ortiz testified at a deposition that he viewed the "safety without compromise" language,
as well as representations regarding drop safety, on Sig Sauer's website.[28]   He also asserted in a
signed declaration that he would not have purchased the P320 if he knew "it was prone to drop
firing due to design defect."[29]

---

[24] Doc. no. 41-18 at 3-4.

[25] Id. at 5.

[26] Id.

[27] Doc. no. 40-17 at 1-2.

[28] See Ortiz Decl. (doc. no. 40-2) at 68:22-69:19.

[29] November 11, 2021 Declaration of Derick Ortiz (doc. no. 59-1) at ¶ 6.

Some time after the purchase, Ortiz learned from a Range Master, Daniel Rush, that Ortiz was not allowed to carry the P320 as his duty weapon anymore because of reports that the pistol was not drop safe.[30]  Following this exchange, Ortiz saw the videos of Omaha's P320 drop tests.[31]  Ortiz also visited Sig Sauer's website and read about the VUP.[32]

At some point, Ortiz entered his pistol's serial number on Sig Sauer's website to register it for the VUP.[33]  On November 17, 2017, Ortiz received an e-mail from Sig Sauer acknowledging his online submission for the VUP; the email also noted that Ortiz is a member of U.S. law enforcement, and his P320 pistol was his primary duty weapon.[34]  After further exchanges that day, Ortiz received an email from Sig Sauer informing him that a representative from the company would reach out to Ortiz shortly.

Ortiz received his next correspondence regarding the VUP roughly five months later, in an email dated April 17, 2018.  The subject line read "SIG SAUER."  The email consisted of two sentences: "Derick, Just give me a call or shoot me an email when you want to get this set up. Thanks!"[35]  Ortiz testified that he did not see this email until September 2020, when he forwarded it to his attorney in connection with this litigation (which he had initiated a year earlier claiming, inter alia, that the VUP would not make him whole).[36]  Ortiz did not receive any

_____

[30] See Ortiz Dep. (doc. no. 63) at 84:3-23.

[31] See id. at 86:3-21.

[32] See id. at 86:18-87:22.

[33] See id. at 95:3-11.

[34] See doc. no. 63-2.

[35] Doc. no. 63-1.

[36] See Ortiz Dep. (doc. no. 63) at 99:19-100:18.

other communication from Sig Sauer regarding the VUP, and Ortiz's P320 has not been

upgraded.

Ortiz still has the pre-upgrade P320 that he purchased in 2016, but he does not use it

because he believes it is not drop safe.[37]  Meanwhile, between 2018 and 2020, Ortiz purchased

four more P320 pistols.  He made these purchases with the understanding, based on information

from Sig Sauer and online reviews, that the drop safety defect "that had previously been

discovered had been corrected in [the] gun[s] that [he would] be purchasing."[38]

### C.      Procedural history

In September 2019, Ortiz filed a putative class action complaint against Sig Sauer,

centered on the alleged drop defect.  In his complaint, Ortiz asserted claims for violation of the

Magnusson-Moss Warranty Act (Count 1), breach of express warranty (Count 2), breach of

implied warranty of merchantability (Count 3), unjust enrichment (Count 4), fraudulent

concealment (Count 5), fraud (Count 6), violation of the Arizona Consumer Fraud Act (Count 7),

and violation of the New Hampshire Consumer Protection Act (Count 8).  This court previously

granted Sig Sauer's motion to dismiss as to Count 8, and Sig Sauer's motion for summary

judgment of Ortiz's claims in Counts 1-3.

Now, Ortiz moves for class certification treatment of the unjust enrichment (Count 4) and

fraudulent concealment (Count 5) claims under Rule 23(b)(3).  He defines the class as "All

persons in the United States who purchased a SIG P320 semi-automatic pistol, regardless of size,

---

[37] See id. at 114:3-17

[38] See id. at 106:5-107:21, 109:8-24.

at any time prior to August 8, 2017," the date that Sig Sauer issued its press release launching the VUP.[39]  Alternatively, Ortiz moves to certify two subclasses:

> (1) a Multistate Fraudulent Omission Subclass, defined as all persons in Arizona, Idaho, Maryland, Mississippi, Nevada, New Hampshire, South Carolina and Washington who purchased a SIG P320 semi-automatic pistol, regardless of size, at any time prior to August 8, 2017; and
>
> (2) a Multistate Unjust Enrichment Subclass defined as all persons in Arizona, Florida, Georgia, Idaho, Nebraska, Pennsylvania and Utah who purchased a SIG P320 semi-automatic pistol, regardless of size, at any time prior to August 8, 2017.[40]

## III.   <u>Analysis</u>

The court begins its analysis with Rule 23's implicit ascertainability requirement, as well as Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements.  After finding that the nationwide class and subclasses satisfy each of these elements, the court turns to Rule 23(b)(3)'s predominance and superiority requirements.  The court finds that common issues of law and fact do not predominate, and a class action is not superior because of the manageability challenges stemming from the disqualifying lack of predominance.  As such, certification is improper.

### A. Ascertainability

"In addition to the explicit requirements of Rule 23, courts generally recognize the implicit requirement that the class definition must be sufficiently definite to allow the court, parties, and putative class members to ascertain class membership."  <u>Kenneth R. ex rel. Tri-Cnty.</u>

---

[39] Compl. (doc. no. 1) at 2-3.

[40] <u>Id.</u> at 3.

CAP, Inc./GS v. Hassan, 293 F.R.D. 254, 263 (D.N.H. 2013) (McAuliffe, J.) (internal quotation omitted).  To satisfy the ascertainability requirement, "the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria."  Raitport v. Harbour Cap. Corp., 312 F. Supp. 3d 225, 236 (D.N.H. 2018) (McAuliffe, J.) (quoting Matamoros v. Starbucks, Corp., 699 F.3d 129, 139 (1st Cir. 2012)).  If the class definition makes "class members impossible to identify prior to individualized fact-finding and litigation," the class fails this basic requirement.  Crosby v. Soc. Sec. Admin. of U.S., 796 F.2d 576, 580 (1st Cir. 1986).

      The court easily concludes that the nationwide class and subclasses are defined by objective criteria--the purchase of a P320 pistol prior to August 8, 2017, and residence in specific states.  Sig Sauer asserts that the class is not ascertainable because Ortiz does not propose a manageable method for identifying class members.  Ortiz suggests, in turn, that class members can identify themselves in affidavits that include the serial number of the pistol as confirmation that the affiant owns the pistol.

      Ortiz's proposed approach is adequate.  Indeed, the First Circuit Court of Appeals has approved of self-identification as a method for ascertaining class members, unless there is reason to believe that the defendant will rebut the affidavits.  See In re Asacol Antitrust Litig., 907 F.3d 42, 52-53 (1st Cir. 2018) (noting that the court previously held that "unrebutted testimony contained in affidavits would suffice as a mechanism for identifying who" belongs to the class, but refusing to adopt the same holding again where "defendants have expressly stated their intention to challenge any affidavits that may be gathered." (citing In re Nexium, 842 F.3d at 40-42)).  Sig Sauer does not assert that it would rebut the affidavits, nor does the court have a basis for inferring that the affidavits would be rebuttable, or that their veracity would be questionable.

See In re Dial Complete Mktg. & Sales Pracs. Litig., 312 F.R.D. 36, 52 (D.N.H. 2015)

(McAuliffe, J.) (finding that members of a class of consumers who purchased a specific hand

soap "can be feasibly identified by sworn affidavits of purchase," and noting that any concerns

about "the submission of fraudulent or mistaken claims" is minimal or can be "combat[ted] . . .

during the claims administration process.").[41]  The nationwide class and subclasses are

ascertainable.

### B. Numerosity

Rule 23(a)'s numerosity requirement is satisfied if "the class is so numerous that joinder

of all members is impracticable."  Fed. R. Civ. P. 23(a).  "No minimum number of plaintiffs is

required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that

the potential number of plaintiffs exceeds 40, [this] prong of Rule 23(a) has been met."  Clough

v. Revenue Frontier, LLC, No. 17-CV-411-PB, 2019 WL 2527300, at *3 (D.N.H. June 19, 2019)

(Barbadoro, J.) (quoting García-Rubiera v. Calderón, 570 F.3d 443, 460 (1st Cir. 2009)).  Other

relevant considerations are whether "the members of the class are from the same geographic

---

[41] Sig Sauer also argues that, for the class to be ascertainable, Ortiz must provide a workable plan
for identifying uninjured class members.  According to Sig Sauer, individuals who obtained an
upgraded pistol through the VUP or chose not to participate in the VUP are uninjured, and they
cannot be identified without individualized factfinding.  This argument goes to Rule 23(b)(3)'s
predominance requirement, and not the ascertainability requirement.  See Asacol, 907 F.3d at 51
(the question of whether "a class [can] be certified . . . even though injury-in-fact will be an
individual issue" is relevant to "the requirement of Rule 23(b)(3) that common issues must
predominate over individual issues in order to certify a class.").  Accordingly, the court
addresses this issue in its predominance analysis, infra Section III.F.i.  The court does not go so
far as to deem these categories of individuals uninjured because the current record does not
establish the effect of the VUP on the drop defect or the reasons for non-participation in the
VUP.  But the court does find that individual inquiries into class members' experiences with the
VUP are relevant to Sig Sauer's liability, at least under the unjust enrichment claim, and weigh
against a finding of predominance.

area" or "can easily be identified," as these circumstances make joinder more practicable.

Andrews v. Bechtel Power Corp., 780 F.2d 124, 132 (1st Cir. 1985) (internal citations omitted).

Sig Sauer does not challenge class certification on this ground, and the court finds that the nationwide class and subclasses easily satisfy the numerosity requirement. Ortiz asserts, and Sig Sauer does not dispute, that, according to wholesale and retail records, 314,059 P320 pistols were sold across the country from March 2014 to August 8, 2017. Further, according to Ortiz, 26,460 of these sales are connected to the fraudulent omission subclass and 47,873 are connected to the unjust enrichment subclass. This volume of sales, along with the geographic spread of the nationwide class and subclass members, renders joinder impracticable.

## C. Commonality

"Rule 23(a)'s requirement of commonality is a low bar, and courts have generally given it a permissive application." In re New Motor Vehicles, 522 F.3d at 19 (internal quotation omitted). For class treatment to be appropriate, the class members' claims "must depend on a common contention" that is "of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Dukes, 564 U.S. at 350. "Even a single common question will do." Id. at 359 (internal quotation and alterations omitted). The commonality inquiry does not focus, then, on the number of questions common to the class, but "the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." Id. (emphasis in original) (internal quotation omitted).

Sig Sauer posits a few common issues, one of which definitively satisfies the commonality requirement--whether the P320s sold during the class period had a drop defect. Sig Sauer does not contend that the design of the P320 varied during the class period, so this

question has a common answer, which can be derived through common proof.  Sig Sauer argues that this question is not tethered to Ortiz's unjust enrichment and fraudulent concealment claims, because they are not product defect claims.  The court disagrees; whether the P320 was defective is "central to the validity" of both claims.  Dukes, 564 U.S. at 350.  Indeed, the fraudulent concealment claim is centered on the allegation that Sig Sauer knowingly concealed the drop defect, and the unjust enrichment claim is based on the notion that it would be unfair for Sig Sauer to retain the benefit of the full sale price of a P320 because the drop defect rendered the pistol less valuable than the market price.  Ortiz's proposed classes satisfy the commonality requirement.

### D.  Typicality

To satisfy Rule 23(a)'s typicality requirement, "the named plaintiff's claim and the class claims [should be] so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  Falcon, 457 U.S. at 157 n.13.  "Typicality, as with commonality, does not require 'that all putative class members share identical claims.'"  In re Neurontin Mktg. & Sale Pracs. Litig., 244 F.R.D. 89, 106 (D. Mass. 2007) (quoting In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 531-32 (3d Cir. 2004)).  Rather, a named representative's claim is typical if it "arise[s] from the same event or practice or course of conduct that gives rise to the claims of other class members, and [is] based on the same legal theory."  García-Rubiera, 570 F.3d at 460 (internal quotations and alterations omitted).  "Class representatives' claims are not typical[,]" however, "if they may be subject to unique defenses that would divert attention from the common claims of the class . . . ."  In re Tyco Int'l, Ltd., No. MD-02-1335-PB, 2006 WL 2349338, at *2 (D.N.H. Aug. 15, 2006) (Barbadoro, J.) (quoting In re Bank of Boston Corp. Sec. Litig., 762 F. Supp. 1525, 1532 (D. Mass. 1991)); see also In re

16

Neurontin, 244 F.R.D. at 106 ("[c]ourts have held that" to defeat typicality, a "defendant must show some degree of likelihood that a unique defense will play a significant role at trial" and "becom[e] the main focus of the litigation thereby distracting attention from the issues common to the class.").

Ortiz's claims are typical. They are rooted in the same conduct on Sig Sauer's part--the sale of a defective P320 pistol and the misrepresentation or non-disclosure of this defect. Ortiz's claims and the class members' claims also rest on the same legal theories, relating to Sig Sauer's duty to disclose or accurately represent the drop fire defect, the nexus between the defect and the economic loss suffered by purchasers who obtained a less valuable pistol than advertised, and the unfair benefit conveyed to Sig Sauer under these circumstances.

Sig Sauer contends that Ortiz's claims are atypical because he is subject to unique defenses going to his entitlement to damages. Specifically, according to Sig Sauer, Ortiz cannot demonstrate that his pistol has a diminished value due to the defect, given that he did not upgrade or attempt to resell it; further, "any such diminished value is eliminated by the availability of the free upgrade."[42] As a result, Sig Sauer argues, Ortiz has not suffered actual damages.

Assuming that these defenses can be asserted against Ortiz, they do not render his claim atypical because they are not unique. All P320 owners are eligible for the VUP, and Sig Sauer has not set forth any data suggesting that Ortiz is in the minority because he did not attempt to resell his pistol. Further, as of May 2021, roughly half of the defective pistols have not been upgraded under the VUP; from this fact, the court infers that a sizable percentage of class members, like Ortiz, have pistols that are not upgraded. Since these defenses are not unique, they cannot distract from issues that are common to the class.

---

[42] Def.'s Objection (doc. no. 51) at 26.

### E. Adequacy

The adequacy requirement under Rule 23(a)(4) is comprised of two parts. "The moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced, and able to vigorously conduct the proposed litigation." Andrews, 780 F.2d at 130. With respect to the first part, "perfect symmetry of interest is not required[;] . . . [o]nly conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the . . . adequacy requirement." Matamoros v. Starbucks Corp., 699 F.3d 129, 138 (1st Cir. 2012) (quoting Newberg on Class Actions § 3:58 (5th ed. 2012)).

Sig Sauer does not dispute class counsel's adequacy. It does, however, challenge Ortiz's adequacy as class representative by, once again, pointing to the purportedly unique defenses applicable to Ortiz. This argument does not fare any better under the adequacy requirement. While Ortiz's claim is not identical to that of other class members--for example, because he is a law enforcement officer who used the pistol as a duty weapon, and he tried to participate in the VUP but did not upgrade his pistol--the differences do not go to the heart of the litigation. For the same reasons that the court finds Ortiz's claim to be typical of the class, it also finds no conflicts of interest between Ortiz and the class that render him an inadequate representative. See Falcon, 457 U.S. at 157 n.13 (noting that the commonality and typicality requirements "tend to merge with the adequacy-of-representation requirement").

### F. Predominance

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed R. Civ. P. 23(b)(3). The predominance inquiry "calls upon courts to give careful scrutiny to the relation between

common and individual questions in a case." Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453 (2016).  "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." Id. (internal quotations omitted).

The court undertakes the predominance analysis of each claim separately, beginning with the unjust enrichment claim, focusing first on the nationwide class and then on the unjust enrichment subclass.  The court then assesses predominance with respect to the fraudulent concealment claim.

### i.   Unjust enrichment claim – nationwide class

Analysis of predominance commences "of course, with the elements of the underlying cause of action." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011).  Thus, the court begins by considering which state law or laws apply to the unjust enrichment claims of the nationwide class.

In a diversity action, as here, the court must apply the forum state's choice-of-law principles to determine the applicable law. Coldwell Banker Real Est., LLC v. Brian Moses Realty, Inc., 752 F. Supp. 2d 148, 164 (D.N.H. 2010) (McCafferty, M.J.).  "Under New Hampshire choice-of-law principles, when more than one state may have an interest in the suit and the choice involves substantive law, the court must first decide whether New Hampshire law actually conflicts with the laws of the other interested states." Patrick v. Massachusetts Port Auth., 141 F. Supp. 2d 180, 187 n.6 (D.N.H. 2001) (DiClerico, J.) (citing Keeton v. Hustler Magazine, Inc., 131 N.H. 6, 13 (1988)).  An actual conflict exists when "application of the laws" of the interested, non-forum state "would change the outcome." Sargent v. Atrium Med. Corp.,

No. 17-CV-740 -LM, 2019 WL 4542725, at *4 (D.N.H. Sept. 19, 2019) (McCafferty, C.J.) (internal citations omitted). The party claiming that another state's law applies bears the burden of demonstrating an actual conflict. Fujifilm N. Am. Corp. v. M&R Printing Equip., Inc., 565 F. Supp. 3d 222, 232 (D.N.H. 2021) (McCafferty, C.J.) (internal citations omitted). If the moving party makes this threshold showing, the court proceeds with New Hampshire's multi-factor, choice-of-law assessment to determine which of the laws applies; if not, the court applies New Hampshire law. Id. (internal citation omitted).

Ortiz contends that New Hampshire law applies across the class, in part because there are no material differences among state laws on unjust enrichment. Sig Sauer asserts that several variations in state law give rise to actual conflicts, and the choice-of-law analysis raises numerous, individual questions, which preclude class certification. The court agrees with Sig Sauer; in fact, the initial step in the choice-of-law analysis alone--identifying actual conflicts--involves individual factual and legal inquiries that overwhelm common issues.[43]

To begin, several courts have surveyed the unjust enrichment laws of the 50 states and found that they "var[y] significantly from state to state." Camey v. Force Factor, LLC, No. CV 14-14717-RWZ, 2016 WL 10998440, at *7 (D. Mass. May 16, 2016); see also, e.g., In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig., No. 16-02709-MD-W-GAF, 2019 WL

---

[43] Ortiz attempts to simplify the choice-of-law inquiry by arguing that Sig Sauer's website contains a choice of law clause that states that "all matters related to the Website . . . and any dispute or claim arising therefrom or related thereto . . . shall be governed by and construed in accordance with the internal laws of the State of New Hampshire." Pl.'s Mot. for Class Cert. (doc. no. 40-1) at 19-20. On February 4, 2022, during a hearing on Sig Sauer's motion for summary judgment, Ortiz clarified that he is not suggesting that the website's statement constitutes a valid agreement regarding the law applicable to the class's claims. Rather, Ortiz urged the court to consider the website's language as a factor when applying New Hampshire's multi-factor test to determine the applicable law, after identifying an actual conflict. The court need not address this factor, as the court does not proceed past the actual conflict analysis.

1418292, at *4 (W.D. Mo. Mar. 21, 2019) (finding "material differences in the various

applicable states' unjust enrichment laws"); Muehlbauer v. Gen. Motors Corp., No. 05 C 2676,

2009 WL 874511, at *6 (N.D. Ill. Mar. 31, 2009) ("The nuances of state law in this area [of

unjust enrichment] are simply too varied" to allow for nationwide class treatment).  These

differences include "the disparity in proof required to prove an enrichment was 'unjust or

wrongful[,]' . . . [] the requirement by some states that there be no adequate remedy at law[,]" the

"direct and indirect benefit elements of unjust enrichment," and the availability and treatment of

equitable defenses like unclean hands.  Thompson v. Bayer Corp., No. 4:07CV00017 JMM,

2009 WL 362982, at *4-6 (E.D. Ark. Feb. 12, 2009).

        Ortiz counters this authority by citing a handful of cases in which courts concluded that

the differences among the unjust enrichment laws of the 50 states are not material, did not create

actual conflicts with forum law, or did not preclude certification.  These cases do not sway the

court because they are distinguishable or limited in their reasoning.  In one case, Rapoport-Hecht

v. Seventh Generation, Inc., the court certified a nationwide unjust enrichment settlement class

after acknowledging that the predominance analysis is less robust in the settlement context, since

it does not require the court to consider all of the manageability issues that can arise when

litigating and resolving claims under differing state laws.  See No. 14-CV-9087 (KMK), 2017

WL 5508915, at *3 (S.D.N.Y. Apr. 28, 2017) ("While the Court does not adopt, in full,

Plaintiff's argument that variations in state law implicate only manageability concerns, which

need not be addressed when analyzing a settlement class . . . the Court does agree that questions

about the ability of the Court to coordinate discovery and trial among several [unjust enrichment]

subclasses that implicate the same broad issues of liability and proof are best characterized as

questions about manageability that need not be addressed here.").  In four of the other cases that

Ortiz cites, the courts found no actual conflict between the laws of the forum states--New Jersey, Delaware, and California--and the laws of the other 49 states, but they did not detail the variations present in the state laws or explain why these differences are immaterial.  For example, in In re Liquid Aluminum Sulfate Antitrust Litigation, the court limited its discussion of the differences in unjust enrichment laws to one footnote with a single citation.  See No. CV 16-MD-2687 (JLL), 2017 WL 3131977, at *29 n.27 (D.N.J. July 20, 2017) (citing In re Mercedes-Benz Tele Aid Contract Litig., 257 F.R.D. 46, 58 (D.N.J. 2009)).  And in Benefit Trust Fund v. Zeneca, Inc., the court concluded that there were no actual conflicts between Delaware law and the laws of the other states, in part, because the parties did not assert any conflicts.  See 710 F. Supp. 2d 458, 477 (D. Del. 2010) (citing cases discouraging courts from engaging in conflicts questions that are not put at issue by the parties).  While these courts may have reasonably limited their analysis of the differences among unjust enrichment laws for any number of reasons, the court does not follow suit here.

Further, a number of the cases that Ortiz cites rely on Powers v. Lycoming Engines, 245 F.R.D. 226 (E.D. Pa. 2007), for the proposition that the differences among the 50 states' unjust enrichment laws are not material and/or do not preclude certification of a nationwide class.  See, e.g., Snyder v. Farnam Companies, Inc., 792 F. Supp. 2d 712, 723 (D.N.J. 2011) (citing Powers, 245 F.R.D. at 231); Zeneca, 710 F. Supp. 2d at 477 (citing Powers, 245 F.R.D. at 231); In re Checking Acct. Overdraft Litig., 307 F.R.D. 630, 647 (S.D. Fla. 2015) (citing In re Mercedes-Benz, which relies on Powers for its analysis of the differences among the states' unjust enrichment laws).  Powers does not provide a sturdy foundation for this proposition, however, for at least two reasons.

22

First, the district court in Powers did not resolutely find that the unjust enrichment laws of the 50 states were substantially similar.  In fact, the court identified "numerous differences in unjust enrichment laws among many states[,]" and it concluded that some (but not most) of them created "actual conflicts" with Pennsylvania law, meaning that the out-of-state law would produce a different result than Pennsylvania law.  Powers, 245 F.R.D. at 230.  After identifying these conflicts, the court applied Pennsylvania's choice-of-law rules to determine that forum law governed the class's unjust enrichment claims because Pennsylvania had "the most significant relationship to the transaction and the parties."  Id. at 232.  Second, after the district court certified the nationwide unjust enrichment class, the Third Circuit Court of Appeals found that "the District Court's choice-of-law exploration was insufficient and, consequently, the inquiry into Rule 23's predominance and superiority requirements rested on questionable premises." Powers v. Lycoming Engines, 328 F. App'x 121, 128 (3d Cir. 2009).  The Third Circuit Court of Appeals remanded the case "for an entirely new choice-of-law determination for both the unjust enrichment and breach of implied warranty claims."  Id. (internal citation omitted).  The district court did not have the opportunity to reconsider its rulings as to the unjust enrichment claim because the plaintiffs subsequently (and voluntarily) withdrew the claim.  Powers v. Lycoming Engines, 272 F.R.D. 414, 419 (E.D. Pa. 2011).  In sum, the court aligns with substantial and reasoned authority in concluding that state unjust enrichment laws substantively differ across the country.

Next, the court details just one of these variations in state law--the diverse standards pertaining to the defendant's conduct--to illustrate the individual legal and factual questions that would arise in determining if actual conflicts exist between New Hampshire law and the laws of the other interested states.  Under New Hampshire law, a plaintiff asserting an unjust enrichment

claim "need not prove that the defendant obtained the benefit through wrongful acts; passive

acceptance of a benefit may also constitute unjust enrichment." Inv. Almaz v. Temple-Inland

Forest Prod. Corp., 243 F.3d 57, 64 (1st Cir. 2001) (citing New Hampshire state court cases); see

also Cohen v. Frank Developers, Inc., 118 N.H. 512, 518 (1978) ("[t]o entitle one to restitution,

it must be shown that there was unjust enrichment either through wrongful acts or passive

acceptance of a benefit that would be unconscionable to retain" (internal quotation omitted)).

 In other states, the defendant's conduct must be of a different, sometimes specific, nature

to warrant relief.

> Minnesota law requires that the defendant be unjustly enriched in the sense that
> the term 'unjustly' could mean illegally or unlawfully.  In Virginia, unjust
> enrichment is limited to claims arising from: money paid by mistake; failed
> consideration; money got[ten] through imposition; extortion; oppression; or any
> other undue advantage taken of the claiming party's situation, where the
> advantage is contrary to laws made for the protection of persons under those
> circumstances.

Martin v. Ford Motor Co., 292 F.R.D. 252, 280 (E.D. Pa. 2013) (internal quotations and citations

omitted).  Further, some states "require that the misconduct include dishonesty or fraud." In re

Baycol Prods. Litig., 218 F.R.D. 197, 214 (D. Minn. 2003).  For instance, in Alabama, a

defendant is unjustly enriched if

> (1) the donor of the benefit . . . acted under a mistake of fact or in misreliance on a right
> or duty, or (2) the recipient of the benefit . . . engaged in some unconscionable conduct,
> such as fraud, coercion, or abuse of a confidential relationship.

Matador Holdings, Inc. v. HoPo Realty Invs., L.L.C., 77 So. 3d 139, 146 (Ala. 2011) (quoting

Jordan v. Mitchell, 705 So.2d 453, 458 (Ala. Civ. App. 1997)).  In Texas, "[u]njust enrichment is

typically found under circumstances in which one person has obtained a benefit from another by

fraud, duress, or the taking of an undue advantage." Thompson, 2009 WL 362982, at*5 (quoting

*Burlington Northern R. Co. v. Southwestern Elec. Power Co.*, 925 S.W.2d 92, 97 (Tex. App. 1996)).

Finally, "[s]ome states do not specify the misconduct necessary to proceed." *In re Sears, Roebuck & Co.*, No. 05 C 2623, 2006 WL 3754823, at *1 n.3 (N.D. Ill. 2006). To complicate matters further, "unjust enrichment is a tricky type of claim that can have varying interpretations even by courts within the same state, let alone among the fifty states." *Id.* Thus, the court would need to assess how these sometimes subjective standards are interpreted in certain states, potentially resolve conflicts within states, and fill gaps where states do not set forth a standard regarding defendants' conduct.

As a first step in determining whether these varying standards pose actual conflicts, the court would need to engage in individualized factual inquiries to determine what state or states are interested in each class member's claim, based on where the member purchased and uses the pistol, for example. Then, the court would proceed to apply the New Hampshire standard and the differing standards of other interested states to class members' claims, and compare the outcome under each standard. The outcome of some claims under the foreign law could turn on Sig Sauer's conduct, which is common to the class. In states in which unjust enrichment claims must involve fraud, misreliance, or mistake, however, resolution of the claim would require, at least in part, an examination of class members' knowledge or understanding of Sig Sauer's drop safety representations when purchasing the P320. As described more fully below, *infra*, Section III.F, evidence in the record does not indicate that the class members uniformly received, interpreted, and relied on Sig Sauer's representations regarding the drop safety of the P320. Thus, this is an individual, not common, factual issue.

If the court were to find that the outcome of a claim is different under New Hampshire law than it is under the law of a non-forum state, then the laws conflict, and the court would proceed with New Hampshire's multi-factor test to determine the applicable law.  On the other hand, if no actual conflict arose under this aspect of the law for some class members, the court would turn to the next substantive difference in the laws and test that for an actual conflict.  See Guardian Angel Credit Union v. MetaBank, No. 08-CV-261-PB, 2010 WL 1794713, at *5 (D.N.H. May 5, 2010) (Barbadoro, J.) ("[c]hoice-of-law questions . . . must be answered on an issue-by-issue basis." (internal citation omitted)).  Individual issues of law and fact would compound with each additional variation in state law, and its application to the individual class members' claims.

Thus, the first step in resolving the class's unjust enrichment claims--identifying actual conflicts in potentially applicable law--requires the court to analyze the differences in the laws of the 50 states and to adjudicate various class members' claims under these distinct laws.  In this way, the actual conflict analysis mirrors the process that the court would undertake if it was tasked to apply the laws of the 50 states to a nationwide unjust enrichment claim.  In these situations, courts have consistently denied certification based on a finding that common issues of law do not predominate.  See, e.g., McLaughlin on Class Actions § 5:60 (18th ed.) ("Where certification of a multistate unjust enrichment class is sought, variations in state law . . . have precluded class certification based on unjust enrichment theories"); In re Actiq Sales & Mktg. Pracs. Litig., 307 F.R.D. 150, 168 (E.D. Pa. 2015) ("For the same reasons why an actual conflict exists among the unjust enrichment laws of the fifty states, individual issues of law predominate with regard to a nationwide class"); Martin, 292 F.R.D. at 281 (noting that the certification of a nationwide unjust enrichment class would require "the Court to deal with a multitude of

plausible arguments on the precise meaning of unjust enrichment under different state laws to ensure correct jury instructions," and this "complicated task, while not dispositive, supports the Court's ultimate decision to deny certification"); In re Conagra Peanut Butter Prod. Liab. Litig., 251 F.R.D. 689, 698 (N.D. Ga. 2008) ("[t]he many differences" in unjust enrichment law "among jurisdictions should prevent the Court from finding that common issues of law predominate on this claim.").

Consistent with this authority, the court denies certification of the nationwide unjust enrichment class based on a failure of predominance. The individual issues that would arise in the actual conflict analysis alone are both numerous and central to the resolution of the class's claims, since they go to the threshold, choice-of-law inquiry. Thus, these individual issues predominate over common ones, rendering certification improper.

### ii.    Unjust enrichment subclass

The unjust enrichment subclass consists of individuals in Arizona, Florida, Georgia, Idaho, Nebraska, Pennsylvania, and Utah who purchased the P320 pistol prior to August 8, 2017. Ortiz provided a chart listing the elements of an unjust enrichment claim in each of the subclass states, supported by citations to case law. According to the chart, each state requires that the plaintiff confer a direct benefit to the defendant; imposes a four-year statute of limitations; and precludes recovery under the theory of unjust enrichment where an adequate remedy at law is available. The chart does not elaborate on the interpretations of these elements in each state.

Once again, the court begins with the choice-of-law analysis. Sig Sauer describes one actual conflict between New Hampshire law and the laws of the seven subclass states.[44]

---

[44] In its objection to Ortiz's class certification motion, Sig Sauer did not identify an actual conflict between New Hampshire law and the laws of the seven subclass states. Thus, the court requested supplemental briefing on this topic, as well as others, and Sig Sauer responded with

According to Sig Sauer, the subclass states "preclude an unjust enrichment claim when an adequate remedy at law exists," but New Hampshire does not.[45]  Sig Sauer develops its argument with respect to Arizona and New Hampshire law, but it does not elaborate on, or cite authority supporting, its characterization of the laws of the other six subclass states, resting instead on Ortiz's chart.  Further scrutiny of relevant state court precedent confirms that Sig Sauer's purported conflict is illusory.

Indeed, New Hampshire, like the subclass states, embraces the principle that "[u]njust enrichment is an equitable remedy that ordinarily is unavailable if legal remedies are adequate under the circumstances."  Parsons Infrastructure & Tech. Grp., Inc. v. Gilbane Bldg. Co., No. 05-CV-01-PB, 2005 WL 2978901, at *1 (D.N.H. Nov. 7, 2005) (Barbadoro, J.) (citing a New Hampshire Supreme Court opinion identifying unjust enrichment as an equitable remedy and a United States Supreme Court opinion declaring that a plaintiff is not entitled to an equitable remedy if legal remedies are adequate); see also Inv. Almaz v. Temple-Inland Forest Prod. Corp., No. CIV. 97-374-JM, 2000 WL 36938, at *1 (D.N.H. Nov. 22, 1999) (Muirhead, J.) ("While it has been said that the origins of unjust enrichment are both legal and equitable, . . . under New Hampshire law unjust enrichment has traditionally been understood as an equitable action." (internal quotations and alterations omitted)); Exeter Realty Corp. v. Buck, 104 N.H.

---

the single conflict discussed in this Section.  In its supplemental brief, Sig Sauer also discusses differences among the laws of the seven subclass states, in an attempt to argue that, if the laws of the separate states are applied to the subclass's unjust enrichment claims, individual legal issues will predominate.  These arguments do not form part of the actual conflict analysis because Sig Sauer does not suggest that these intra-subclass distinctions also create conflicts with New Hampshire law.

[45] Def.'s Supp. Br. (doc. no. 100) at 7.

199, 200 (1962) (discussing the "general and familiar rule that equitable remedies will not be granted where there is an adequate remedy at law").

In an attempt to refute this aspect of New Hampshire law, Sig Sauer points to Motion Motors, Inc. v. Berwick, in which the New Hampshire Supreme Court did not disturb a trial court's decision to offer the defendant an option between a legal or equitable remedy.  In Motion Motors, the plaintiffs transferred land to the defendant under a quitclaim deed, while reserving certain rights, including the right to remove gravel from the property for a period of time.  150 N.H. 771, 775-76, 780 (2004).  The trial court ruled that the defendant violated the plaintiff's right in part.  Id. at 780.  In discussing the remedy, the trial court expressed a "reluctan[ce] to order a continuing relationship between" the parties, and thus ordered the defendant to choose between "reimburs[ing] the [plaintiffs] for the value of the gravel to which they were entitled and unable to remove," or a three-year extension of the plaintiffs' mineral rights.  Id. at 780-81.  On appeal, the defendant argued that "the trial court's grant of the equitable remedy . . . was improper because the 'plain, adequate and complete' remedy of legal damages was available."  Id. at 780.  In rejecting this argument, the New Hampshire Supreme Court simply stated that "the trial court did not impose an equitable remedy upon" the defendant, but instead "provided it with an option to choose between an equitable remedy or a legal remedy."  Id. at 781.

The court is not convinced that the Motion Motors Court established a rule that overrides or conflicts with the general principle under New Hampshire law, that an equitable remedy is precluded where an adequate legal remedy is available.  In fact, by distinguishing the trial court's action from the imposition of an equitable remedy, the Motion Motors Court implied that it would be improper to order an equitable remedy where an adequate legal remedy is available.  At most, then, Motion Motors recognizes a limited exception to the general rule, under which

New Hampshire courts can exercise their discretion to allow (not force) a defendant that has

wronged a plaintiff to choose between an equitable or legal remedy, when the particular

circumstances of the case render it unclear which remedy is feasible and practical.  See Exeter

Realty Corp. v. Buck, 104 N.H. 199, 200 (1962) ("This state has long proceeded on the basis that

the division line between equity and law is not precise and that trial courts have considerable

discretion in determining whether equity should intervene to aid litigants in the protection of

their legal rights.").  Assuming, without deciding, that such an exception exists, the court has no

basis from which to find that it would apply here--nor does Sig Sauer argue for its applicability.

Sig Sauer next cites two New Hampshire state court cases, Goodman v. Wells Fargo

Bank and Leonard v. Schneider, in which fraud and unjust enrichment claims premised on

similar facts were permitted to proceed together past the summary judgment and dismissal

stages, respectively.  These cases do not lend support to Sig Sauer's purported conflict, either.

The cases are not inconsistent with the general principle that an adequate legal remedy renders

an equitable remedy unavailable, and, critically, they do not present a rule or practice that is

unique to New Hampshire.

In Goodman, the court denied the defendant's motion for summary judgment as to the

plaintiff's wrongful foreclosure, fraud, and unjust enrichment claims, which were all based on

similar facts, after finding that material, disputed facts remained as to each claim.  No.

2172009EQ00436, 2012 WL 12283196, at *1-2 (N.H. Super. Sept. 7, 2012).  And in Leonard,

the plaintiffs asserted unjust enrichment, fraud, breach of contract, and breach of fiduciary duties

claims premised on the defendant's refusal to recognize the plaintiff's ownership interest in the

defendant's company.  No. 217-2019-CV-00507, 2019 WL 5059104, at *1-2 (N.H. Super. Oct.

7, 2019).  The defendant argued that the unjust enrichment claim must be dismissed because a

valid, express contract covered the subject matter.  Id. at *4.  The court denied the motion to dismiss on this ground, concluding that the unjust enrichment claim could proceed as an alternative theory of recovery since the defendant denied the validity of the contract, though the claim could not be maintained "if [the] breach of contract claim is [found to be] sufficient," since "[r]estitution is subordinate to contract as an organizing principle of private relationships."  Id. at *5.

Similarly, courts adjudicating unjust enrichment claims under the laws of each of the subclass states have, at various stages of litigation, allowed plaintiffs to assert unjust enrichment claims alongside other claims for legal remedies based on similar facts.  As in Leonard, the unjust enrichment claims proceeded as alternative theories of recovery, particularly where the adequacy or exclusivity of another legal remedy, or the existence an express contract governing the issue, was in dispute.  See Cheatham v. ADT Corp., 161 F. Supp. 3d 815, 832 (D. Ariz. 2016) (rejecting the defendant's argument that the plaintiff's unjust enrichment claim must be dismissed because she had an adequate remedy at law based on fraud, reasoning that the plaintiff "assert[ed] her unjust enrichment claim in the alternative," and, under Arizona law, "[a]n unjust enrichment count should not be dismissed unless it is insufficient apart from its inconsistency with the other counts");[46] Botting v. Goldstein, No. 15-CV-62113, 2015 WL 10324134, at *3

---

[46] Sig Sauer also argues that since the presence of an adequate remedy at law precludes an unjust enrichment claim under Arizona law, and not New Hampshire law, the two laws conflict, and New Hampshire's choice-of-law rules dictate that Arizona law governs Ortiz's unjust enrichment claim.  Sig Sauer then contends that Ortiz cannot assert an unjust enrichment claim under Arizona law because he also maintains two fraud claims, which provide an adequate remedy at law.  See Compl. (doc. no. 1) at 25-27.  As a result, Sig Sauer argues, Ortiz lacks standing to represent a class as to this claim.  This argument, which Sig Sauer raised for the first time in a supplemental brief ordered after oral argument on the class certification motion, cannot prevail since Sig Sauer does not satisfy its initial burden, under New Hampshire's choice-of-law rules, to establish an actual conflict between Arizona and New Hampshire law.  Absent an actual conflict, the court must apply New Hampshire law to Ortiz's unjust enrichment claim.  See Fujifilm, 565

(S.D. Fla. Dec. 21, 2015) (denying a motion to dismiss the plaintiff's unjust enrichment claim,

where the plaintiff also asserted a Fair Labor Standards Act claim based on similar facts, because

alternative pleading is permitted under Federal Rule of Civil Procedure 8, adding that "until or

unless an adequate remedy at law is proved, dismissal of Plaintiffs' claim is premature");[47] Hix

v. Acrisure Holdings, Inc., No. 1:21-CV-4541-MLB, 2022 WL 2803633, at *10-11 (N.D. Ga.

July 18, 2022) ("the availability of any claim for money damages excludes a claim

for unjust enrichment" under Georgia law, but the plaintiff could "invoke the doctrine [of unjust

enrichment] as an alternate theory of recovery"); Klein v. Beck, No. 4:10-CV-0088-EJL-REB,

2013 WL 12142374, at *3 (D. Idaho Mar. 22, 2013) (finding it proper that Idaho unjust

enrichment and Uniform Fraudulent Transfers Act claims proceeded before the jury, given that

"there was no contract claim between [the parties] that would prevent the equitable claim of

unjust enrichment, . . . [and] the Court finds the UFTA may not always be an adequate legal

remedy for unjust enrichment"); Williams Sols., Inc. v. Cambian Bus. Servs., Inc., No.

8:09CV97, 2009 WL 1652254, at *3 (D. Neb. June 10, 2009) (the "Nebraska Supreme Court has

---

F. Supp. 3d at 232.  Sig Sauer does not argue that Ortiz cannot maintain his unjust enrichment claim, and thus lacks standing, under applicable New Hampshire law.

[47] The Botting Court noted that some courts have ruled that a Florida unjust enrichment claim is subject to dismissal when any adequate remedy at law is available, while other courts have held that the claim is barred only when "a contractual legal remedy" exists.  2015 WL 10324134, at *3 (emphasis in original) (internal citations omitted).  The former rule may present an actual conflict between New Hampshire and Florida law, but the latter rule does not, since the class members do not have an express contract with Sig Sauer.  Regardless of this mixed authority, Sig Sauer does not satisfy its burden to demonstrate an actual conflict between Florida and New Hampshire law.  Sig Sauer does not cite authority supporting (or otherwise develop) its argument that Florida law conflicts with New Hampshire law, nor does it address how, if at all, Rule 8 affects the actual conflict analysis.  See Vollmar v. Atrium Med. Corp., No. 17-CV-704-LM, 2019 WL 3935364, at *2 (D.N.H. Aug. 20, 2019) (McCafferty, C.J.) (in demonstrating an actual conflict, "[t]he party who asserts that the law of another state is different from the law of the forum state bears the burden of proving the content of the foreign law.").

endorsed the practice of joining both express and implied contract theories of recovery in the same complaint where the facts arise out of the same transaction," and "a complaint may properly allege both . . . theories of recovery . . . in the alternative" or "simultaneously, if the implied contract is based on a conferral of benefits that was not covered by an express contract" (internal quotations and citations omitted)); Infogroup, Inc. v. Database LLC, 95 F. Supp. 3d 1170, 1198 (D. Neb. 2015) (the Nebraska Supreme Court has "adopted the Restatement (Third) view of unjust enrichment," which provides that a defendant can be "liable both on a theory of tort and (alternatively) on a theory of unjust enrichment"); Kane v. Platinum Healthcare, LLC, No. CIV.A. 10-4390, 2011 WL 248494, at *5 (E.D. Pa. Jan. 25, 2011) (under Pennsylvania law, "[a]n unjust enrichment claim is subject to the basic tenet of equity jurisprudence that if an adequate remedy at law exists, equitable relief will not be granted," but dismissal of the claim was not proper because the plaintiff "sufficiently pled facts to satisfy the elements of . . . unjust enrichment," Rule 8 "contemplate[s] pleading in the alternative," the plaintiff "has not clearly alleged the existence of any contract," and "[a]t this early stage in the pleadings, it is not clear that Plaintiff's [statutory] claims . . . are adequate remedies at law"); Gulf Coast Shippers Ltd. P'ship v. DHL Exp. (USA), Inc., No. 2:09-CV-00221, 2015 WL 4557573, at *19 (D. Utah July 28, 2015) (denying a motion to dismiss an unjust enrichment counterclaim asserted alongside a breach of contract counterclaim, reasoning that "[u]ntil the jury determines whether [the defendant] may enforce the [contract] against Plaintiffs, it would be inappropriate for this court to dismiss [the defendant's] equitable counterclaims based on existing Utah case law, which often touches only briefly on the issue of alternative legal and equitable claims"); In re K–Dur Antitrust Litig., 338 F.Supp.2d 517, 544 (D.N.J. 2004) (denying a motion to dismiss nationwide class's unjust enrichment claims brought under the laws of the 50 states, the District of

Columbia, and Puerto Rico because the plaintiffs "are clearly permitted to plead alternative theories of recovery.").

Thus, Sig Sauer fails to establish that New Hampshire and the subclass states differ with respect to their treatment of unjust enrichment claims when an adequate remedy at law may be, or is, available.  Since Sig Sauer has not identified an actual conflict, the choice-of-law analysis is complete, and New Hampshire law applies.  See Fujifilm, 565 F. Supp. 3d at 232 (if the moving party demonstrates an actual conflict, the court must proceed with the choice-of-law analysis, but "[i]f the moving party does not so demonstrate, the court applies New Hampshire law." (internal citation omitted)).

This means that the predominance inquiry centers on the balance between individual and common factual issues that will arise when adjudicating the unjust enrichment claims under applicable New Hampshire law.  In New Hampshire, "[t]he doctrine of unjust enrichment is that one shall not be allowed to profit or enrich himself at the expense of another contrary to equity." Cohen, 118 N.H. at 518 (internal quotation omitted).  More specifically, "[a] defendant is unjustly enriched, and a plaintiff is entitled to restitution, when the court determines that the defendant has 'received a benefit and it would be unconscionable for the defendant to retain that benefit.'" Inv. Almaz, 243 F.3d at 64 (quoting Nat'l Employment Serv. Corp. v. Olsten Staffing Serv., Inc., 145 N.H. 158, 163 (2000)).  "A defendant's retention of a benefit is 'unconscionable' when it 'affronts the sense of justice, decency, or reasonableness' or is 'shockingly unjust or unfair.'" Est. of Mortner v. Thompson, 170 N.H. 625, 632 (2018) (quoting Black's Law Dictionary 1757 (10th ed. 2014)).  Thus, to adjudicate this claim, the court undertakes a fact-specific inquiry.  See Kowalski v. Cedars of Portsmouth Condo. Ass'n, 146 N.H. 130, 132 (2001) ("[a] trial court must determine whether the facts and equities of a particular case

warrant[] a remedy in restitution" (quoting R. Zoppo Co., Inc. v. City of Manchester, 122 N.H. 1109, 1113 (1982))).

Ortiz summarily contends, without citation to authority, that "[n]o individual inquiries are needed" to resolve the unjust enrichment claims because "any reasonable consumer would deeply care about the alleged gun safety problem attributed to their potential purchase."[48]  The court disagrees.  The question at the heart of this equitable claim--whether it is "unconscionable" for Sig Sauer to retain the full sale price of the P320--turns on facts that are unique to each class member.  Indeed, the balance of the equities can differ in each transaction, based on factors including class members' knowledge of and reliance on Sig Sauer's drop safety representations when making their purchase decisions; their exposure to drop fire risks based on the purpose, frequency, and duration of their use of the P320; and their experiences with the VUP.  See generally McLaughlin on Class Actions § 5:60 (19th ed.) ("The majority view is that unjust enrichment claims usually are not amenable to class treatment because the claim requires evaluation of the individual circumstances of each claimant to determine whether a benefit was conferred on defendant and whether the circumstances surrounding each transaction would make it inequitable for the defendant to fail to return the benefit to each claimant.").  Below, the court details the relevance of each of these factors to the unconscionability analysis, and then uses Ortiz's case to illustrate the individualized, fact-specific nature of each inquiry.

***Individual motivations for purchasing the P320.***  First, the weight that a class member placed on Sig Sauer's drop safety representations when purchasing the pistol affects the unconscionability analysis.  For example, while equity may dictate that restitution is owed to a class member who largely based his or her purchase decision on Sig Sauer's drop safety

---

[48] Pl.'s Reply Brief (doc. no. 54) at 8.

representations, the same cannot be said for a class member who did not know about the representations and/or did not care about this particular feature of the pistol.

This is an individual, and not common, issue because P320 purchasers were not uniformly subject to Sig Sauer's drop safety representations, and the record does not suggest that each purchaser was driven to purchase the P320 based on its drop safety. Indeed, Ortiz asserts that he learned of the pistol's drop safety on Sig Sauer's website and YouTube. He does not argue, nor can he, that each class member was privy to this same information. Each class member could have sought information about the pistol from a variety of sources, ranging from Sig Sauer's website, to salespeople at third party retailers, to online reviews, and each source could have highlighted different features of the pistol. Further, among class members who learned of Sig Sauer's drop safety representations, it is likely that some drew differing inferences from the language or placed varying amounts of weight on this information, based on their intended uses of the pistol, their past experiences with firearms, or their baseline assumptions regarding drop fire danger, regardless of any safety features. Accordingly, individualized investigations into each class member's purchasing decision would be necessary to conduct the unconscionability analysis; this weighs against a finding of predominance. See, e.g., In re Sears, Roebuck & Co. Tools Mktg. & Sales Pracs. Litig., No. 05 C 2623, 2007 WL 4287511, at *9 (N.D. Ill. Dec. 4, 2007) (individual factual issues predominated for a multi-state class unjust enrichment claim premised on a manufacturer's deceptive "Made in the USA" representation, given that "each plaintiff will have been exposed to a different representation or mix of representations," and "proving each class member's motivation for buying Craftsman products would be highly individualized"); In re Dial, 312 F.R.D. at 60-74 (denying certification for unjust enrichment claims asserted under the laws of eight states based on allegedly false

advertising of the antibacterial properties of hand soap, after finding, in part, that individual

factual issues regarding "motivations for purchasing" the hand soap predominated); accord

McLaughlin on Class Actions § 5:51 (18th ed.) (in the context of claims concerning fraud in

sales and marketing, "usually consumer behavior may be motivated by a variety of factors

requiring individualized analysis").[49]

       Ortiz's claim exemplifies the detailed and fact-specific nature of the inquiry into the

effect of Sig Sauer's drop safety representations on any class member's purchasing decision.

Ortiz, a law enforcement officer, purchased the P320 as his duty weapon, though he also used it

for recreational shooting.  Before deciding to purchase the P320, Ortiz test-fired the pistol and

found that he liked the feel of it in his hand, its safety features, and its modularity.  He also

researched the pistol on YouTube and on Sig Sauer's website, where he saw Sig Sauer's

assertion that "the P320 won't fire unless you want it to."  From his research, Ortiz deduced that

---

[49] Precedent from certain states supports a finding that common factual issues predominate as to
fraud-based unjust enrichment claims, if the defendant's fraudulent act is common to the class.
This precedent is not persuasive here.  For example, in In re ConAgra Foods, Inc., several
statewide classes of purchaser plaintiffs asserted consumer protection, unjust enrichment, and
other claims against the manufacturer of cooking oil, claiming that the label on each bottle
falsely stated that the contents were "100% natural."  90 F. Supp. 3d 919, 939-40 (C.D. Cal.
2015).  The district court certified Indiana, Nebraska, Oregon, and South Dakota classes, based
on binding authority from each state directing that an unjust enrichment class can be certified
where each class member was subject to uniform treatment from the defendant and/or exposed to
a non-unique, fraudulent representation.  See id. at 1009-19.  By contrast, the ConAgra court did
not certify New York, Florida, Colorado, and Texas classes, in reliance on authority from each
state treating unjust enrichment claims as fact-intensive.  See id.  The court is not persuaded by
the non-binding authority from the first set of states for two reasons.  First, as previously noted,
unlike in ConAgra, there is no evidence that P320 owners were uniformly exposed to Sig Sauer's
drop safety representations.  Second, Ortiz does not point to, nor is the court aware of any,
binding authority from New Hampshire holding that certification of an unjust enrichment claim
based on non-uniform misrepresentations is proper.  Absent such authority, the court concludes
that the class's unjust enrichment claims require individualized factual inquiries, which
predominate over common issues.  See Kowalski, 146 N.H. at 132 (noting, in the context of an
unjust enrichment claim adjudicated under New Hampshire law, that "[a] trial court must
determine whether the facts and equities of a particular case warrant[] a remedy in restitution.").

the pistol was drop safe.  According to Ortiz, he would not have purchased the pistol if he knew of the drop defect.  These facts indicate that Ortiz understood the pistol to be drop safe, and this feature was a key, though not exclusive, impetus for Ortiz's purchase, for good reason--Ortiz intended to use the pistol in his law enforcement work, including in potentially fast-paced or high-pressure situations.

*Operation of the P320.*  After purchasing the P320, each class member used the pistol with different frequency, for varying lengths of time, and in a variety of settings. These individual facts can materially alter the balance of the equities in an unjust enrichment claim. Hypothetically, for example, a class member who purchased the P320 shortly before the launch of the VUP and used it a few times before being alerted of the drop defect would be differently situated, in terms of her unjust enrichment claim, than a class member who used the pistol for years before learning of the drop defect, including in high-risk settings, or a class member who experienced a drop fire.  These issues of fact are, by definition, individual, and thus also weigh against a finding of predominance.  See, e.g., Martin, 292 F.R.D. at 282 (E.D. Pa. 2013) (finding that individual factual issues predominated for a nationwide unjust enrichment class of individuals who acquired the Ford Windstar minivan with a rear axle design defect, in part because one minivan may have "been driven for twelve years without incident[,]" and another may have been driven for "seven years . . . [when] the rear axle fractured"); Muehlbauer, 2009 WL 874511, at *7 (a multi-state unjust enrichment class of individuals who owned or leased General Motors vehicles with defective braking systems presented individual factual issues precluding certification, since the defect would "manifest[] at a different time in each vehicle's useful life[,]" depending on the climate in which the vehicle is operated, where the vehicle is parked, the frequency of use, and more).

In Ortiz's case, he purchased the pistol roughly a year before the VUP was launched, and he used the pistol as his duty weapon, just as he intended when making the purchase. After some months, his employer required him to change his duty pistol specifically because of the P320's drop defect. There is no evidence that Ortiz experienced a drop fire, or something close to a drop fire, while operating the P320. Further details on the duration, frequency, or circumstances surrounding Ortiz's use of the pistol could shed more light on the balance of the equities in Ortiz's case. Nevertheless, this particular set of facts strengthens Ortiz's claim by demonstrating that the drop defect interfered completely with Ortiz's ability to operate the pistol in the manner he intended, and the defect may have been uniquely risky for Ortiz, given that he used the pistol in potentially sensitive situations as a law enforcement officer.

*Experiences with the VUP.* Finally, Sig Sauer launched the VUP on August 8, 2017, and 45.4% of P320 pistols with the drop defect were upgraded through the VUP as of May 2021. The VUP introduces yet another source of individual, factual distinctions among class members' claims, which are relevant to the unconscionability analysis. For example, class members who willingly chose not to participate in the VUP or participated in the VUP with relative ease and received upgraded pistols that are wholly or substantially non-defective, would have far less (if any) right to restitution than a class member who lacked proper notice of the VUP and would have personally preferred or benefitted from the upgrade.

For those who took advantage of the VUP, the extent to which the upgrade remedied the drop defect is a common, relevant issue. Indeed, if the remedy completely resolved the defect, the claims of class members who participated in the VUP may be extinguished. If the remedy

was incomplete, however, individual facts, such as those previously described, would once again

be relevant to the resolution of the claims.[50]

Individual factual issues abound with respect to class members who did not participate in

the VUP.  Ortiz does not argue, nor does he provide evidence suggesting, that each P320 owner

was notified of the VUP through either Sig Sauer's press release or website.  Also, there is

evidence in the record indicating that certain P320 owners knew of the VUP but chose not to

---

[50] In its order granting in part and denying in part Sig Sauer's motion for summary judgment, the court determined that material factual disputes remain as to whether the VUP completely cures the purported drop defect.  See doc. no. 81 at 33-36.  Sig Sauer moves for partial reconsideration of the court's order as to this specific finding, arguing that this conclusion is erroneous for two reasons.  Both arguments are unsuccessful.  First, Sig Sauer contends that the record lacks any admissible evidence supporting Ortiz's position that the VUP was ineffective.  Instead, according to Sig Sauer, Ortiz provided documents with inadmissible hearsay statements describing two incidents in which post-upgrade P320 pistols purportedly drop fired.  Importantly, Ortiz discussed these documents in his objection to Sig Sauer's motion for summary judgment, but Sig Sauer did not assert a hearsay argument in its reply brief or elsewhere, and instead raises it for the first time in its motion for reconsideration.  The argument cannot prevail in this posture, as motions to reconsider do "not allow a party to introduce new evidence or advance new arguments that could or should have been presented to the district court prior to judgment." Frese v. MacDonald, No. 18-CV-1180-JL, 2020 WL 13003802, at *2 (D.N.H. Feb. 14, 2020) (quoting Marks 3–Zet–Ernst Marks GMBH & Co. KG v. Presstek, Inc., 455 F.3d 7, 15-16 (1st Cir. 2006)); see also Adam v. Hensley, No. CIV. 07-CV-338-JL, 2008 WL 2949230, at *1 (D.N.H. July 30, 2008) ("a motion for reconsideration . . . may not be used 'to raise new legal theories that should have been raised earlier.'" (quoting Nat'l Metal Finishing Co. v. BarclaysAmerican/Commercial, Inc., 899 F.2d 119, 123 (1st Cir.1990))).  Sig Sauer further asserts that evidence obtained after the summary judgment briefing was complete proves that a drop fire did not occur in one of the two incidents.  Even if the court were to credit this argument, it does not eliminate the existence of a dispute of fact regarding the VUP's effectiveness, since the record would still contain some evidence of at least one post-upgrade drop fire.  Second, Sig Sauer argues that the evidence surrounding the two purported drop fire incidents permits differing inferences regarding what caused each gun to fire.  Thus, Sig Sauer argues, Ortiz's evidence is too speculative to create a material dispute of fact on this issue.  The court addressed this argument in its order.  While the evidence in the record does not definitively confirm that the two post-upgrade pistols experienced drop fires, it does not rule out that possibility, either, resulting in a dispute of fact as to the VUP's effectiveness.  See doc. no. 81 at 34-35.  Sig Sauer's motion for reconsideration (doc. no. 82) is denied.

participate in it because they were satisfied with, or preferred, the pistol in its pre-upgrade state.[51]
Thus, individual examination would be necessary to determine whether non-participation was
based on personal preferences, a lack of notice regarding the VUP, or other barriers to
participation.

Again, Ortiz's case provides an example of how individual facts going to class members'
experiences with the VUP are pertinent to the unconscionability determination.  This particular
factor has a mixed effect on Ortiz's claim.  As a law enforcement officer, Ortiz was eligible to
receive a new, upgraded pistol in the mail through the VUP.  According to Sig Sauer, this
upgraded design was also incorporated into all subsequent shipments of the P320.  If this is true,
the pistol Ortiz would have received through the VUP would be equivalent, in terms of drop
safety, to the four P320 pistols that Ortiz purchased between 2018 and 2020--pistols that Ortiz
personally considers to be safe.  This would suggest that the VUP offered Ortiz a pistol that fit
his needs and preferences.  Ortiz, however, did not participate in the VUP.  He registered to
participate on Sig Sauer's website, but Sig Sauer responded five months later with an email that
did not clearly reference the VUP.  Ortiz claims that he did not see this response until after he
initiated this litigation.  These facts suggest that Sig Sauer's management of Ortiz's request was
arguably delayed and unclear, and potentially impeded Ortiz's ability to obtain an upgraded
pistol through the VUP.

---

[51] See Manning Dep. (doc. no. 51-9) at 99:6-13 ("Q. Do you know why some people decided not
to use the voluntary upgrade? A. Some of them just didn't feel the need to go through  the
process. They were, they were okay with the firearm as it was. Others had mentioned that there
was a change in how the trigger, the trigger pull felt, and they, they wanted to keep their firearm
as is.").

In sum, to adjudicate Ortiz's unjust enrichment claim, the court must consider facts going to matters including his specific purchasing decision, use of the P320, and experience with the VUP, as these facts inform the court's assessment of whether Sig Sauer retention of the full P320 purchase price from Ortiz would be unconscionable. The same goes for other class members' claims. These individualized inquiries would devolve into numerous mini-trials that would overwhelm any common issues. Accordingly, the court denies the motion to certify as to the unjust enrichment subclass.

### iii.    Fraudulent concealment claim

The court now turns to the fraudulent concealment claim. This claim is premised on allegations that Sig Sauer had knowledge of the drop defect, which is a material fact; Sig Sauer failed to discharge its duty to disclose this material fact; and the class "reasonably relied on [Sig Sauer's] failure to disclose insofar as they would not have purchased the SIG P320 pistols had they known they were defective."[52]

Generally, the court would begin by determining the applicable law. While the parties disagree on this issue--with Ortiz contending that New Hampshire law applies, and Sig Sauer urging the court to undertake a choice-of-law analysis to determine the applicable law--the court need not resolve this dispute because it will not affect the outcome of the predominance analysis.[53] Inquiry into the predominance requirement for the nationwide class and the

---

[52] Compl. (doc. no. 1) at ¶ 98.

[53] Though the court does not engage in a full-blown choice-of-law analysis, it notes here that such analysis would most likely result in the application of New Hampshire law. Sig Sauer has not met its burden of demonstrating an actual conflict between New Hampshire substantive law and that of other interested states because it fails to "prov[e] the content of the foreign law." Vollmar, 2019 WL 3935364, at *2. Sig Sauer simply states that, "New Hampshire law requires proof of a manifest defect but certain other states do not." Def.'s Supp. Br. (doc. no. 100) at 21. To support its characterization of non-forum law, Sig Sauer cites to the district court's finding in

42

fraudulent omission subclass begins and ends with the issue of reliance, an element that the parties agree applies under the law of New Hampshire or the laws of any of the other interested states.[54]

Certification is generally not proper in a fraud-based class action when reliance must be established individually, as this individual issue defeats predominance.  See Basic Inc. v. Levinson, 485 U.S. 224, 242 (1988) (noting, in a securities fraud class action, that "[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones"); In re TJX Companies Retail Sec. Breach Litig., 246 F.R.D. 389, 395 (D. Mass. 2007) ("A fraud class action cannot be certified when individual reliance will be an issue" (quoting Castano v. American Tobacco Co., 84 F.3d 734, 745 (5th Cir. 1996))); Rothwell v. Chubb Life Ins. Co. of Am., 191 F.R.D. 25, 31 (D.N.H. 1998)

---

In re Gen. Motors LLC Ignition Switch Litig., that manifestation of a defect is not a requirement for common law fraud claims in twenty-seven jurisdictions.  339 F. Supp. 3d 262, 276-77 (S.D.N.Y. 2018).  The court stated, however, that this finding was partially based on the parties' stipulations concerning certain states, as well as "the absence of state law to the contrary" in some states.  Id. at 276 & n.1.  Sig Sauer's argument regarding a potential actual conflict is not sufficiently specific or developed.  As such, New Hampshire choice-of-law rules dictate that the law of the forum state applies.  See Fujifilm, 565 F. Supp. 3d at 232.

[54] See Def.'s Objection (doc. no. 51) at 27 ("Reliance is an element of fraudulent concealment claims around the country"); accord 37 Corpus Juris Secundum § 50 ("an essential element of any fraud claim is that the plaintiff must have reasonably relied on the alleged misrepresentation").  Ortiz provided a chart listing the elements of a fraudulent concealment claim in each of the fifty states.  See doc. no. 51-11.  The chart asserts that reliance is an element of the claim in each state, except for North Carolina.  The North Carolina case that Ortiz cites does not conclude that the element is not present in, or irrelevant to, a fraudulent concealment claim, however.  Rather, it states that "in the specific context of a claim of fraud based upon a breach of a duty to disclose a material fact, we believe that the reasonable reliance requirement is unnecessary because it is virtually identical to what is already required to establish that a duty to disclose exists in the first place."  Everts v. Parkinson, 147 N.C. App. 315, 325 (2001) (emphasis added).  Thus, Ortiz also concedes that reliance must be proven to establish a fraudulent concealment claim in each of the 50 states.

(Barbadoro, J.) ("agree[ing] with the majority view that certification generally is inappropriate when individual reliance is an issue" (internal citations omitted)).

Ortiz attempts to avoid this outcome by arguing that reliance can be presumed on a class-wide basis, since "the omission at issue is undoubtedly material."[55]  Ortiz draws this theory of presumed reliance on material omissions from Affiliated Ute Citizens v. U.S., 406 U.S. 128 (1972).  In Affiliated Ute, the Supreme Court held that, in the context of a securities fraud class action involving "primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision."  Id. at 153-54 (internal citations omitted).  The Affiliated Ute presumption is grounded in part on the "logical impossibility of proving that plaintiffs relied on information that they did not have."  Ansin v. River Oaks Furniture, Inc., 105 F.3d 745, 754 (1st Cir. 1997) (quoting Holmes v. Bateson, 583 F.2d 542, 558 (1st Cir.1978)).  In other words, the presumption relieves plaintiffs of the "difficult[]" task "of proving a 'speculative negative'--that the plaintiff relied on what was not said."  In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig., 2 F.4th 1199, 1204 (9th Cir. 2021) (internal quotation omitted).

The Affiliated Ute presumption is inapplicable here because the fraudulent concealment claim at issue does not "primarily" rest on "a failure to disclose."  406 U.S. at 153 (emphasis added).  The complaint alleges that Sig Sauer affirmatively misrepresented the drop safety of the P320, particularly on its website, and that Ortiz (and potentially other class members) reasonably relied on these false statements when deciding to purchase the pistol.  The fraudulent concealment claim is centered on Sig Sauer's failure to disclose the drop defect—an omission

---

[55] Pl.'s Supp. Br. (doc. no. 98) at 15.

that is directly related to, and simply the flip side of, the alleged drop safety misrepresentations.

Since Ortiz alleges that Sig Sauer made affirmative misstatements regarding drop safety, Ortiz

and the class do not face the difficult task of proving reliance on information they did not

receive; thus, the Affiliated Ute presumption is unavailable to them.  See In re Volkswagen, 2

F.4th at 1208-09 ("while fraud necessarily involves concealing the truth, we cannot allow such

concealment to transform affirmative misstatements into implied omissions"); Waggoner v.

Barclays PLC, 875 F.3d 79, 96 (2d Cir. 2017) (noting that "the omissions the Plaintiffs list in

their complaint are directly related to the earlier statements Plaintiffs also claim are false[,]" and

"the Affiliated Ute presumption does not apply to earlier misrepresentations made more

misleading by subsequent omissions, . . . []or . . . misstatements whose only omission is the truth

that the statement misrepresents"); Kenney v. State St. Corp., 754 F. Supp. 2d 288, 292 (D.

Mass. 2010) (concluding that the plaintiff cannot "circumvent the requirement to prove

detrimental reliance by recasting his [negligent misrepresentation] claim as one for

nondisclosure").[56]

---

[56] The law is unsettled regarding the full extent to which the Affiliated Ute presumption can be
applied outside of the securities fraud context.  Compare Ansin, 105 F.3d at 754 (acknowledging
that reliance on material omissions can be presumed in a common law fraud claim related to a
securities transaction), and In re Tyco, 2006 WL 2349338, at *6 (finding that "the logic of
Affiliated Ute lends itself equally well to" the plaintiffs' Employee Retirement Income Security
Act breach of fiduciary duty claim "because it would be practically impossible for plaintiffs to
prove that they relied on information that was never provided to them" (internal quotation
omitted)), with Brinker v. Chicago Title Ins. Co., No. 8:10-CV-1199-T-27AEP, 2012 WL
1081211, at *13 (M.D. Fla. Feb. 9, 2012), report and recommendation adopted, 2012 WL
1081182 (M.D. Fla. Mar. 30, 2012) (refusing to apply Affiliated Ute to presume class-wide
reliance in a breach of contract claim involving fraud because "Plaintiffs have presented no legal
authority or other justifiable argument to extend the Affiliated Ute presumption of reliance
outside the context of a securities litigation to the instant case.").  The court need not decide
whether the presumption applies to the type of claim that Ortiz asserts, since Sig Sauer does not
dispute the applicability of the presumption on these grounds, and the court finds the
presumption inapplicable regardless, based on the facts of the case.

Further, even if the class-wide presumption of reliance was applicable, the predominance inquiry would not end there.  As Sig Sauer points out, it would have the right to rebut the presumption by demonstrating that individual class members would have purchased the P320 even if they knew of the drop defect.  See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 159 (2008) (describing the Affiliated Ute presumption as a "rebuttable presumption of reliance").  Importantly, both the evidence in the record and logic guide that such an argument would be reasonable and available to Sig Sauer.  See Bais Yaakov of Spring Valley v. ACT, Inc., 12 F.4th 81, 89 (1st Cir. 2021) ("In deciding whether individual issues predominate over common questions, a court . . .  should consider only those issues that would likely arise if an individual class member's claims were being adjudicated on the merits.").

For example, as previously noted, more than 50% of the P320 pistols with the alleged drop fire defect were not upgraded through the VUP as of May 2021.  While some non-participating P320 owners may have been unaware of the VUP or faced barriers to participation, the record indicates that some P320 owners knew about the VUP and chose not to participate because they were "okay with the firearm as it was."[57]  It is plausible, for example, that the non-participants saw no need to upgrade the pistol because they did not purchase the P320 with the expectation of drop safety, or because the press release launching the VUP specified that the P320 still satisfied ANSI/SAAMI, NIJ, and other safety and testing protocols.  It stands to reason that, if some individuals chose not to participate in the VUP upon learning of the defect, some individuals also would have bought the P320 if they knew of the defect prior to the purchase.  Ultimately, if Sig Sauer were to provide individualized proof rebutting the presumption of reliance "as to a sizable portion of a purported class, individual showings of reliance would

---

[57] See Manning Dep. (doc. no. 51-9) at 99:9-10.

effectively foreclose the plaintiffs' ability to satisfy Rule 23(b)(3)'s predominance requirement."
Levy v. Gutierrez, 448 F. Supp. 3d 46, 56 (D.N.H. 2019).

In sum, reliance is an individual issue, which defeats predominance.  The court therefore
denies the motion to certify any class as to the fraudulent concealment claim.

### G. Superiority

In addition to predominance, Rule 23(b)(3) requires that a "class action [be] superior to
other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.
23(b)(3).  When assessing superiority, courts consider, in pertinent part, "the likely difficulties in
managing" the case in a class format.  Id.

As discussed above, the adjudication of the class's unjust enrichment and fraudulent
concealment claims requires individualized inquiries into numerous legal and factual issues.
These individualized assessments create manageability issues that foreclose a finding of
superiority.  See In re Celexa & Lexapro Mktg. & Sales Pracs. Litig., 325 F.R.D. 529, 540-41
(D. Mass. 2017) (finding that plaintiffs asserting Racketeer Influences and Corrupt Organizations
Act claims did not satisfy the superiority requirement because "resolution of the claims will
require an individualized assessment of whether the drugs would have been prescribed but-for
the off-label promotions and whether the drugs were effective[,] . . . present[ing] serious issues
of manageability.").  Ortiz argues that class treatment is superior because individual class
members would not pursue their low-value claims outside of the class mechanism.  While the
court is sensitive to this argument, it finds that it is counterbalanced by the (at least partial) relief
offered under the VUP, and it is outweighed by manageability concerns.

IV.   **Conclusion**

For the reasons stated above, Ortiz's motion for class certification[58] is DENIED.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: February 10, 2023

cc:    Joshua Arisohn, Esq.
       Neal J. Deckant, Esq.
       Charles G. Douglas, III, Esq.
       Brent Dwelkotte
       Benjamin B. Folsom, Esq.
       Brian Keith Gibson
       Robert L. Joyce, Esq.
       Benjamin T. King, Esq.
       Joseph Marchese, Esq.
       Michael J. Quinn, Esq.

---

[58] Doc. no. 40.